# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ATUL SHAH, AMITA SHAH, SHAILENDRA PRASAD, JOSHUA BOUCK, SHENWEI ZHAO, and ADAM SPRING, individually on behalf of themselves and all others similarly situated, | |
| Plaintiffs, | Case No. 26-cv-823 |
| v. | **CLASS ACTION COMPLAINT** |
| CHINA LIBERAL EDUCATION HOLDINGS LTD., NGAI NGAI LAM, WENHUAI ZHUANG, FANGZHONG SUN, NGO YIN TSANG, WANDONG CHEN, XIAONAN LIU, XINYU DENG, TRANSHARE CORPORATION, ASCENT INVESTOR RELATIONS LLC, TINA XIAO, EVER ALPHA GLOBAL LIMITED, LIM XIANG JIE CEDRIC, MING-SHEN CHENG, KING SUNG WONG, KO SEN CHAI, SIONG WEE VUN, CHIEN LUNG MA, KOK WAH WONG, and YAN ZHAO, | **JURY TRIAL DEMANDED** |
| Defendants. | |

Plaintiffs Atul Shah, Amita Shah, Shailendra Prasad, Joshua Bouck, Shenwei Zhao, and Adam Spring (together, "Plaintiffs"), by and through their undersigned counsel, allege the following for their complaint against Defendants China Liberal Education Holdings Ltd. ("CLEU" or the "Company"), Ngai Ngai Lam, Wenhuai Zhuang, Fangzhong Sun, Ngo Yin Tsang, Wandong Chen, Xiaonan Liu, Xinyu Deng, Transhare Corporation ("Transhare"), Ascent Investor Relations LLC ("Ascent"), Tina Xiao, Ever Alpha Global Limited ("Ever Alpha"), Lim Xiang Jie Cedric, Ming-Shen Cheng, King Sung Wong, Kian Nig Chung, Ko Sen Chai, Siong Wee Vun, Chien Lung Ma, Kok Wah Wong, and Yan Zhao (collectively, "Defendants"). Plaintiffs make the following allegations upon knowledge as to themselves and their own actions, and upon information and belief as to all other matters. Plaintiffs' information and belief is based on, among other things, the independent investigation of counsel, which includes, but is not limited to: (a) review of CLEU's filings with the United States Securities and Exchange Commission (the "SEC"); (b) review of media reports about the Company; (c) review of public filings and court orders in other litigation relating to the fraudulent scheme alleged herein (the "CLEU Scheme") and related schemes conducted by the same criminal syndicate; and (d) discussions with, surveys of, and review of documents and information provided by more than 500 victims of the fraudulent scheme (the "CLEU Victim Group").

## **INTRODUCTION**

1.     This action arises from a brazen fraud carried out by a criminal syndicate of scammers using social media to orchestrate pump-and-dump schemes involving NASDAQ-listed shares of little-known and thinly-traded Chinese companies, with the active cooperation of the companies' management and service providers.

2.     This particular iteration of the scheme involves securities of CLEU, a Chinese educational services and technology company that publicly listed on NASDAQ in May 2020.

3.     Shortly after its public listing, CLEU's business faltered due to the impact of the COVID-19 pandemic, regulatory changes in China that sharply curtailed the cross-border partnerships with international universities that were central to CLEU's business, and a failed attempt to diversify into operations of domestic Chinese universities.

4.     By the end of 2023, two of CLEU's principal business lines had been entirely eliminated, it had abandoned its foray into domestic university operations, and its remaining businesses could not be operated profitably.

5.     With its business failing, CLEU's  most valuable remaining asset was its public listing, which provides much-coveted access to the U.S. capital markets. CLEU's management, led by Defendant Lam, the Company's Chief Executive Officer ("CEO"), set about trying to monetize that asset.

6.     Defendant Lam first negotiated a reverse-merger agreement with AIWAYS, a Chinese electric vehicle company, pursuant to which AIWAYS would merge into CLEU—thereby becoming a publicly listed company—and the surviving entity would focus its operations on AIWAY's electric vehicle business. However, the merger fell apart due to AIWAYS' struggles to gain traction in the highly competitive electric vehicle market, and the parties ultimately agreed to terminate their agreement.

7.     With the failure of the AIWAYS merger, CLEU management turned to illegitimate means of obtaining value for the Company's public listing—coordinating with criminal scammers to carry out a pump-and-dump scheme involving the Company's shares.

8.     In a modern-day take on the classic boiler room operation, the scammers first recruited victims through advertisements on the Facebook and Instagram social media platforms promoting supposed investment clubs associated with celebrities, well-known investors, and advisory firms.

9.     Victims who clicked on the ads were then added to groups on the WhatsApp messaging platform. Within the WhatsApp groups, the scammers posed as financial advisors and encouraged victims to purchase securities whose prices the scammers were manipulating so that their co-conspirators could unload their holdings at artificially inflated prices, reaping massive, illicit profits.

10.     In or around the fall of 2024, Defendants determined to utilize CLEU shares in one such pump-and-dump scheme.

11.     In furtherance of the scheme, CLEU management caused the Company to issue millions of shares of CLEU stock and warrants to the scammers in December 2024 through a non-bona fide offering. CLEU management then agreed on December 31, 2024 to exchange the previously issued warrants for 240 million additional CLEU shares, giving the scammers a stockpile of more than 250 million shares to use in their fraudulent scheme.

12.     Even worse, CLEU management, with the complicity of the Company's transfer agent (Transhare) and investor relations firm (Ascent), actively concealed for more than a month that the 240 million shares had been issued and were available to be traded in the market, misleadingly stating that the additional shares would be issued at an unspecified future date, and waiting until the end of January 2025 to inform the SEC and NASDAQ that the shares had been issued. As a result, the Company was able to regain apparent compliance with NASDAQ listing standards, ensuring its shares remained readily available for purchase by unsuspecting retail

investors, and for nearly the entirety of the month of January 2025, the market believed that that were only 29 million CLEU shares outstanding, when the actual share count was nearly ten times as much.

13.    During this critical window, scammers in the WhatsApp groups began recommending that Plaintiffs and other victims purchase CLEU shares. Using a fake analyst report and other materials, the scammers touted the strength of the Company's business and a soon-to-be-completed merger with a U.S.-based education company that would lead to "explosive growth" in CLEU's share price.

14.    The scammers instructed victims to make purchases of CLEU shares at specified price points. Meanwhile, their co-conspirators, who held the secretly issued 240 million CLEU shares, entered sell orders at matching price points, thereby liquidating their massive—and previously undisclosed—stockpile of CLEU shares in exchange for the victims' cash.

15.    Then, in the early hours of January 30, 2025, the market became aware of CLEU's previously secret share issuance.

16.    The stock price immediately collapsed, and Plaintiffs and other victims of the scheme lost hundreds of millions of dollars they had invested in CLEU shares. Plaintiffs estimate total losses to the proposed Class to be in excess of $300 million.

17.    Plaintiffs bring this action on behalf of themselves and a proposed Class of all victims of the alleged scheme. Plaintiffs' claims arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, and under the Civil Remedies provision of the Racketeer Influenced and Corrupt Organizations Act ("Civil RICO"), 18 U.S.C. § 1964. Plaintiffs seek compensatory damages, treble damages, interest, costs and fees, including attorneys' fees.

18.    The facts supporting Plaintiffs' claims are set forth below, and Plaintiffs anticipate that substantial additional evidentiary support for their claims and allegations will exist after a reasonable opportunity for discovery.

## **THE PARTIES**

19.    Plaintiff Atul Shah immigrated to the United States to study chemistry, ultimately earning Masters degrees in Chemistry and Business Administration, and he now operates a small drycleaning business. Plaintiff Atul Shah resides in Georgia with his wife, Plaintiff Amita Shah, who is a retired pharmacist. The Shahs were lured into the CLEU Scheme through Facebook advertisements and were led to purchase shares of CLEU beginning on January 23, 2025, as set forth in the attached certifications. The Shahs together lost approximately $1.8 million, including all of the retirement savings they had accumulated over the last 30 years.

20.    Plaintiff Shailendra Prasad previously worked at a private investment firm and resides in California. Plaintiff Prasad was lured into the CLEU scheme through Facebook advertisements and was led to purchase shares of CLEU beginning on January 23, 2025, as set forth in the attached certification. Plaintiff Prasad lost virtually his entire life savings, totaling more than $1.4 million. Plaintiff Prasad has been forced to take out a home equity loan to continue pay for his daughter's college tuition, his family's mortgage, and other living expenses.

21.    Plaintiff Joshua Bouck is a Fire Captain in Los Angeles County and resides in California. Plaintiff Bouck was lured into the CLEU Scheme while he was fighting the Southern California wildfires. Plaintiff Bouck was led to purchase shares of CLEU beginning on January 22, 2025, and he lost more than $850,000, as set forth in the attached certification. Plaintiff Bouck has taken out a home equity loan and has been working endless overtime to recover his losses, depriving him of precious time with his three young children.

22.     Plaintiff Shenwei Zhao is the founder of an information technology consulting firm with a background in systems engineering and resides in New Jersey. Plaintiff Zhao was lured into the CLEU Scheme through Facebook advertisements and was led to purchase shares of CLEU in his investment and retirement accounts beginning on January 23, 2025, as set forth in the attached certification. Plaintiff Zhao lost more than $240,000 (with an additional $30,000 in losses through investments on behalf of his wife).

23.     Plaintiff Adam Spring is a Lieutenant Colonel in the United States Air Force who is stationed in North Carolina. Plaintiff Spring was lured into the CLEU Scheme through Facebook advertisements and was led to purchase shares of CLEU beginning on January 22, 2025, as set forth in the attached certification. Plaintiff Spring lost more than $136,000 (with an additional $7,000 in losses through investments on behalf of his wife), representing 20 years of retirement savings and nearly half of his liquid net worth.

24.     Defendant China Liberal Education Holdings Limited is an exempted company incorporated in the Cayman Islands. CLEU employs a variable interest entity ("VIE") structure, such that CLEU is a holding company that conducts its operations through its wholly owned subsidiaries, which are limited liability companies organized in the People's Republic of China ("PRC")—namely, China Liberal (Beijing) Education Technology Co., Ltd. ("China Liberal Beijing") and Beijing Oriental Wisdom Culture Development Co., Ltd. ("Oriental Wisdom"). CLEU was formed in February 2019 to access the U.S. capital markets to obtain funding for its subsidiaries' operations. The Company conducted an initial public offering ("IPO") in May 2020, and thereafter its so-called "Ordinary Shares" were publicly traded on the Nasdaq Capital Market ("NASDAQ") under the ticker "CLEU" until they were delisted in June 2025. Following delisting, the Company's shares trade on the OTC Pink Current Market under the ticker "CLEUF." As a

foreign issuer, prior to its delisting, CLEU filed annual reports with the SEC on Form 20-F, as well as periodic reports on Form 6-K to disclose material events and developments.

25.     Defendant Ngai Ngai Lam ("Lam") has been the Chair of CLEU's Board of Directors (the "Board") since July 2020. Lam has been the Company's co-CEO since January 15, 2025, and previously, she was the Company's CEO since July 2020. Lam also has been the Chair of the Company's subsidiary, China Liberal Beijing, since 2015. Lam was designated CLEU's "Principal Executive Officer" for purposes of the Company's filings with the SEC during the relevant time period.

26.     Defendant Wenhuai Zhuang ("Zhuang") has been CLEU's Chief Financial Officer since April 2019, and he also serves as Chief Finance Officer for the Company's subsidiary, China Liberal Beijing. Zhuang was designated CLEU's "Principal Financial Officer" for purposes of the Company's filings with the SEC during the relevant time period.

27.     Defendant Fangzhong Sun ("Sun") has been a member of CLEU's Board since February 2022, and has been the Chief Education Specialist and a director of the Company's subsidiary, China Liberal Beijing, since June 2014. Sun also has served as an expert at the PRC Ministry of Education since June 2004. Sun has held multiple leadership positions with Chinese universities, including serving as President of Minjiang Vocational University, which he helped to form.

28.     Defendant Ngo Yin Tsang ("Tsang") has been a member of CLEU's Board since May 2020. Tsang has been the executive director of Good Talent Limited, a Hong Kong-based staffing and recruiting company, since April 2014. Tsang also serves as a director and corporate secretary, respectively, of LKS Holding Group Limited and Zhouxin International Holdings Limited, both of which are public companies listed on the Hong Kong Stock Exchange. Tsang has

a Master's degree in Law, is a CPA, and claims to have more than 18 years of experience in auditing, accounting, corporate governance monitoring, and financial management.

29.    Defendant Wandong Chen ("Chen") has been a member of CLEU's Board since July 2021. Chen is a partner with the Beijing-based accounting firm Moore Stephens Da Hua CPAs, which is one of China's ten largest accounting firms. Chen claims to have more than 17 years of experience in accounting and finance.

30.    Defendant Xiaonan Liu ("Liu") has been a member of CLEU's Board since August 2024. Liu's background is in finance, and he currently is an investment manager with Dongkai Assets Management Co., Ltd., a Chinese asset management company. Previously, Liu was an investment manager with CITIC Securities, where he was responsible for developing and implementing investment strategies for high-net-worth individuals and institutional clients.

31.    Defendant Xinyu Deng ("Deng") was a member of CLEU's Board from July 2021 until August 2024, at which point she resigned for unspecified "personal reasons." Deng was Chief General Counsel of Baomihua.com, a Chinese online video platform (akin to YouTube, but focusing on the Chinese market), and previously practiced as an attorney with two Beijing-based law firms.

32.    Defendants Lam, Zhuang, Sun, Tsang, Chen, Liu, and Deng are collectively referred to herein as the "Director and Officer Defendants," and together with Defendant CLEU, they are referred to herein as the "CLEU Defendants."

33.    Defendant Transhare Corporation is a transfer agent registered with the SEC. Transhare markets itself as a "full service stock transfer agency and registrar specializing in serving publicly traded micro-cap, small-cap and mid-cap companies," and it frequently acts as transfer agent to PRC-based companies with public listings in the United States. Transhare has acted as

transfer agent for CLEU at all times relevant to this action. Since 2019, Transhare has been wholly owned by J&C Issuer Services, LLC, a Florida limited liability company formed by Transhare's President Jinlong Liu. Transhare's principal office is in Clearwater, Florida.

34.    Defendant Ascent Investor Relations LLC is an investor relations and corporate communications firm with offices in New York City, Beijing, and Han Zhou, China. Ascent acted as investor relations consultant for CLEU during the time period relevant to Plaintiffs' claims. In that capacity, Ascent drafted and disseminated false and misleading press releases in furtherance of the CLEU Scheme. Ascent also has acted as investor relations consultant to numerous other non-U.S. companies listed on NASDAQ whose shares have been used in pump-and-dump scams during the last two years, including Park Ha Biological Technology Co., Solowin Holdings Limited, Springview Holdings Limited, Ten-League International Holdings Limited, DarkIris, Inc., and at least a dozen others. Ascent's website claim the firm's "Team" consists of six individuals.[1] However, at least two of the individuals appear to employees of different companies who have no actual affiliation with Ascent, but whose photos and biographical information were scraped from public sources and repurposed for the Ascent website, and a third has not been affiliated with Ascent for more than six years.[2]

---

[1] https://ascent-ir.com/ourTeam.html.

[2] Purported Vice President Terrence DeFranco actually is the Chairman and CEO of Iota Communications, Inc. and has no known affiliation with Ascent. See https://www.linkedin.com/in/tmdefranco/. Purported Associate Eva Xing actually is a Senior Manager of Credit Risk Management at American Express and has no known affiliation with Ascent. See https://www.linkedin.com/in/yiwei-eva-x-958994b2/. And purported Director Nicolas Palar actually is a Senior Analyst for Cirrus Research and has not been affiliated with Ascent since 2019. See https://cirrus-res.com/OurTeam; https://www.linkedin.com/in/nicolas-palar/.

35.  Defendant Tina Xiao is the Founder and President of Ascent. Xiao was personally involved in drafting and disseminated false and misleading press releases on behalf of CLEU in furtherance of the CLEU Scheme.

36.  Defendant Ever Alpha Global Limited is a British Virgin Islands company, which is 100% owned and controlled by Defendant Lam. Defendant Lam used Ever Alpha as a vehicle to hold shares of CLEU stock.

37.  Defendants Lim Xiang Jie Cedric ("Cedric"), Ming-Shen Cheng ("Cheng"), Ko Sen Chai ("Chai"), King Sung Wong ("K.S. Wong"), Siong Wee Vun ("Vun"), Chien Lung Ma ("Ma"), and Kok Wah Wong ("K.W. Wong") (collectively, the "*Cedric* Indictees") are residents of Malaysia and Taiwan and are the subject of a criminal indictment in the matter of *United States v. Cedric, et al.*, Case No. 1:25-cr-161 (N.D. Ill. Mar. 20, 2025), which arises out of the CLEU Scheme. As alleged in more detail below, the *Cedric* Indictees, along with their co-conspirators, perpetrated the CLEU Scheme by, among other things, receiving millions of CLEU shares through non-bona fide offerings and selling those shares beginning on or around January 22, 2025, while the price of CLEU shares was artificially inflated, resulting in more than $334 million in illicit profits for the *Cedric* Indictees. The United States government has seized and sought forfeiture of approximately $214 million of the proceeds of the *Cedric* Indictees' sales.

38.  Defendant Yan Zhao ("Zhao") is a Chinese national who holds himself out as a financial advisor. Zhao utilizes various aliases, including "Hank Shi," "Hank Shu," "Altman," and "Bob." Zhao is the subject of a criminal indictment in the matter of *United States v. Zhao, et al.*, Case No. 1:25-cr-259 (E.D. Va. Sept. 10, 2025), which arises out of multiple interrelated stock manipulation schemes, including the CLEU Scheme. Zhao was instrumental in conceiving of and carrying out the CLEU Scheme and other related stock manipulation schemes. Among other

things, Zhao, in conjunction with Defendants Lam, orchestrated non-bona fide securities offerings to put CLEU shares in the hands of the *Cedric* Indictees and their co-conspirators, and facilitated manipulative trading in CLEU shares on behalf of his clients (which include the *Cedric* Indictees and their co-conspirators) by opening brokerage accounts and providing trading instructions on their behalf. Zhao performed similar acts in connection with similar schemes involving securities of other Chinese companies, including Ostin Technology Group Co., Ltd. ("OST"), Jayud Global Logistics Ltd. ("JYD"), and Pheton Holdings Ltd. ("PTHL").

## JURISDICTION AND VENUE

39.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, 15 U.S.C. § 78aa, and 18 U.S.C. § 1964(c).

40.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and 15 U.S.C. § 78aa. Substantial acts in furtherance of the alleged fraudulent scheme occurred in this District. Many of the acts alleged herein, including the dissemination of false and/or misleading information, and the execution of abusive and manipulative trading activity on the NASDAQ exchange, occurred in substantial part in this District. In addition, the Company's agent for service of process, Cogency Global Inc., is located in this District.

41.    In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the internet, interstate telephone communications, and facilities of a national securities exchange.

## SUBSTANTIVE ALLEGATIONS

### A.    CLEU's Business

42.    CLEU's publicly stated mission is "to provide China's students with the tools to excel in a global environment." The Company purportedly has sought to accomplish its mission

through educational services for Chinese students and technology consulting services for Chinese colleges and universities.

43.     CLEU claims to have operated five business lines since becoming a public company in May 2020: (a) Sino-foreign Jointly Managed Academic Programs ("JMAPs"); (b) Textbook and Course Material Sales ("Textbooks"); (c) Overseas Study Consulting Services ("Overseas Study"); (d) Technological Consulting Services for Smart Campus Solutions ("Campus Technology"); and (e) Integration of Enterprises and Vocational Services ("Vocational Training"). The Company also claims to have briefly operated two colleges in the PRC.

44.     However, shortly after the Company's public listing, its business began to falter due to market and regulatory developments, and by the end of 2023, it was clear the Company could not operate profitably.

### 1.     JMAPs

45.     Historically CLEU's principal business line, JMAPs are joint ventures between Chinese and foreign institutions, which enable students to begin their studies at the Chinese institution and then complete their studies at the foreign institution.

46.     Through JMAPs, Chinese students are able to obtain a degree from a foreign university at lower cost compared to completing their full course of study at the foreign university. JMAPs also provide training in language and other skills to prepare students for study at a foreign university.

47.     CLEU partnered with Chinese institutions offering JMAPs to develop course content, assist with recruitment of faculty, and consult with students to ensure they obtained appropriate course credit to complete their degrees.

48.     China Liberal Beijing has provided services to JMAPs since 2012, and JMAPs accounted for the majority of CLEU's revenues each year prior to 2023.

49.     However, amidst increasing scrutiny from Chinese authorities, two of the five JMAP programs were put into run off shortly before the Company's public listing, and by September 2023, the remaining programs had been discontinued, entirely eliminating this important revenue stream.

### 2.     Textbooks

50.     In addition to revenues from JMAP program fees, the Company also has generated revenues from the sale of textbooks and course materials developed in conjunction with its services to JMAPs.

51.     Revenues for the Textbooks business are de minimis, never generating more than $50,000 in any given year since 2018. In two of the last three reporting years (2021 and 2023), revenues from the Textbooks business were nil.

### 3.     Overseas Study

52.     CLEU's Overseas Study business provides consulting services to assist Chinese students desiring to study outside of the PRC.

53.     CLEU launched the Overseas Study business in 2017, and it initially included both private, one-on-one consulting services to individual students and on-campus services to assist students enrolled in foreign language programs at various universities in the PRC.

54.     CLEU discontinued providing private consulting services in 2020 due to the impact of the COVID-19 pandemic.

55.     The on-campus programs were then terminated in January 2023 in response to guidance from the PRC Ministry of Education directing Chinese institutions to cease projects and cooperation with external parties.

56.     As a result, CLEU's revenues from its Overseas Study business fell sharply in 2020 and 2021, before recovering modestly in 2022, and then falling to $0 in 2023.

### 4.     Campus Technology

57.     Also launched in 2017, CLEU's Campus Technology business includes the buildout of campus intranet solutions, installation and testing of smart devices on campus, customization of school management software, and school management data collection and analysis for Chinese universities.

58.     CLEU claimed to have some initial success in attracting large-scale Campus Technology projects, such as development of a comprehensive business system for one university spanning registrar administration, teaching resource databases, mobile online learning systems, and human resources, and the build out of a "smart campus" solution, including software and hardware procurement, for another university.

59.     CLEU reported meaningful revenues from these large-scale projects in the lead up to the Company's public listing in 2020, but the projects stopped generating revenues shortly thereafter.

60.     CLEU's more recent Campus Technology projects are decidedly more modest, with the Company's annual report for calendar year 2023 mentioning only the sale of a single large-format display (*i.e.*, a big computer screen) in January 2023.

61.    As a result of the Company's failure to generate large-scale projects in recent years, Campus Technology revenues declined sharply, falling to approximately $683,000 in 2023 from a peak of more than $2.2 million in 2019.

### 5.    Vocational Training

62.    Launched in 2019, CLEU's Vocational Training business involves partnerships with Chinese vocational schools and colleges to provide job readiness training to graduating students.

63.    Utilizing the partner schools' administrative resources and classroom facilities, CLEU recruits faculty and develops course materials and content to help students improve their technical and social skills and assists with job placement. In exchange, CLEU receives a portion of the program fees from the partner schools.

64.    Revenues attributed to the Vocational Training business have grown steadily, with CLEU receiving $2.2 million in revenue in calendar year 2023, but those revenues have been insufficient to offset declines in CLEU's other businesses.

### 6.    College Services

65.    In addition to the above business lines, CLEU briefly operated two Chinese colleges: Fuzhou Melbourne Polytechnic ("FMP") and Strait College of Minjiang University ("Strait College"). The revenues from FMP and Strait College were short-lived, contributing to the Company's financials only in 2022.

66.    CLEU acquired the rights to operate FMP and Strait College through its acquisition of Wanwang Investment Limited ("Wanwang") in September 2, 2022.

67.    The business performance of the colleges was unsatisfactory, producing virtually no profits for CLEU, despite generating more than $6.0 million in revenues in 2022.

68.    The Company also anticipated that it would be unable to continue operating and exercising control over the colleges due to expected changes in PRC government policies.

69.    Accordingly, in December 2023, the Company agreed to transfer its equity interest in Wanwang to Xiaoshi Huang, one of Wanwang's previous owners, for $40 million.

70.    Xiaoshi Huang assumed Wanwang's results of operations effective September 1, 2023, and CLEU no longer receives any revenue from operation of FMP or Strait College.

### B.    The Company's Business Deterioration Leads to Financial Struggles and a Declining Stock Price

71.    When CLEU went public in 2020, it claimed to be a modestly profitable business, reporting profits of more than $1.2 million for the year, despite the impact of the COVID-19 pandemic.

72.    However, as the JMAPs, Overseas Study, and Technology Consulting businesses declined amidst poor performance and legal challenges in the early 2020s, the Company's revenues declined to the point that it was unable to operate profitably, even as the Vocational Training business purportedly experienced some success.

73.    The Company posted a net loss of more than -$1.2 million in 2021, which grew to -$1.7 million in 2022, and then ballooned to -$5.0 million in 2023.

74.    Even worse, the Company had virtually no prospects of returning to profitability because its core JMAPs and Overseas Study businesses were effectively eliminated by the Chinese government's tightening of restrictions on collaboration with foreign universities, and its move into operating Chinese universities failed out of the gate.

75.    As CLEU's business declined, so too did its stock price. In September 2020, CLEU stock traded at $6.15 per share, but by July 2021, the price had fallen to less than $2.00.

76.     By January 2023, CLEU's stock price had fallen below NASDAQ's minimum price requirement of $1.00 per share, and the Company received a notice from NASDAQ that its shares were at risk of delisting.

### C.     The Company Negotiates and Then Abandons a Merger with AIWAYS

77.     Faced with declines in the Company's core businesses and a rapidly falling stock price, CLEU's management, led by Defendant Lam, negotiated a merger agreement with AIWAYS Holdings Limited ("AIWAYS"), an electric vehicle company based in China, in November 2022.

78.     Pursuant to the merger agreement, AIWAYS would merge into CLEU; AIWAYS shareholders would receive publicly listed CLEU shares; and CLEU would transition its business to focus primarily on developing and manufacturing electric vehicles and batteries.

79.     Given that CLEU had no electric vehicle assets, experience, or expertise of its own, the principal benefit of the merger for AIWAYS was that it could leverage CLEU's NASDAQ listing to become a publicly traded company with access to the U.S. capital markets.

80.     Underscoring that CLEU's prior operations would contribute little or nothing to the business of the post-merger company, under the terms of the merger agreement, former AIWAYS shareholders would own 99.2% of the post-merger company, with legacy CLEU shareholders owning just 0.8%.

81.     The planned merger was terminated in April 2023 because AIWAYS faced difficulties in the highly competitive Chinese electric vehicle market, leading it to halt production at its electric vehicle manufacturing facility in Shangrao, China in February 2023.

**D.**    **The Company Executes a Share Consolidation to Preserve Its Public Listing**

82.    With the prospect of the AIWAYS merger in early 2023, CLEU's stock price recovered to above $1.00 per share following the January 2023 NASDAQ notice.

83.    However, with the failure of the AIWAYS merger, CLEU's stock price declined again, and by September 2023, it had fallen back below NASDAQ's $1.00 per share listing threshold.

84.    After receiving another notice from NASDAQ that its shares were at risk of being de-listed, the Company proposed a 1-for-15 reverse share split (or consolidation) to boost its share price.

85.    The proposal was approved by CLEU shareholders on November 30, 2023, and it took effect on January 19, 2024.

86.    Following the share consolidation, CLEU had approximately 3.4 million shares outstanding.

**E.**    **The Company Issues Shares to Purchasers Hand-Selected by Defendant Lam**

87.    In May 2024, the Company announced that it planned to conduct a private offering (the "June 2024 Issuance") of up to 25,000,000 shares—or more than seven times the number of previously outstanding shares—at an offering price of $1.00 per share, with anticipated net proceeds of $24.8 million.

88.    Approximately 10,000,000 shares were to be issued to Defendant Lam, while the remaining 15,000,000 shares would be sold "through [Defendant Lam] to her friends, acquaintances and business associates."

89.    The Company completed the offering on June 20, 2024.

90.     Defendant Lam, directly and indirectly through Ever Alpha, purchased 10,000,000 shares, as previously announced. The Company did not disclose the identity of the purchasers of the other 15,000,000 shares selected by Defendant Lam.

91.     On June 18, 2024, the last trading day prior to closing of the June 2024 Issuance, CLEU's stock closed at $2.80 per share. As a result, given the offering price of $1.00 per share, Defendant Lam, Ever Alpha, and Lam's hand-selected purchasers acquired shares at a more than 64% discount to the then-current trading price.

### F.     The Company Again Faces Delisting After Defendant Lam and Her Hand-Selected Purchasers Dump Their Newly Issued Shares

92.     Less than two weeks after the closing of the June 2024 Issuance, CLEU shares experienced a heavy sell-off, beginning on July 3 and continuing through July 10, 2024.

93.     The Company's stock price declined from an opening price of $2.96 per share on July 3 to close at $0.39 per share on July 10, well below NASDAQ's minimum price requirement.

94.      Trading volume was well above average, peaking at 15.7 million shares on July 8. This volume of trades could be achieved only if Defendant Lam, Ever Alpha, and Lam's hand-selected purchasers unloaded their shares during the sell-off.

95.     The Company's shares continued to trade well below the $1.00 per share minimum bid requirement for the next several weeks, and on August 21, 2024, NASDAQ again notified the Company it was at risk of de-listing.

### G.     The Company Implements Another 15-for-1 Share Consolidation

96.     Despite facing delisting, on September 19, 2024, the Company issued an additional 250,000,000 shares to Defendant Lam and nine undisclosed purchasers at a price of $0.28 per share, raising $70 million in proceeds (the "September 2024 Issuance"). Defendant Lam, directly and indirectly through Ever Alpha, received 50,000,000 shares through the issuance.

19

97.     Given the offering price and the fact that the issuance represented nearly ten times the then-outstanding shares (approximately, 28.4 million shares), the September 2024 Issuance virtually guaranteed that the Company's share price would remain below NASDAQ's $1.00 per share minimum price requirement unless it conducted another share consolidation.

98.     Just weeks after the September 2024 Issuance, the Company again proposed a 15-for-1 share consolidation, which shareholders approved on November 25, 2024.

99.     The consolidation was scheduled to take effect on a date to be determined by the Board, but not later than February 17, 2025.

100.    In the meantime, on October 11, 2024, the Company issued a press release (the "October 11 Press Release") announcing financial results for the first six months of 2024. The October 11 Press Release was drafted by Ascent and identified Defendant Xiao as the Company's "Investor Relations Contact."

101.    The October 11 Press Release misleadingly characterized the Company as an ongoing business in the midst of a rebound, while failing to disclose that the CLEU Defendants had effectively abandoned the Company's operations in favor of attempting to monetize its public listing.

102.    For example, the October 11 Press Release touted "a resurgence in revenue" from the Textbooks business, which, in fact had produced a meager $13,476 during the period, and it emphasized a nearly $64 million increase in the Company's cash position, while failing to disclose that it did not have any means or plans to productively utilize the cash to generate returns for shareholders.

103.    The October 11 Press Release quoted Defendant Lam as saying:

> Those figures are a testament to the resilience of our business model and operations, and we expect to navigate short-term headwinds and

> resume our long-term growth trajectory. Looking forward, we remain confident in our business model and committed to translating our efforts into sustained growth and creating value for our shareholders."

104.    Defendant Lam's statements, and the October 11 Press Release as a whole, were false and misleading because Defendants were not working to "resume [the Company's] long-term growth trajectory," generate "sustained growth," or "create[e] value for . . . shareholders," but instead had determined to monetize the Company's public listing through illicit means.

105.    On December 20, 2024, the Company announced that the 15-for-1 share consolidation would take effect four days later on December 24, 2024.

**H.    The Company Conducts a Fraudulent Offering to Put Millions of Shares Into the Hands of the *Cedric* Indictees and Their Co-Conspirators**

106.    On December 23, 2024—the day before the 15-for-1 consolidation was to take effect—the Company announced an issuance of shares and warrants (the "December 2024 Issuance") to 30 purchasers whose identities were undisclosed at the time, but were later revealed to include the *Cedric* Indictees and their co-conspirators.

107.    Through the December 2024 Issuance, the Company issued 160,000,000 shares at a price of $0.13 per share. Participants also received warrants (the "Warrants") entitling them to purchase two additional shares for each share purchased in the issuance (*i.e.*, up to 320,000,000 shares).

108.    Setting aside the Warrants, the December 2024 Issuance increased the Company's total shares outstanding to approximately 438,800,000 shares, approximately one-third of which were held by the *Cedric* Indictees and their co-conspirators, and another approximately 60,000,000 were held by Defendant Lam directly or indirectly through Ever Alpha.

109.    Following the 15-for-1 consolidation—which took effect the day after the December 2024 Issuance—the number of shares outstanding was reduced to approximately 29,300,000 shares, with approximately 10,700,000 of those shares held by the *Cedric* Indictees and their co-conspirators, and another approximately 4,000,000 held by Defendant Lam directly and indirectly through Ever Alpha.

110.    As a result of the share consolidation, the Company's stock price increased from a close of $0.16 on December 23, to close at $2.70 per share on December 24, 2024.

111.    The December 2024 Issuance was not done for legitimate business purposes. Instead, the issuance was designed to put the Company's shares in the hands of the *Cedric* Indictees and their co-conspirators to be used in a fraudulent pump-and-dump scheme.

112.    The December 2024 Issuance was conducted pursuant to a prospectus supplement on Form 424B5 filed by the Company with the SEC on December 23, 2024 (the "December 2024 Prospectus").

113.    The December 2024 Prospectus misrepresented that the December 2024 Issuance was intended to raise $20.8 million in proceeds for "working capital and other capital expenditure purposes." In fact, however, the CLEU Defendants had no intention to using the proceeds of the offering for such purposes because they had effectively abandoned the Company's operations in favor of monetizing its public listing through illicit means. Further, even if Defendants were attempting to continue the business as a going concern, following the June and September 2024 Issuances, the Company had more than sufficient capital to fund its much diminished operations for years to come. Indeed, the Company had more than $84 million in cash on hand before the December 2024 Issuance, whereas its operating expenses for the prior year were less than $2.6 million. In other words, the Company already had sufficient cash on hand to fund its operations

for more than 32 years, making the December 2024 Issuance entirely unnecessary from a business perspective.

114.    The December 2024 Prospectus also failed to disclose that the *Cedric* Indictees and their co-conspirators were conducting a fraudulent investment scheme through social media and that the December 2024 Issuance was designed to issue shares to the *Cedric* Indictees and their co-conspirators for use in that scheme.

I.    **The Company Gifts the *Cedric* Indictees and Their Co-Conspirators Millions of Additional Shares, While Concealing Critical Information from the Market**

115.    The exercise price of the Warrants issued in conjunction with the December 2024 Issuance initially was set at $0.45 per share. However, on the seventh calendar day after the issuance (*i.e.*, December 30, 2024), the exercise price would be reduced to $0.04 per share, and the number of shares available to be issued upon exercise of the Warrants would increase to 3,600,000,000 (the "Reset Adjustment"), a more than ten-fold increase.

116.    The December 2024 Prospectus stated that the Warrants would be subject to "customary anti-dilution clauses and other exercise price adjustment mechanisms," and the Warrant Agreement expressly provided for the exercise price and the number of shares available to be issued to be adjusted to reflect any share split or consolidation by the Company.

117.    After giving effect to the Reset Adjustment and the 15-for-1 consolidation, the Warrants were exercisable to acquire 240,000,000 CLEU shares at an exercise price on $0.60 per share—nearly ten times the total number of post-consolidation shares outstanding.

118.    On December 31, 2024, the Company filed a Form 6-K with the SEC (the "December 2024 6-K") announcing that it had entered into a Warrant Exchange Agreement with

the holders of the Warrants (whose identities still were not disclosed). The December 2024 6-K was signed by Defendant Lam.

119.    Pursuant to the Warrant Exchange Agreement, the holders surrendered the Warrants in exchange for 240,000,000 CLEU shares (the "Exchange Shares"). The holders of the Warrants were not required to pay the exercise price or provide any other consideration to the Company in exchange for the Exchange Shares, other than surrendering the Warrants.

120.    In other words, the Company agreed to issue the shares that holders would be entitled to receive upon exercise of the Warrants, but the holders were not required to actually exercise the Warrants or pay the exercise price contemplated thereby. In effect, the Company gave the holders of the Warrants—*i.e.*, the *Cedric* Indictees and their co-conspirators—240,000,000 CLEU shares in exchange for no additional consideration, further demonstrating that the sole purpose of the December 2024 Issuance was to put CLEU shares in the hands of the *Cedric* Indictees and their co-conspirators, and not to raise capital.

121.    As with the December 2024 Prospectus, the December 2024 6-K failed to disclose that the *Cedric* Indictees and their co-conspirators were conducting a fraudulent investment scheme through social media and that the Warrant Exchange Agreement was designed to issue shares to the *Cedric* Indictees and their co-conspirators for use in that scheme.

122.    Defendants also misleadingly concealed the timing of the issuance of the Exchange shares pursuant to the Warrant Exchange Agreement to facilitate the use of those shares by the *Cedric* Indictees and their co-conspirators in their fraudulent scheme.

123.    Under the terms of the Warrant Exchange Agreement, Transhare, as the Company's transfer agent, was responsible for issuing the Exchange Shares to the holders of the Warrants following receipt of instructions from the Company.

124.    The Exchange Shares were issued to the *Cedric* Indictees and their co-conspirators on December 31, 2024.

125.    To conceal the fact that the Exchange Shares had been issued and were available to be traded in the market, the December 2024 6-K misleadingly stated that the Exchange Shares would be issued at an unspecified future date.

126.    Moreover, the CLEU Defendants did not advise the SEC of the issuance or comply with NASDAQ regulations (*i.e.*, NASDAQ Rule 5250(e)(1)) requiring that a Change in Shares Outstanding form be filed within 10 calendar days after the issuance of shares representing 5% or more of the company's shares outstanding.

127.    Likewise, despite having issued the shares in its capacity as transfer agent, Transhare did not timely announce or advise the SEC or NASDAQ of the issuance.

128.    The CLEU Defendants and Transhare did not publicly announce the issuance of the Exchange Shares until January 27, 2025, and they did not file the Change in Shares Outstanding form with NASDAQ until January 29, 2025.

129.    Because of the CLEU Defendants' and Transhare's failure to disclose the issuance of the 240,000,000 Exchange Shares, the market continued to believe through January 2025 that the Company had approximately 29,300,000 shares outstanding, when in fact the actual number of shares outstanding was nearly ten times as much at 269,300,000. As a result, the Company's stock price was artificially inflated throughout January 2025.

130.    The concealment of the issuance of the Exchange Shares and the artificial inflation of the Company's stock price enabled the Company to announce on January 13, 2025 that it had regained compliance with NASDAQ's minimum price requirement, ensuring CLEU shares remained listed and publicly tradeable.

131.    Indeed, on January 13, 2025, the Company issued a press release (the "January 13 Press Release"), which was drafted by Ascent and listed Defendant Xiao as the Company's "Investor Relations Contact." The January 13 Press Release stated that the Company had "effectuated a share consolidation on December 24, 2024" "to cure the Minimum Bid Price deficiency," and that the Company had regained compliance with NASDAQ's listing standards because it maintained "a closing bid price at or greater than US$1.00 per share for 10 consecutive business days from December 24, 2024 to January 8, 2025." The January 13 Press Release misleadingly failed to disclose the issuance of 240,000,000 Exchange shares on December 31, 2024 or that, if the issuance of those shares were known to the market, the Company's share price would be far below the NASDAQ minimum price requirement.

132.    The *Cedric* Indictees and their co-conspirators, along with Defendant Zhao, then used the Company's continued public listing and their secret holdings of 240,000,000 shares to carry out a pump-and-dump scheme through which they reaped hundreds of millions of dollars in profits at the expense of the Class.

**J.     The *Cedric* Indictees and Their Co-Conspirators Use
Social Media to Perpetrate a Pump-and-Dump Scheme**

133.    The *Cedric* Indictees and their co-conspirators first targeted potential victims with ads on Facebook and Instagram promoting fake investment clubs, which, in reality, were merely vehicles for the Scammers to execute a stock manipulation scheme.

134.    Some of the ads featured celebrities. For example, Plaintiff Bouck was targeted with ads featuring Kevin O'Leary, a/k/a "Mr. Wonderful" from Shark Tank, while other members of the CLEU Victim Group were targeted with ads featuring Dave Portnoy of Barstool Sports and conservative commentator Tucker Carlson.

135.    Other ads featured well-known investors. For example, Plaintiff Zhao was targeted with ads featuring Tom Lee, a featured commentator on CNBC programs, and Plaintiff Spring was targeted with ads featuring Liz Ann Sanders, Managing Director and Chief Investment Strategist at Charles Schwab. Other members of the CLEU Victim Group were targeted with ads featuring Savita Subramanian, Head of U.S. Equity and Quantitative Strategy at Bank of America Merrill Lynch, and Cathie Wood of ARK Invest.

136.    Still other ads appeared to be from reputable financial advisory firms whose likenesses, branding, and other information had been appropriated and exploited by the Scammers. For example, Plaintiff Bouck was targeted with ads that appeared to be for Sageview Capital, an investment firm based in Newport Beach, California, while other members of the CLEU Victim Group were target with ads seemingly for Circle Advisors, Blue Wolf Capital, and Viking Global Investments.

137.    The ads told targeted Facebook and Instagram users that investment club members would have access to stock recommendations from the featured financial advisors and promised that the recommendations would result in tremendous returns.

138.    For example, advertisements for "Mr. Wonderful Wealth Sharing" touted that the previous week's three stock recommendations were up 48%, 66%, and 108%, respectively.



139.    Another ad, purportedly for Ms. Subramanian's "trading training" program, promised potential returns of 30%-40% "everyday."



140. Facebook and Instagram users who clicked on the ads either were automatically added into, or were invited to click an embedded link to join, a private WhatsApp group.

141. Within the WhatsApp group, *Cedric* Indictees and their co-conspirators posed as representatives of the featured advisors and communicated with users regarding the club's operations, including the timing of stock recommendations.

142. For example, the purported financial advisor representatives in one group communicated that they would make two or three short-term recommendations each week, with returns of 10%-15% over a three- to seven-day holding period, and that they periodically would make medium- to long-term investment recommendations with profits exceeding 160%.

143. The *Cedric* Indictees and their co-conspirators also created dozens of fake accounts, posing as club members within the WhatsApp group and touting their prior successes following the advisors' recommendations, which created the appearance of legitimacy and reliability that helped lure victims into the scheme.

144. Users were offered a free trial period (typically 60 to 90 days) to try out the investment club, after which they would be charged commissions based on the returns they realized.

145. Then, over a period of months, the *Cedric* Indictees and their co-conspirators communicated with users in the WhatsApp group, providing investment recommendations and friendly communications to build trust.

### K. The *Cedric* Indictees and Their Co-Conspirators Solicit Purchases of CLEU by Plaintiffs and the Class Based on False and Misleading Information

146. On January 22, 2025, the *Cedric* Indictees and their co-conspirators, posing as financial advisor representatives, began recommending that WhatsApp group members purchase

shares of CLEU at specified price points. They predicted that the price of CLEU stock would appreciate significantly in the near future, typically promising returns of 380% within 20-30 days.

147.    The *Cedric* Indictees and their co-conspirators continued to recommend additional purchases of CLEU at higher price points over the coming days, pressuring victims to liquidate other investments, move cash from other accounts, and even take out loans to fund their purchases.

148.    The *Cedric* Indictees and their co-conspirators provided WhatsApp group members with a purported analyst report setting forth the investment case for CLEU stock.

149.    The analyst report forecast rapid growth in China's education industry, projecting that it "would double again in the next 5-6 years," becoming a $1.4 trillion dollar industry by 2030.

150.    The analyst report contained various false and misleading statements about the industry and the market opportunity available to CLEU. For example, the report represented that the Chinese government "emphasizes cooperation and exchanges with other countries in the field of education" and that CLEU "has extensive cooperation and exchanges in the field of international education and is able to provide students with international education services." In fact, however, the Chinese government recently had taken steps to curb cooperation with foreign universities, limiting opportunities for international education and leading CLEU to shutter its JMAPs and Overseas Study business lines.

151.    The analyst report also promoted a fictitious business combination between CLEU and Stride Inc., a U.S.-based online education company that the report claimed was seeking to enter the Chinese market by acquiring CLEU which "will surely lead to explosive growth." The analyst report predicted that CLEU's share price would rise to $22-$28 per share (approximately four times the current trading price) after the business combination was announced.

152.    The *Cedric* Indictees and their co-conspirators repeated similar claims in the WhatsApp groups, stating, for example, that their price target for CLEU was $20 per share or higher.

153.    The *Cedric* Indictees and their co-conspirators pressured victims to buy quickly, claiming that waiting even a few days would cause them to miss out on the stock's rise.

154.    The *Cedric* Indictees and their co-conspirators also promised to reimburse investors for up to 80% of any losses on the CLEU investment.

155.    In reliance on these false and misleading statements, Class members purchased shares of CLEU stock.

156.    Because hundreds, if not thousands, of victims across hundreds of WhatsApp groups were making purchases, CLEU's stock price rose rapidly. With the promised returns seemingly materializing, Class members were falsely reassured and continued to make additional purchases based on the Scammers' representations, further inflating the stock price.

157.    CLEU's stock price increased from a closing price of $5.32 per share on January 21, 2025 to a peak of $7.90 per share on January 29, 2025, as shown in the chart below.



158.    Trading volume was exceptionally high, with 126 million shares traded on January 22nd, 71.6 million shares on January 23rd, and at least 23 million shares traded on each of the following four trading days. In contrast, CLEU's prior trading volume typically was less than 1 million shares daily.

**L.    The *Cedric* Indictees and Their Co-Conspirators Use Victims' Purchases to Unload Their CLEU Shareholdings, Including the Secretly Issued Exchange Shares, at Inflated Prices**

159.    Unbeknownst to the victims, *Cedric* Indictees and their co-conspirators were standing on the other side of the CLEU transactions from January 22 through January 29, 2025.

160.    The *Cedric* Indictees and their co-conspirators unloaded their CLEU shareholdings—including the 240,000,000 Exchange Shares they had received pursuant to the Warrant Exchange Agreement, which still had not been disclosed to the market—by entering sale transactions at price points matching those fed to victims in the WhatsApp groups.

161.    Through these sales, the *Cedric* Indictees and their co-conspirators reaped hundreds of millions of dollars in illicit profits by selling CLEU shares at inflated prices.

162.    The sales by the *Cedric* Indictees are summarized in the following table:

| Defendant | Date(s) | Number of Shares | Proceeds |
|-----------|---------|------------------|----------|
| K.W. Wong | Jan. 22, 2025 | 4,936,410 | $26 million |
| Cheng | Jan. 22, 2025 | 9,278,975 | $49 million |
| Chai | Jan. 22, 2025 | 9,188,500 | $49 million |
| Cedric | Jan. 22, 2025 | 3,687,598 | $19 million |
| Ma | Jan. 22-23, 2025 | 8,949,270 | $48 million |
| K.S. Wong | Jan. 23, 2025 | 9,329,500 | $57 million |
| Vun | Jan. 29, 2025 | 7,285,000 | $56 million |

163.    Following the sales by Defendants Cedric, Chai, Cheng, and K.S. Wong on January 22 and 23, they were prohibited by their brokerage firm from selling any additional CLEU shares. However, between January 24 and 29, 2025, Defendants Cedric, Chai, Cheng, and K.S. Wong collectively entered and immediately canceled more than 2,500 orders to purchase approximately 56 million CLEU shares to create the appearance of demand and increase the value of the stock to facilitate sales by the other *Cedric* Indictees and their co-conspirators.

164.    On information and belief, Defendant Lam also made sales of CLEU shares, both directly and indirectly through Ever Alpha, during the period when the stock price was inflated by the failure to disclose the issuance of the Exchange Shares and the market manipulation scheme; however, Defendant Lam failed to report those trades as required by applicable law and SEC regulations.

**M.    Transhare and Defendant Zhao Facilitate Sales of CLEU Shares by the *Cedric* Indictees and Their Co-Conspirators**

165.    In order to sell the 240,000,000 Exchange Shares through the pump-and-dump scheme, the *Cedric* Indictees and their co-conspirators needed to deposit those shares into brokerage accounts with the capability of trading NASDAQ-listed securities and ensure that those shares were not subject to trading restrictions.

166.    On January 14 and 15, 2025, Defendants Cheng, K.S. Wong, Cedric, and Chai collectively deposited more than 33.9 million CLEU shares in accounts at a U.S.-based brokerage firm, which, on information and belief, was Charles Schwab & Co. Inc. ("Schwab").

167.    Between January 17 and 29, 2025, Defendants K.W. Wong, Ma, and Vun collectively deposited more than 21.1 million CLEU shares in accounts at a U.S.-based brokerage firm, which, on information and belief, was eToro Group Ltd. ("eToro").

168.    Defendant Zhao facilitated the opening of the accounts by the *Cedric* Indictees and their co-conspirators, including by communicating with Scwhab and eToro representatives, completing account-opening documents and other required paperwork, and arranging for the transfer of the CLEU shares.

169.    Transhare also facilitated the opening of the accounts by vouching for the legitimacy of the 240,000,000 Exchange Shares despite knowing that the issuance of the shares had not been publicly reported or reflected in public information regarding the number of CLEU shares outstanding, and that the *Cedric* Indictees and their co-conspirators were perpetuating a market manipulation scheme. Among other things, Transhare advised Schwab and eToro representatives that the Exchange Shares had been issued directly by the Company, were not subject to any restrictions, and were available to be traded, despite knowing that NASDAQ and other public sources were unaware the shares had been issued.

**N.    CLEU's Stock Price Collapses When the CLEU Defendants and Transhare Disclose the Exchange Shares**

170.    Following the Company and Transhare's filing of the Change in Shares Outstanding form with NASDAQ on January 29, 2025, the reported number CLEU shares outstanding was updated to reflect the 240,000,000 previously undisclosed Exchange Shares.

171.    This revelation caused the CLEU share price to fall precipitously on January 30, 2025 as the market became aware that the actual number of shares outstanding was 269,000,000, and not 29,000,000 as previously reported.

172.    The stock opened at $1.03 per share on January 30, versus a closing price of $7.75 per share the previous day. By the end of the day, the stock price had collapsed to less than $0.15 per share—a one-day loss of 98%—resulting in hundreds of millions of dollars in losses to Plaintiffs and the Class.

173.    Plaintiffs and the Class soon discovered that they had been victimized by a pump-and-dump scam, that the purported financial advisors in the WhatsApp group were, in reality, criminal scammers, and that the information they had been provided regarding the Company was false, misleading, and unreliable. These revelations spurred further declines in the stock price as victims sold their CLEU shares.

174.    CLEU's share price continued to decline over the coming weeks, falling to approximately $0.05 by the end of February 2025.

175.    Effective March 3, 2025, the Company conducted an 80-for-1 share consolidation, which nominally increased CLEU's share price, but did nothing to repair the damage suffered by Plaintiffs and the Class.

176.    The Company's shares were then suspended by NASDAQ and ultimately delisted in June 2025.

### O.    The Scheme's Devastating Impact on Victims

177.    The CLEU Scheme caused significant financial harm to its victims. The more than 500 members of the CLEU Victim Group collectively suffered losses of more than $64 million, and Plaintiffs estimate that the overall loss to the Class was more than $300,000,000.

178.    Members of the CLEU Victim Group and the proposed Class come from all walks of life—parents, grandparents, retirees, young families, veterans, active-duty military personnel, first responders, public servants, business executives, scientists, engineers, university professors, and students.

179.    Several victims report having lost their entire life savings, and many face difficulties paying their mortgages or their children's college tuition. Others have been forced to take out loans or commit to long hours of overtime to make ends meet.

180.    In addition to the CLEU Scheme's financial impact, victims have suffered emotional, psychological, social, and physical distress, including feelings of shame, depression, and anxiety, with physical impacts including elevated blood pressure, heart palpitations, and insomnia, with some victims requiring medication and/or therapy.

181.    In addition to Plaintiffs, members of the CLEU Victim Group include a 71-year-old grandmother, who has been battling neuroendocrine cancer for eight years, who was lured into the CLEU Scheme because she was looking for investment income to replace the $3,200 per month she lost when her long-term disability policy expired. She ended up losing a majority of her savings and is uncertain how she will pay for her monthly chemotherapy treatments. She reports an "overwhelming" emotional toll and that she has been required to begin taking medication for insomnia.

182.    Another victim is a single mother of a one-and-a-half-year-old daughter, who recently escaped an abusive marriage. She lost 15 years of savings and is now living paycheck-to-paycheck and questions how she will afford childcare (which she needs to be able to work full-time), healthcare (including treatment for pregnancy-related complications), housing, and finalization of her divorce.

183.    Additionally, a married couple lost approximately $985,000, including all of the money they had saved to pay college tuition for their four children. The couple has been forced to overhaul their finances and reassess college plans and other family expenses.

184.    Similarly, a 68-year-old senior and her 69-year-old husband have been forced to delay their plans to retire this year. Despite deteriorating health, they must continue to work to pay for medical treatment because they lost the approximately $182,000 they had saved to pay for future medical expenses.

**P.** **Defendants Extend Their Scheme to Other Penny Stocks**

185.    In addition to CLEU, Defendant Zhao and the *Cedric* Indictees and their co-conspirators orchestrated virtually identical pump-and-dump scams involving other Chinese companies, including JYD, OST, and PTHL.

186.    Like CLEU, each of JYD, OST, and PTHL are Chinese companies that employ a VIE structure, are incorporated in the Cayman Islands, and have (or had) their shares listed on NASDAQ.

187.    Like CLEU, each of JYD, OST, and PTHL were the subject of social media-based pump-and-dump scams, with scammers impersonating financial advisors in WhatsApp groups encouraging victims to purchase shares in anticipation of a significant increases in the stock price based on an as-yet-unannounced merger or other material developments.

188.    Like CLEU, each of JYD, OST, and PTHL conducted non-bona fide securities offerings involving the issuance of shares to scammers working in collaboration with Zhao and the *Cedric* Indictees, who then sold those shares while the price was inflated by the social media scheme.

189.    Defendants perpetrated these schemes in the months following the CLEU scheme, with JYD's share price increasing rapidly through March before crashing on April 2, 2025, OST's share price increasing rapidly from April through June before crashing on June 27, 2025, and PTHL's share price increasing rapidly through June and July before collapsing on July 29, 2025.

## ADDITIONAL FACTUAL ALLEGATIONS

**A.** **Defendants' Conduct Caused CLEU's Share Price to Be Artificially Inflated**

190.    As a result of the materially false and misleading statements and failures to disclose alleged herein, CLEU's shares traded at artificially inflated prices during the Class Period.

191.    The CLEU Defendants, Ascent, and Transhare withheld fundamental information regarding the number of CLEU shares that had been issued and were actively trading in the market, and took steps to conceal that the Exchange Shares had been issued, including by misrepresenting in the December 2024 6-K that those shares would be issued at an unspecified future date, misleadingly stating in the January 13, 2025 Press Release that the Company had regained compliance with NASDAQ listing standards, and failing to advise NASDAQ or the SEC that the shares had been issued until January 29, 2025.

192.    The CLEU Defendants also failed to disclose other material information, including that (a) CLEU shares were subject to a pump-and-dump scam and (b) the December 2024 Issuance and the Warrant Exchange Agreement were non-bona fide transactions designed to put CLEU shares in the hands of the *Cedric* Indictees and their co-conspirators for use in that scam.

193.    CLEU's share price also was inflated by the actions of the *Cedric* Indictees and their co-conspirators, who fraudulently induced Plaintiffs and the Class to purchase CLEU shares based on false and misleading information regarding the Company and its prospects, including the purportedly imminent merger with Stride. Additionally, the *Cedric* Indictees and their co-conspirators engaged in manipulative trading practices, such as the submission and immediate cancellation of illegitimate purchase orders, thereby creating the false appearance of robust demand for CLEU shares.

**B.    No Safe Harbor**

194.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements alleged herein.

195.    The statements alleged to be false and misleading herein all relate to then-existing facts and conditions, such as the date of the issuance of the Exchange Shares.

196.    In addition, to the extent any such statement could be characterized as forward-looking, they were not identified as "forward-looking statements" when made, and there was no meaningful cautionary language identifying material risk factors. Moreover, at the time each statement was made, Defendants had actual knowledge that the statement was materially false or misleading.

C.    **Reliance**

197.    Plaintiffs and the Class purchased CLEU shares relying upon the integrity of the market price of CLEU's shares and market information relating to the Company, and have been damaged thereby.

198.    At all relevant times, the market for CLEU shares was an efficient market for the following reasons, among others: (a) CLEU shares were listed and actively trading on NASDAQ, an efficient and automated market; (b) as a regulated issuer, the Company filed periodic public reports with the SEC and NASDAQ; and (c) the Company regularly communicated with public investors via established market communication mechanisms, including SEC filings and press released on major newswire services.

199.    As a result of the foregoing, the market for CLEU's securities promptly digested current information regarding the Company from all publicly available sources and reflected such information in CLEU's share price. Under these circumstances, all purchases of the Company's securities during the Class Period suffered similar injury through their purchase of CLEU shares at artificially prices, and a presumption of reliance applies pursuant to *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972).

D.    **Loss Causation**

200.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss and other damages suffered by Plaintiffs and the Class.

201.    During the Class Period, Plaintiffs and the Class purchased CLEU shares at artificially inflated prices and were damaged thereby. The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors losses.

E.    **Scienter Allegations**

202.    Defendants acted with scienter because Defendants: (a) engaged in a deliberate scheme to manipulate the price of CLEU shares through false and misleading statements and abusive trading practices; (b) intentionally facilitated the scheme by conducting non-bona fide offerings, concealing the issuance of the Exchange Shares, and making false and misleading statements to brokerage firms; and (c) were motivated by their receipt, directly or indirectly, of hundreds of millions of dollars in illicit trading proceeds.

## CLASS ACTION ALLEGATIONS

203.    Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and a proposed class of all persons or entities who purchased CLEU Shares between January 22 and January 30, 2025 (the "Class Period") and suffered damages as a result. (the "Class").

204.    Excluded from the Class are: (a) Defendants; (b) members of the immediate family of each Defendant; (c) any subsidiary or affiliate of CLEU; (d) any entity in which any Defendant has or had a controlling interest; (e) the officers and directors of CLEU during the Class Period;

(f) the legal representatives, heirs, successors, and assigns of any excluded person or entity; and

(g) any person or entity who purchased CLEU securities as part of the fraudulent scheme alleged herein.

205.    The members of the Class are so numerous that joinder of all members is impracticable. Upon information and belief, the Class consists of thousands of geographically dispersed victims.

206.    There are questions of law and fact common to the Class, which predominate over questions affecting any individual Class member. These common questions include, *inter alia*, whether the Defendants violated Section 10(b) and Rule 10b-5 and/or the Civil RICO statute; whether Defendants made false or misleading statements or engaged in market manipulation; the extent of damages suffered by Plaintiffs and the Class; and the proper measure of such damages.

207.    Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

208.    Plaintiffs are committed to prosecuting this action and have retained competent counsel experienced in litigation of this nature.

209.    Plaintiffs' claims are typical of the claims of other Class members, and Plaintiffs have the same interests as other Class members. Accordingly, Plaintiffs are adequate representatives of the Class and will fairly and adequately protect the interests of the Class.

210.    The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Defendant or adjudications with respect to individual members of the Class that would, as a practical matter, be dispositive of

the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

211.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## CAUSES OF ACTION

## COUNT I

**Violation of Section 10(b) of the Securities Exchange Act and SEC Rule 10b-5
Against All Defendants**

212.    Plaintiffs repeat and reallege the allegations set forth in the paragraphs above as if fully set forth herein.

213.    Defendants violated Section 10(b) of the Securities Exchange Act and SEC Rule 10b-5 promulgated thereunder by (a) employing a device, scheme, or artifice to defraud; (b) making false and misleading statements; and (c) engaging in acts, practices, and a course of business that operated as a fraud or deceit on Plaintiffs and the Class.

214.    The *Cedric* Indictees and their co-conspirators perpetrated a fraudulent scheme by (a) using fraudulent advertisements to lure Plaintiffs and the Class into fake investment clubs; (b) making knowingly false and misleading statements about the Company and its prospects to entice Plaintiffs and the Class into purchasing CLEU shares; (c) conspiring with the CLEU Defendants to obtain secret Exchange Shares through the December 2024 Issuance and the Warrant Exchange Agreement; (d) entering and immediately canceling illegitimate purchase orders for CLEU shares to create the appearance of demand and further inflate the CLEU share price; and (e) selling CLEU shares at artificially inflated prices.

215.    The CLEU Defendants participated in the alleged fraudulent scheme by (a) engaging in non-bona fide transactions—namely the December 2024 Issuance and the Warrant

Exchange Agreement—to transfer shares to the *Cedric* Indictees and their co-conspirators; (b) making false and misleading statements regarding the terms and purpose of those transactions; (c) concealing the issuance of the Exchange Shares through their false and misleading statements in the December 2024 6-K that the shares would be issued at an unspecified future date and their failure to timely advise the SEC and NASDAQ that the Exchange Shares had been issued, including failing to comply with applicable NASDAQ regulations; and (d) selling CLEU shares at artificially inflated prices and failing to report those sales.

216.    Defendants Transhare and Zhao participated in the alleged fraudulent scheme by (a) failing to timely disclose or advise the SEC or NASDAQ of the issuance of the Exchange Shares; (b) facilitating the opening of brokerage accounts to enable the *Cedric* Indictees and their co-conspirators to trade the Exchange Shares; and (c) making false and misleading statements to Schwab and eToro that the Exchange Shares were validly issued and available to be traded, despite knowing the shares had not been disclosed to the market, the SEC, or NASDAQ.

217.    Defendants Ascent and Xiao participated in the alleged fraudulent scheme by drafting and issuing false and misleading press releases on behalf of the Company, concealing the issuance of the Exchange Shares, and falsely claiming that the Company had regained compliance with NASDAQ listing standards, thereby ensuring that the shares remained available for trading during the period the *Cedric* Indictees carried out their pump-and-dump scheme.

218.    Defendants' participation in the alleged fraudulent scheme was intentional and knowing, and they made all allegedly false and misleading statements with actual knowledge of the true facts and the statements' falsity.

219.    Defendants' fraudulent scheme, including their false and misleading statements and their manipulative trading practices, caused the price of CLEU shares to be artificially inflated during the Class Period.

220.    Plaintiffs and the Class purchased CLEU shares while the price was artificially inflated and were damaged thereby.

221.    Plaintiffs and the Class purchased CLEU shares in reliance on the integrity of the market, believing the share price reflected all material information regarding the Company and its shares, and without knowledge of Defendants' fraudulent scheme.

222.    By virtue of the foregoing, Defendants violated Section 10(b) and SEC Rule 10b-5.

223.    As a direct and proximate cause of Defendants' wrongful conduct, Plaintiffs and the Class suffered damages in connection with their respective purchases and sales of CLEU shares during the Class Period.

## COUNT II

### Violation of Section 20(a) of the Exchange Act
### Against the Director and Officer Defendants

224.    Plaintiffs repeat and reallege the allegations set forth in the paragraphs above as if fully set forth herein.

225.    The Director and Officer Defendants acted as controlling persons of CLEU as alleged herein. By virtue of their high-level positions, participation in and awareness of the Company's operations, and knowledge of and participation in preparing the contents of the Company's SEC filings and communications with the public, the Director and Officer Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the contents and dissemination of the statements

alleged to be false and misleading. The Director and Officer Defendants had access to the Company's SEC filings and other public statements prior to or shortly after the statements were issued and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

226.    As set for the above, CLEU violated Section 10(b) and Rule 10b-5 by virtue of its participation in the alleged fraudulent scheme and its false and misleading statements. By virtue of their positions as controlling persons, the Director and Officer Defendants are liable as control persons of CLEU pursuant to Section 20(a).

227.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the Class have suffered damages in connection with their respective purchases and sales of CLEU shares during the Class Period.

## COUNT III

### Violation of Section 1964 of the Civil RICO Statute
### Against All Defendants

228.    Plaintiffs repeat and reallege the allegations set forth in the paragraphs above as if fully set forth herein.

229.    Defendant CLEU is a legal entity organized under the laws of the Cayman Islands and, therefore, is a "person" and an "enterprise" within the meaning of 18 U.S.C. § 1961(3) and (4).

230.    Alternatively, Defendants and their co-conspirators constituted an association-in-fact enterprise (the "Enterprise") within the meaning of 18 U.S.C. § 1961(4). The Enterprise was a group of individuals and entities associated together for the common purpose of executing the CLEU Scheme. The Enterprise had a common purpose, relationships among its members, and sufficient longevity to enable its members to pursue the Enterprise's purpose. The Enterprise

functioned as a continuing unit with an ascertainable structure, including a hierarchy and division of responsibilities among its members.

231.    The Enterprise operated for purposes of the CLEU Scheme from at least October 2024 through at least January 30, 2025, and it continued to operate at least through July 2025 in connection with related schemes involving JYD, OST, and PTHL

232.    The Enterprise had an organizational structure, hierarchy, and division of responsibilities among its members. For example: Defendant Zhao orchestrated the CLEU Scheme, coordinated with the Director and Officer Defendants, including Lam and Liu, to secure CLEU's cooperation, and facilitated relationships with brokerage firms to enable the sale of CLEU shares. The Director and Officer Defendants structured, authorized, and implemented the December 2024 Issuance and the Warrant Exchange Agreement to transfer CLEU shares to the *Cendric* Indictees and their co-conspirators for use in the scheme, and made, or caused CLEU to make, false and misleading statements, including to conceal the issuance of the Exchange Shares. The *Cedric* Indictees and their co-conspirators recruited victims through misleading social media advertisements, solicited purchases of CLEU shares by Plaintiffs and the Class through false and misleading statements in fake investment clubs, engaged in manipulative trading practices, and sold CLEU shares at artificially inflated prices.

233.    The Enterprise engaged in and affected interstate commerce because it utilized the facilities of NASDAQ (located in New York), U.S.-based brokerage firms (located in New Jersey and Texas), the SEC's EDGAR filing system (servers located in Virginia), interstate wire communications and the internet to execute the fraudulent scheme.

234.     Defendants conducted and participated in the conduct of the affairs of the Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5), which requires at least two predicate acts of racketeering activity.

235.     Defendants' pattern of racketeering activity consisted of multiple violations of 18 U.S.C. § 1343 (wire fraud), which is a predicate act under 18 U.S.C. § 1961(1)(B). These include: (a) filing with the SEC of the false and misleading December 2024 Prospectus; (b) filing with the SEC of the false and misleading December 2024 6-K; (c) posting of hundreds of false and misleading advertisements on Facebook and Instagram to recruit victims; (d) thousands of false and misleading communications with victims through WhatsApp groups; (e) misleading communications with Schwab and eToro by telephone, email, or other electronic messaging platforms; (f) submission and execution of hundreds of trades in CLEU shares while the stock price was artificially inflated; and (g) submission and immediate cancellation of illegitimate purchase orders for CLEU shares to manipulate the stock price.

236.     The predicate acts alleged above constitute a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5) because they involve at least two acts of racketeering activity (in fact, multiple acts as detailed above), they are related to each other as part of a common scheme, they are not isolated events, and they pose a threat of continued criminal activity.

237.     The predicate acts are related because they all were committed in furtherance of the same fraudulent pump-and-dump scheme involving CLEU securities. The acts share the same purpose (to artificially inflate CLEU's stock price and enable co-conspirators to dump shares at inflated prices), the same participants (Defendants and their co-conspirators), the same victims (investors who purchased CLEU securities during the Class Period), and the same methods

(fraudulent securities offerings, false SEC filings, fraudulent promotional campaigns, and systematic selling by Defendants)

238.    The predicate acts demonstrate continuity because they occurred over a substantial period of time (at least from October 2024 through January 2025), involved open-ended conduct (the fraudulent scheme continued until it collapsed on January 30, 2025), and would likely have continued but for the investigation and criminal charges by federal authorities.

239.    Moreover, Defendants (particularly Defendant Zhao and the *Cedric* Indictees and their co-conspirators) engaged in similar fraudulent schemes involving at least three other companies (JYD, OST, and PTHL), demonstrating a pattern of repeated fraudulent conduct over time targeting multiple companies and victim groups.

240.    As a direct and proximate result of Defendants' violations of 18 U.S.C. § 1962(c), Plaintiffs and the Class have been injured in their business or property.

241.    Specifically, Plaintiffs and the Class members purchased CLEU shares at artificially inflated prices during the Class Period in reliance on the integrity of the market and/or Defendants' fraudulent statements and omissions. When the fraudulent scheme collapsed and the truth was revealed, CLEU's stock price crashed, causing Plaintiffs and Class members to suffer substantial losses.

242.    The damages to Plaintiffs and the Class were directly and proximately caused by Defendants' RICO violations. But for Defendants' fraudulent scheme, Plaintiffs and Class members would not have purchased CLEU securities at artificially inflated prices or would not have purchased CLEU securities at all.

243.    Plaintiffs and Class are entitled to recover treble damages, costs, and reasonable attorneys' fees as provided by 18 U.S.C. § 1964(c).

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment as follows:

A.      Determining that this action is a proper class action and certifying Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure and Plaintiffs' counsel as Lead Counsel for the Class;

B.      Finding that Defendants violated the federal securities laws and the Civil RICO statute as alleged herein;

C.      Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

D.      Awarding treble damages pursuant to 18 U.S.C. § 1964(c) in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' RICO violations;

E.      Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees, expert fees, and other out-of-pocket expenses incurred by Plaintiffs or their counsel; and

F.      Awarding such other and further relief as the Court deems just and appropriate.

Dated:  January 30, 2026

_____

**MORRIS KANDINOV LLP**
Aaron T. Morris
Andrew W. Robertson
William H. Spruance III
305 Broadway, 7th Floor
New York, NY 10007
(212) 431-7473
aaron@moka.law
andrew@moka.law
william@moka.law

**MORRIS KANDINOV LLP**
Leo Kandinov
550 West B Street, 4th Floor
San Diego, CA 92101
(619) 780-3993
leo@moka.law

**HIGHFUL LAW PLLC**
Tyler Highful
5900 Balcones Drive, Suite 100
Austin, TX 78731
(512) 666-7426
tyler@highful.com

*Attorneys for Plaintiffs*