**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

ATUL SHAH, AMITA SHAH, SHAILENDRA PRASAD, JOSHUA BOUCK, SHENWEI ZHAO, ADAM SPRING, PIERRE LOTZOF, and BO KWON, individually on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

CHINA LIBERAL EDUCATION HOLDINGS LTD., NGAI NGAI LAM, WENHUAI ZHUANG, FANGZHONG SUN, NGO YIN TSANG, WANDONG CHEN, XIAONAN LIU, XINYU DENG, TRANSHARE CORPORATION, ASCENT INVESTOR RELATIONS LLC, TINA XIAO, EVER ALPHA GLOBAL LIMITED, LIM XIANG JIE CEDRIC, MING-SHEN CHENG, KING SUNG WONG, KO SEN CHAI, SIONG WEE VUN, CHIEN LUNG MA, KOK WAH WONG, YAN ZHAO, and AUDIT ALLIANCE, LLP,

Defendants.

Case No. 26-cv-823

**FIRST AMENDED CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

Lead Plaintiffs Amita Shah, Pierre Lotzof, Shailendra Prasad, Joshua Bouck, and Bo Kwon ("Lead Plaintiffs") and additional named Plaintiffs Atul Shah, Adam Spring, and Shenwei Zhao, (together with Lead Plaintiffs, the "Plaintiffs"), by and through their undersigned counsel, allege the following for their complaint against Defendants China Liberal Education Holdings Ltd. ("CLEU" or the "Company"), Ngai Ngai Lam, Wenhuai Zhuang, Fangzhong Sun, Ngo Yin Tsang, Wandong Chen, Xiaonan Liu, Xinyu Deng, Transhare Corporation ("Transhare"), Ascent Investor Relations LLC ("Ascent"), Tina Xiao, Ever Alpha Global Limited ("Ever Alpha"), Lim Xiang Jie Cedric, Ming-Shen Cheng, King Sung Wong, Ko Sen Chai, Siong Wee Vun, Chien Lung Ma, Kok Wah Wong, Yan Zhao, and Audit Alliance, LLP (collectively, "Defendants"). Plaintiffs make the following allegations upon knowledge as to themselves and their own actions, and upon information and belief as to all other matters. Plaintiffs' information and belief is based on, among other things, the independent investigation of counsel, which includes, but is not limited to: (a) review of CLEU's filings with the United States Securities and Exchange Commission (the "SEC"); (b) review of media reports about the Company; (c) review of public filings and court orders in other litigation relating to the fraudulent scheme alleged herein (the "CLEU Scheme") and related schemes conducted by the same criminal syndicate; and (d) discussions with, surveys of, and review of documents and information provided by more than 500 victims of the fraudulent scheme (the "CLEU Victim Group").

## NATURE OF THE ACTION AND OVERVIEW

1. This matter arises from a brazen fraud carried out by a criminal syndicate of scammers using social media to orchestrate pump-and-dump schemes involving NASDAQ-listed shares of little-known and thinly traded Chinese companies, with the active cooperation of the companies' management and service providers.

2. This particular iteration of the scheme involves securities of CLEU, a Chinese educational services and technology company that publicly listed on NASDAQ in May 2020. The Company was founded in 2011 and is incorporated as an offshore holding company in the Cayman Islands. Its principal place of business is purportedly located at 7th Floor, Building 5, No. 2 Zhenxing Road, Changping District, Beijing, People's Republic of China 102299.

3. This case arises from the sudden collapse of CLEU's stock in late January 2025, following a dramatic yet illusory run-up orchestrated by a fraudulent stock promotion scheme propagated over social media.

4. CLEU claims to provide a wide variety of educational services and products intended to assist students and schools it partners with. These include services provided under Sino-foreign jointly managed academic programs; overseas study consulting services; and technological consulting services to Chinese universities with the stated goal of optimizing their teaching, operating, and management environments. Also, the Company claims to publish and provide textbooks as well as other course materials to students enrolled with its partnered schools.

5. Shortly after its public listing, CLEU's business faltered due to the impact of the COVID-19 pandemic, regulatory changes in China that sharply curtailed the cross-border partnerships with international universities that were central to CLEU's business, and a failed attempt to diversify into operations of domestic Chinese universities.

6. By the end of 2023, CLEU had eliminated two of its principal business lines, abandoned its attempt to operate domestic universities, and could no longer run its remaining businesses at a profit.

7. With its business failing, CLEU's most valuable remaining asset was its public listing, which provides much-coveted access to the U.S. capital markets. CLEU's management,

led by Defendant Lam, the Company's Chief Executive Officer ("CEO"), set about trying to monetize that asset.

8. Defendant Lam first negotiated a reverse-merger agreement with AIWAYS, a Chinese electric vehicle company, pursuant to which AIWAYS would merge with a wholly owned CLEU subsidiary, thereby becoming a publicly listed company, and the surviving entity would focus its operations on AIWAYS's electric vehicle business. However, the merger fell apart due to AIWAYS's struggles to gain traction in the highly competitive electric vehicle market, and the parties ultimately agreed to terminate their agreement.

9. With the failure of the AIWAYS merger, CLEU management turned to illegitimate means of obtaining value for the Company's public listing, coordinating with criminal scammers to carry out a pump-and-dump scheme involving the Company's shares.

10. More specifically, in a modern-day take on the classic boiler room operation, the scammers first recruited victims through advertisements on Facebook and Instagram social media platforms promoting supposed investment clubs associated with celebrities, well-known investors, and advisory firms.

11. Victims who clicked on the ads were then added to groups on the WhatsApp messaging platform. Within the WhatsApp groups, the scammers posed as celebrities and financial advisors and encouraged victims to purchase securities whose prices the scammers were manipulating so that their co-conspirators could unload their holdings at artificially inflated prices, reaping massive, illicit profits.

12. In or around the fall of 2024, Defendants determined to utilize CLEU's listing and shares in one such pump-and-dump scheme.

13. In furtherance of the scheme, CLEU management caused the Company to issue millions of shares of CLEU stock and warrants to the scammers in December 2024 through a non-bona fide offering. CLEU management then agreed on December 31, 2024, to exchange the previously issued warrants for 240 million additional CLEU shares, giving the scammers a stockpile of more than 250 million shares to use in their fraudulent scheme.

14. Even worse, CLEU management, with the complicity of the Company's transfer agent (Transhare) and investor relations firm (Ascent), actively concealed that the 240 million shares had been issued and were available to be traded in the market, misleadingly stating that the additional shares would be issued at a future date, and waiting until the end of January 2025 to inform the SEC and NASDAQ that the shares had been issued. As a result, the Company was able to regain apparent compliance with NASDAQ listing standards, ensuring its shares remained readily available for purchase by unsuspecting retail investors, and for nearly the entirety of the month of January 2025, the market believed that there were only 29 million CLEU shares outstanding, when the actual share count was approximately 269 million.

15. During this critical window, scammers in the WhatsApp groups began recommending that Plaintiffs and other victims purchase CLEU shares. Using a fake analyst report and other materials, the scammers touted the strength of the Company's business and a soon-to-be-completed merger with a U.S.-based education company that would lead to "explosive growth" in CLEU's share price.

16. The scammers instructed victims to make purchases of CLEU shares at specified price points. Meanwhile, their co-conspirators, who held the secretly issued 240 million CLEU shares, entered sell orders at matching price points, thereby liquidating their massive (and previously undisclosed) stockpile of CLEU shares in exchange for the victims' cash.

17. In the weeks and months leading up to the collapse, CLEU's share price surged from roughly $2.00 to an all-time high of $7.90 despite no fundamental changes to the Company or news to justify the spike.

18. Then, in the early hours of January 30, 2025, the market became aware of CLEU's previously secret share issuance.

19. The stock price immediately collapsed, plummeting from $7.75 per share to $0.15 per share (a 98% drop), and Plaintiffs and other victims of the scheme lost hundreds of millions of dollars they had invested in CLEU shares. Since the collapse, the Company was delisted from NASDAQ, and its share price has continued to decline to less than $0.01 per share. The shares now trade on the OTC Pink market under the symbol "CLEUF."

20. Plaintiffs estimate that the proposed Class suffered total losses of more than $300 million.

21. Throughout the Class Period, Defendants made materially false and/or misleading statements and failed to disclose material adverse facts about the Company's business, operations, and the true nature of the trading activity in its securities. Specifically, Defendants failed to disclose to investors that: (1) CLEU was the subject of a fraudulent stock promotion scheme involving social media-based misinformation and impersonated financial professionals; (2) the Company had directly and purposefully issued hundreds of millions of shares privately to investors whom the Company knew would perpetrate a fraudulent pump-and-dump stock promotion scheme, or recklessly disregarded a substantial risk these investors would do so; (3) insiders, affiliates, and/or co-conspirators used offshore or nominee accounts to facilitate the coordinated dumping of shares during a price-inflation campaign; (4) CLEU's public statements and risk disclosures omitted any mention of the false rumors and artificial trading activity driving the spike

in stock price; and (5) as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

22. The wrongdoing alleged herein resulted in a March 2025 criminal indictment by the Department of Justice ("DOJ"), which illuminates how the Company's public listing was used as a vehicle for an illicit "pump-and-dump" stock promotion scheme.[1]

23. In the indictment, the DOJ explains how fraudsters, after receiving hundreds of millions of shares directly from the Company, stole the identities of legitimate financial advisors and touted CLEU in online forums, chat groups, and social media posts with sensational claims to instigate a buying frenzy of CLEU stock among retail investors. The indictment further explains how concealment of the 240 million-share issuance, with the complicity of Company insiders, further inflated CLEU's share price and enabled the scammers and their co-conspirators to dump their secret shareholdings into the market frenzy.

**JURISDICTION AND VENUE**

24. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

25. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

26. Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b) and Section 27 of the Exchange Act (15 U.S.C. §78aa). Substantial acts in furtherance of the alleged fraud or

---

[1] Complaint ¶¶2-24 (Counts One – Seven), ¶¶1-4 (Counts Eight Fourteen), *U.S. v. Lim Xiang Jie Cedric,* No. 1:25-cr-00161, ECF No. 1 (E.D. Ill. Mar. 20, 2025). https://www.justice.gov/usao-ndil/media/1394106/dl?inline ("*Cedric* Indictment").

the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District. In addition, the Company's agent for service of process is located in this District.

27. In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

**PARTIES**

28. Plaintiff Atul Shah immigrated to the United States to study chemistry, ultimately earning master's degrees in Chemistry and Business Administration, and he now operates a small drycleaning business. Plaintiff Atul Shah resides in Georgia with his wife, Lead Plaintiff Amita Shah, who is a retired pharmacist. The Shahs were lured into the CLEU Scheme through Facebook advertisements and were led to purchase shares of CLEU beginning on January 23, 2025, as set forth in the certifications previously filed with the Court (ECF Nos. 1-1; 1-2). The Shahs together lost approximately $1.8 million, including all of the retirement savings they had accumulated over the last 30 years.

29. Lead Plaintiff Shailendra Prasad previously worked at a private investment firm and resides in California. Plaintiff Prasad was lured into the CLEU Scheme through Facebook advertisements and was led to purchase shares of CLEU beginning on January 23, 2025, as set forth in the certification previously filed with the Court (ECF No. 1-3). Plaintiff Prasad lost virtually his entire life savings, totaling more than $1.4 million. Plaintiff Prasad has been forced

to take out a home equity loan to continue to pay for his daughter's college tuition, his family's mortgage, and other living expenses.

30. Lead Plaintiff Joshua Bouck is a Fire Captain in Los Angeles County and resides in California. Plaintiff Bouck was lured into the CLEU Scheme while he was fighting the Southern California wildfires. Plaintiff Bouck was led to purchase shares of CLEU beginning on January 22, 2025, and he lost more than $850,000, as set forth in the certification previously filed with the Court (ECF No. 1-4). Plaintiff Bouck has taken out a home equity loan and has been working endless overtime to recover his losses, depriving him of precious time with his three young children.

31. Lead Plaintiff Bo Kwon runs a food truck and catering business and resides in Oregon. Plaintiff Kwon was lured into the CLEU Scheme through Facebook advertisements and was led to purchase shares of CLEU beginning on January 22, 2025. Plaintiff Kwon invested in CLEU securities as set forth in the certification previously filed with the Court (ECF No. 46-8) and lost more than $1,398,000.

32. Lead Plaintiff Pierre Lotzof is a physician and resides in California. Plaintiff Lotzof was lured into the CLEU Scheme through Facebook advertisements and was led to purchase shares of CLEU beginning on January 22, 2025. Plaintiff Lotzof invested in CLEU securities as set forth in the certification previously filed with the Court (ECF No. 46-4) and lost more than $1,609,000.

33. Plaintiff Adam Spring is a Lieutenant Colonel in the United States Air Force who is stationed in North Carolina. Plaintiff Spring was lured into the CLEU Scheme through Facebook advertisements and was led to purchase shares of CLEU beginning on January 22, 2025, as set forth in the certification previously filed with the Court (ECF No. 1-6). Plaintiff Spring lost

more than $136,000 (with an additional $7,000 in losses through investments on behalf of his wife), representing 20 years of retirement savings and nearly half of his liquid net worth.

34. Plaintiff Shenwei Zhao is the founder of an information technology consulting firm with a background in systems engineering and resides in New Jersey. Plaintiff Zhao was lured into the CLEU Scheme through Facebook advertisements and was led to purchase shares of CLEU in his investment and retirement accounts beginning on January 23, 2025, as set forth in the certification previously filed with the Court (ECF No. 1-5). Plaintiff Zhao lost more than $240,000 (with an additional $30,000 in losses through investments on behalf of his wife).

35. Defendant China Liberal Education Holdings Limited is an exempted company incorporated in the Cayman Islands. CLEU employs a variable interest entity ("VIE") structure, such that CLEU is a holding company that conducts its operations through its wholly owned subsidiaries, which are limited liability companies organized in the People's Republic of China ("PRC")—namely, China Liberal (Beijing) Education Technology Co., Ltd. ("China Liberal Beijing") and Beijing Oriental Wisdom Culture Development Co., Ltd. ("Oriental Wisdom"). CLEU was formed in February 2019, to access the U.S. capital markets to obtain funding for its subsidiaries' operations.

36. CLEU conducted an initial public offering ("IPO") in May 2020, and thereafter its so-called "Ordinary Shares" were publicly traded on the Nasdaq Capital Market ("NASDAQ") under the ticker "CLEU" until they were delisted in June 2025. Following delisting, the Company's shares trade on the OTC Pink Current Market under the ticker "CLEUF." As a foreign issuer, prior to its delisting, CLEU filed annual reports with the SEC on Form 20-F, as well as periodic reports on Form 6-K to disclose material events and developments.

37. Defendant Ngai Ngai Lam ("Lam") has been the Chair of CLEU's Board of Directors (the "Board") since July 2020. Lam has been the Company's co-CEO since January 15, 2025, and previously, she was the Company's CEO since July 2020. Lam also has been the Chair of the Company's subsidiary, China Liberal Beijing, since 2015. Lam was designated CLEU's "Principal Executive Officer" for purposes of the Company's filings with the SEC during the relevant time period.

38. Defendant Wenhuai Zhuang ("Zhuang") has been CLEU's Chief Financial Officer since April 2019, and he also serves as Chief Finance Officer for the Company's subsidiary, China Liberal Beijing. Zhuang was designated CLEU's "Principal Financial Officer" for purposes of the Company's filings with the SEC during the relevant time period.

39. Defendant Fangzhong Sun ("Sun") has been a member of CLEU's Board since February 2022, and has been the Chief Education Specialist and a director of the Company's subsidiary, China Liberal Beijing, since June 2014. Sun also has served as an expert at the PRC Ministry of Education since June 2004. Sun has held multiple leadership positions with Chinese universities, including serving as President of Minjiang Vocational University, which he helped to form.

40. Defendant Ngo Yin Tsang ("Tsang") has been a member of CLEU's Board since May 2020. Tsang has been the executive director of Good Talent Limited, a Hong Kong-based staffing and recruiting company, since April 2014. Tsang also serves as a director and corporate secretary, respectively, of LKS Holding Group Limited and Zhouxin International Holdings Limited, both of which are public companies listed on the Hong Kong Stock Exchange. Tsang has a master's degree in Law, is a CPA, and claims to have more than 18 years of experience in auditing, accounting, corporate-governance monitoring, and financial management.

41. Defendant Wandong Chen ("Chen") has been a member of CLEU's Board since July 2021. Chen is a partner with the Beijing-based accounting firm Moore Stephens Da Hua CPAs, which is one of China's ten largest accounting firms. Chen claims to have more than 17 years of experience in accounting and finance.

42. Defendant Xiaonan Liu ("Liu") has been a member of CLEU's Board since August 2024. Liu's background is in finance, and he currently is an investment manager with Dongkai Assets Management Co., Ltd., a Chinese asset management company. Previously, Liu was an investment manager with CITIC Securities, where he was responsible for developing and implementing investment strategies for high-net-worth individuals and institutional clients.

43. Defendant Xinyu Deng ("Deng") was a member of CLEU's Board from July 2021 until August 2024, at which point she resigned for unspecified "personal reasons." Deng was Chief General Counsel of Baomihua.com, a Chinese online video platform (akin to YouTube, but focusing on the Chinese market), and previously practiced as an attorney with two Beijing-based law firms.

44. Defendants Lam, Zhuang, Sun, Tsang, Chen, Liu, and Deng are collectively referred to herein as the "Director and Officer Defendants," and together with Defendant CLEU, they are referred to herein as the "CLEU Defendants."

45. Defendant Transhare Corporation is a transfer agent registered with the SEC. Transhare markets itself as a "full service stock transfer agency and registrar specializing in serving publicly traded micro-cap, small-cap and mid-cap companies," and it frequently is the transfer agent to PRC-based companies with public listings in the United States. Transhare has acted as transfer agent for CLEU at all times relevant to this action. Since 2019, Transhare has been wholly

owned by J&C Issuer Services, LLC, a Florida limited liability company formed by Transhare's President Jinlong Liu. Transhare's principal office is in Clearwater, Florida.

46. Transhare is registered with the SEC as a transfer agent under Section 17Ac2-1 of the Exchange Act and is a member of the Securities Transfer Association. Transhare is also a "FAST" and "DRS" agent through the Depository Trust Company ("DTC"), which allows Transhare to issue and transfer shares in electronic form, both directly and indirectly, to and from broker-dealers, and to make shares eligible for immediate deposit into brokerage accounts and sale into the public market. Transhare has also served as transfer agent to other PRC-based companies listed on NASDAQ whose shares were used in social-media pump-and-dump schemes materially identical to the CLEU Scheme, including Ostin Technology Group Co., Ltd. ("OST"), whose NASDAQ-listed shares lost more than 90% of their value in a single trading session on June 26, 2025, following a coordinated online promotion, and whose co-chief executive officer and director was later charged in a federal criminal indictment.

47. Defendant Ascent Investor Relations LLC is an investor relations and corporate communications firm with offices in New York City, Beijing, and Hangzhou, China. Ascent acted as investor relations consultant for CLEU during the time period relevant to Plaintiffs' claims. In that capacity, Ascent drafted and disseminated false and misleading press releases in furtherance of the CLEU Scheme. Ascent also has acted as investor-relations consultant to numerous other non-U.S. companies listed on NASDAQ whose shares have been used in pump-and-dump scams during the last two years, including Park Ha Biological Technology Co., Solowin Holdings Limited, Springview Holdings Limited, Ten-League International Holdings Limited, DarkIris, Inc., and at least a dozen others. Ascent's website claims the firm's "Team" consists of six

individuals.[2] At least three of those individuals, however, simultaneously hold themselves out publicly as full-time employees of other, unaffiliated companies, and the profile information Ascent displays for them appears materially outdated. These circumstances raise questions about whether Ascent's "Team" page accurately reflects the firm's actual.[3]

48. Ascent performed substantive work in furtherance of the CLEU Scheme and did not act as a mere conduit for the Company's communications. Ascent holds itself out publicly as providing, among other things, disclosure, and regulatory-compliance assistance; development of corporate messaging; preparation of earnings releases, investor presentations, and announcements; execution and distribution of news releases; media and social-media outreach; and service as the issuer's primary point of contact with the investing public. Consistent with those represented services, Ascent and Xiao appeared as the designated investor-relations contact on CLEU's press releases throughout the period relevant to Plaintiffs' claims, including the misleading communications alleged herein, and were responsible for drafting and disseminating those communications.

49. Defendant Tina Xiao is the Founder and President of Ascent. Xiao was personally involved in drafting and disseminating false and misleading press releases on behalf of CLEU in furtherance of the CLEU Scheme.

---

[2] *Our Team,* ASCENT, https://ascent-ir.com/ourTeam.html (last visited July 22, 2026).

[3] Purported Vice President Terrence DeFranco actually is the Chairman and CEO of Iota Communications, Inc. and does not acknowledge any affiliation with Ascent in his employment history. *See* Terrence DeFranco, LINKEDIN, https://www.linkedin.com/in/tmdefranco/ (last visited July 22, 2026). Purported Ascent Associate Eva Xing actually is a Senior Manager of Credit Risk Management at American Express and does not acknowledge any affiliation with Ascent in her employment history. *See* Yiwei (Eva) X, LINKEDIN, https://www.linkedin.com/in/yiwei-eva-x-958994b2/ (last visited July 22, 2026). And purported Director Nicolas Palar actually is a Senior Analyst for Cirrus Research and has not been affiliated with Ascent since 2019. *See Meet Our Team,* CIRRUS RESEARCH, LLC, https://cirrus-res.com/OurTeam (last visited July 22, 2026); Nicolas Palar, LINKEDIN, https://www.linkedin.com/in/nicolas-palar/ (last visited July 22, 2026).

50. Defendant Ever Alpha Global Limited is a British Virgin Islands company, which is 100% owned and controlled by Defendant Lam. Defendant Lam used Ever Alpha as a vehicle to hold shares of CLEU stock.

51. Defendants Lim Xiang Jie Cedric ("Cedric"), Ming-Shen Cheng ("Cheng"), Ko Sen Chai ("Chai"), King Sung Wong ("K.S. Wong"), Siong Wee Vun ("Vun"), Chien Lung Ma ("Ma"), and Kok Wah Wong ("K.W. Wong") (collectively, the "*Cedric* Indictees") are residents of Malaysia and Taiwan and are the subject of the aforementioned criminal indictment in the matter of *United States v. Cedric,* No. 1:25-cr-161 (N.D. Ill. Mar. 20, 2025), which arises out of the CLEU Scheme. As alleged in more detail below, the *Cedric* Indictees, along with their co-conspirators, perpetrated the CLEU Scheme by, among other things, receiving millions of CLEU shares through non-bona fide offerings and selling those shares beginning on or around January 22, 2025, while the price of CLEU shares was artificially inflated, resulting in more than $300 million in illicit profits for the *Cedric* Indictees. The United States government has seized and sought forfeiture of approximately $214 million of the proceeds of the *Cedric* Indictees' sales.

52. Defendant Yan Zhao ("Zhao") is a Chinese national who holds himself out as a financial advisor. Zhao utilizes various aliases, including "Hank Shi," "Hank Shu," "Altman," and "Bob." Zhao is the subject of a criminal indictment in the matter of *United States v. Zhao*, No. 1:25-cr-259 (E.D. Va. Sept. 10, 2025), which arises out of multiple interrelated stock manipulation schemes, including the CLEU Scheme (which the indictment identifies as "Public Company A"). Zhao was instrumental in conceiving of and carrying out the CLEU Scheme and other related stock-manipulation schemes. Among other things, Zhao, in conjunction with Defendant Lam, orchestrated non-bona fide securities offerings to put CLEU shares in the hands of the *Cedric* Indictees and their co-conspirators, and facilitated manipulative trading in CLEU

shares on behalf of his clients (which include the *Cedric* Indictees and their co-conspirators) by opening brokerage accounts and providing trading instructions on their behalf. Zhao performed similar acts in connection with similar schemes involving securities of other Chinese companies, including OST, Jayud Global Logistics Ltd. ("JYD"), and Pheton Holdings Ltd. ("PTHL").

53. Defendant Audit Alliance, LLP ("Audit Alliance") was the Company's auditor at all relevant times. Audit Alliance is part of the Allinial Global network of public accounting firms headquartered in Lawrenceville, Georgia. Audit Alliance itself is located in Singapore. Audit Alliance issued clean audit opinions on financial statements incorporated into the June 6, 2024, and December 23, 2024, securities offerings issued during the Class Period. At all relevant times, Audit Alliance had access to material non-public information and because of its position, Audit Alliance knew that the adverse facts specified herein had not been disclosed to, and were being concealed from the public, and that the positive representations which were being made were materially false and/or misleading. Furthermore, Audit Alliance had the ability and opportunity to prevent issuance of the fraudulent SEC filings or cause them to be corrected. Therefore, it is also liable for the false statements alleged herein.

## SUBSTANTIVE ALLEGATIONS

### I. CLEU'S BUSINESS FAILS, LEAVING ITS NASDAQ LISTING AS ITS MOST VALUABLE ASSET

#### A. CLEU's Business

54. CLEU's publicly stated mission is "to provide China's students with the tools to excel in a global environment." The Company purportedly has sought to accomplish its mission through educational services for Chinese students and technology consulting services for Chinese colleges and universities.

55. CLEU purportedly commenced operations in August 2011 through its principal operating subsidiary, China Liberal Beijing, and holds itself out as a Beijing-based educational services provider. Its shares began trading on the NASDAQ Capital Market under the ticker "CLEU" on May 8, 2020, and on May 12, 2020, CLEU completed its initial public offering of 1,333,333 ordinary shares at $6.00 per share, for gross proceeds of $8 million. In its IPO offering documents, the Company broadly described itself as an educational services provider whose mission was to provide China's students with the tools to excel in a global environment, principally through its Sino-foreign jointly managed academic programs and related educational and technology-consulting services.

56. CLEU claims to have operated five business lines since becoming a public company in May 2020: (a) Sino-foreign Jointly Managed Academic Programs ("JMAPs"); (b) Textbook and Course Material Sales ("Textbooks"); (c) Overseas Study Consulting Services ("Overseas Study"); (d) Technological Consulting Services for Smart Campus Solutions ("Campus Technology"); and (e) Integration of Enterprises and Vocational Services ("Vocational Training"). The Company also claims to have briefly operated two colleges in the PRC.

57. However, shortly after the Company's public listing, its business began to falter due to market and regulatory developments, and by the end of 2023, it was clear the Company could not operate profitably.

**1. JMAPs**

58. Historically CLEU's principal business line, JMAPs are joint ventures between Chinese and foreign institutions, which enable students to begin their studies at the Chinese institution and then complete their studies at the foreign institution.

59. Through JMAPs, Chinese students can obtain a degree from a foreign university at lower cost compared to completing their full course of study at the foreign university. JMAPs also provide training in language and other skills to prepare students for study at a foreign university.

60. CLEU partnered with Chinese institutions offering JMAPs to develop course content, assist with faculty recruitment, and advise students about the appropriate course credit to complete their degrees.

61. China Liberal Beijing has provided services to JMAPs since 2012, and JMAPs accounted for the majority of CLEU's revenues each year prior to 2023.

62. However, amidst increasing scrutiny from Chinese authorities, two of the five JMAP programs were put into run off shortly before the Company's public listing, and by September 2023, the remaining programs had been discontinued, entirely eliminating this important revenue stream.

**2. Textbooks**

63. In addition to revenues from JMAP program fees, the Company also has generated revenues from the sale of textbooks and course materials developed in conjunction with its services to JMAPs.

64. Revenues for the Textbooks business are *de minimis*, never generating more than $50,000 in any given year since 2018. In two of the last three reporting years (2021 and 2023), revenues from the Textbooks business were nil.

**3. Overseas Study**

65. CLEU's Overseas Study business provides consulting services to assist Chinese students desiring to study outside of the PRC.

66. CLEU launched the Overseas Study business in 2017, and it initially included both private, one-on-one consulting services to individual students and on-campus services to assist students enrolled in foreign language programs at various universities in the PRC.

67. CLEU discontinued providing private consulting services in 2020 due to the impact of the COVID-19 pandemic.

68. The on-campus programs were then terminated in January 2023 in response to guidance from the PRC Ministry of Education directing Chinese institutions to cease projects and cooperation with external parties.

69. As a result, CLEU's revenues from its Overseas Study business fell sharply in 2020 and 2021, before recovering modestly in 2022, and then falling to $0 in 2023.

**4. Campus Technology**

70. Also launched in 2017, CLEU's Campus Technology business includes the buildout of campus intranet solutions, installation, and testing of smart devices on campus, customization of school management software, and school management data collection and analysis for Chinese universities.

71. CLEU claimed to have some initial success in attracting large-scale Campus Technology projects, such as development of a comprehensive business system for one university spanning registrar administration, teaching resource databases, mobile online learning systems, and human resources, and the build out of a "smart campus" solution, including software and hardware procurement, for another university.

72. CLEU reported meaningful revenues from these large-scale projects in the lead up to the Company's public listing in 2020, but the projects stopped generating revenues shortly thereafter.

73. CLEU's more recent Campus Technology projects are decidedly more modest, with the Company's annual report for calendar year 2023 mentioning only the sale of a single large-format display (*i.e.*, a big computer screen) in January 2023.

74. As a result of the Company's failure to generate large-scale projects in recent years, Campus Technology revenues declined sharply, falling to approximately $683,000 in 2023 from a peak of more than $2.2 million in 2019.

**5. Vocational Training**

75. Launched in 2019, CLEU's Vocational Training business involves partnerships with Chinese vocational schools and colleges to provide job readiness training to graduating students.

76. Utilizing the partner schools' administrative resources and classroom facilities, CLEU recruits faculty and develops course materials and content to help students improve their technical and social skills and assists with job placement. In exchange, CLEU receives a portion of the program fees from the partner schools.

77. Revenues attributed to the Vocational Training business have grown steadily, with CLEU receiving $2.2 million in revenue in calendar year 2023, but those revenues have been insufficient to offset declines in CLEU's other businesses.

**6. College Services**

78. In addition to the above business lines, CLEU briefly operated two Chinese colleges: Fuzhou Melbourne Polytechnic ("FMP") and Strait College of Minjiang University ("Strait College"). The revenues from FMP and Strait College were short-lived, contributing to the Company's financials only in 2022 and 2023.

79. CLEU acquired the rights to operate FMP and Strait College through its acquisition of Wanwang Investment Limited ("Wanwang") on September 2, 2022.

80. The business performance of the colleges was unsatisfactory, producing virtually no profits for CLEU, despite generating more than $6 million in revenues in 2022.

81. The Company also anticipated that it would be unable to continue operating and exercising control over the colleges due to expected changes in PRC government policies.

82. Accordingly, in December 2023, the Company agreed to transfer its equity interest in Wanwang to Xiaoshi Huang, one of Wanwang's previous owners, for $40 million.

83. Xiaoshi Huang assumed Wanwang's results of operations effective September 1, 2023, and CLEU no longer receives any revenue from operation of FMP or Strait College.

### B. The Company's Business Deterioration Leads to Financial Struggles and a Declining Stock Price

84. When CLEU went public in 2020, it claimed to be a modestly profitable business, reporting profits of more than $1.2 million for the year, despite the impact of the COVID-19 pandemic.

85. However, as the JMAPs, Overseas Study, and Technology Consulting businesses declined amidst poor performance and legal challenges in the early 2020s, the Company's revenues declined to the point that it was unable to operate profitably, even as the Vocational Training business purportedly experienced some success.

86. The Company posted net losses of approximately $1.25 million in 2021, $1.69 million in 2022, and $4.96 million in 2023.

87. Even worse, the Company had virtually no prospects of returning to profitability because its core JMAPs and Overseas Study businesses were effectively eliminated by the Chinese government's tightening of restrictions on collaboration with foreign universities, and its move into operating Chinese universities failed out of the gate.

88. As CLEU's business declined, so too did its stock price. In September 2020, CLEU stock traded at $6.15 per share, but by July 2021, the price had fallen to less than $2.00.

89. By January 2023, CLEU's stock price had fallen below NASDAQ's minimum price requirement of $1.00 per share, and the Company received a notice from NASDAQ that its shares were at risk of delisting.

**C. The Company Negotiates and Then Abandons a Merger with AIWAYS**

90. Faced with declines in the Company's core businesses and a rapidly falling stock price, CLEU's management, led by Defendant Lam, negotiated a merger agreement with AIWAYS Holdings Limited ("AIWAYS"), an electric vehicle company based in China, in November 2022.

91. Pursuant to the merger agreement, AIWAYS would merge with a wholly owned CLEU subsidiary; AIWAYS shareholders would receive publicly listed CLEU shares; and CLEU would transition its business to focus primarily on developing and manufacturing electric vehicles and batteries.

92. Given that CLEU had no electric vehicle assets, experience, or expertise of its own, the principal benefit of the merger for AIWAYS was that it could leverage CLEU's NASDAQ listing to become a publicly traded company with access to the U.S. capital markets.

93. Underscoring that CLEU's prior operations would contribute little or nothing to the business of the post-merger company, under the terms of the merger agreement, former AIWAYS shareholders would own 99.2% of the post-merger company, with legacy CLEU shareholders owning just 0.8%.

94. The planned merger was terminated in April 2023 because AIWAYS faced difficulties in the highly competitive Chinese electric vehicle market, leading it to halt production at its electric vehicle manufacturing facility in Shangrao, China in February 2023.

### D. The Company Executes a Share Consolidation to Preserve Its Public Listing

95. With the prospect of the AIWAYS merger in early 2023, CLEU's stock price recovered to above $1.00 per share following the January 2023 NASDAQ notice.

96. However, with the failure of the AIWAYS merger, CLEU's stock price declined again, and by September 2023, it had fallen back below NASDAQ's $1.00 per share listing threshold.

97. After receiving another notice from NASDAQ that its shares were at risk of being de-listed, the Company proposed a 1-for-15 reverse share split (or consolidation) to boost its share price.

98. The proposal was approved by CLEU shareholders on November 30, 2023, and it took effect on January 19, 2024.

99. Following the share consolidation, CLEU had approximately 3.4 million shares outstanding.

## II. THE CLEU DEFENDANTS FUNNEL HUNDREDS OF MILLIONS OF DISCOUNTED SHARES TO DEFENDANT LAM, THE *CEDRIC* INDICTEES, AND THEIR CO-CONSPIRATORS, WHILE CONCEALING THE SCHEME FROM THE MARKET

### A. The Company Issues Shares to Purchasers Hand-Selected by Defendant Lam

100. In May 2024, the Company announced that it planned to conduct a registered, self-underwritten public offering (the "June 2024 Issuance") of up to 25,000,000 shares (or more than seven times the number of previously outstanding shares) at an offering price of $1.00 per share, with anticipated net proceeds of $24.8 million.

101. Approximately 10,000,000 shares were to be issued to Defendant Lam, while the remaining 15,000,000 shares would be sold "through [Defendant Lam] to her friends, acquaintances and business associates."

102. CLEU described the June 2024 Issuance as a "best efforts self-underwritten public offering" for which no minimum offering amount was required as a condition to closing. The Company engaged no underwriter, broker, or dealer. Instead, Defendant Lam, the Company's CEO and Chairperson of the Board, was to sell the offering shares herself, directly to the public and to her own friends, acquaintances, and business associates, and was to receive no commission, purporting to rely on the safe harbor from broker-dealer registration in Rule 3a4-1 under the Securities Exchange Act of 1934. The Company acknowledged that Lam had limited experience conducting a best efforts offering and that there was no guarantee she would sell any of the shares.

103. The Company completed the offering on June 20, 2024.

104. Defendant Lam, directly and indirectly through Ever Alpha, purchased 10,000,000 shares, as previously announced. The Company did not disclose the identity of the purchasers of the other 15,000,000 shares selected by Defendant Lam.

105. On June 18, 2024, the last trading day prior to closing of the June 2024 Issuance, CLEU's stock closed at $2.80 per share. As a result, given the offering price of $1.00 per share, Defendant Lam, Ever Alpha, and Lam's hand-selected purchasers acquired shares at a more than 64% discount to the then-current trading price.

106. The $1.00 offering price was set below the market price of CLEU shares. The prospectus reported that the last reported sale price of CLEU's shares on NASDAQ was $2.02 on June 6, 2024. CLEU further stated that it intended to use approximately 80% of the net proceeds to pursue a new line of business providing integrated education and support services to Chinese students in Southeast Asian countries, a business the Company had not yet begun and for which it had only "been engaged in discussions with a few universities in Malaysia," while reserving broad discretion to apply the proceeds to other purposes.

**B. The Company Again Faces Delisting After Defendant Lam and Her Hand-Selected Purchasers Dump Their Newly Issued Shares**

107. Less than two weeks after the closing of the June 2024 Issuance, CLEU shares experienced a heavy sell-off, beginning on July 3 and continuing through July 10, 2024.

108. The Company's stock price declined from an opening price of $2.96 per share on July 3 to close at $0.39 per share on July 10, well below NASDAQ's minimum price requirement.

109. Trading volume was well above average, peaking at 15.7 million shares on July 8. This volume of trades could be achieved only if Defendant Lam, Ever Alpha, and Lam's hand-selected purchasers unloaded their shares during the sell-off.

110. The Company's shares continued to trade well below the $1.00 per share minimum bid requirement for the next several weeks, and on August 21, 2024, NASDAQ again notified the Company it was at risk of de-listing.

**C. The Company Implements Another 15-for-1 Share Consolidation**

111. Despite facing delisting, on September 19, 2024, the Company issued an additional 250,000,000 shares to Defendant Lam and nine undisclosed purchasers at a price of $0.28 per share, raising $70 million in proceeds (the "September 2024 Issuance"). Defendant Lam, directly and indirectly through Ever Alpha, received 50,000,000 shares through the issuance.

112. Given the offering price and the fact that the issuance represented nearly ten times the then-outstanding shares (approximately 28.4 million shares), the September 2024 Issuance virtually guaranteed that the Company's share price would remain below NASDAQ's $1.00 per share minimum-price requirement unless it conducted another share consolidation.

113. Just weeks after the September 2024 Issuance, the Company again proposed a 15-for-1 share consolidation, which shareholders approved on November 25, 2024.

114. The consolidation was scheduled to take effect on a date to be determined by the Board, but not later than February 17, 2025.

115. In the meantime, on October 11, 2024, the Company issued a press release (the "October 11 Press Release") announcing financial results for the first six months of 2024. The October 11 Press Release was drafted by Ascent and identified Defendant Xiao as the Company's "Investor Relations Contact."

116. The October 11 Press Release misleadingly characterized the Company as an ongoing business in the midst of a rebound, while failing to disclose that the CLEU Defendants had effectively abandoned the Company's operations in favor of attempting to monetize its public listing.

117. For example, the October 11 Press Release touted "a resurgence in revenue" from the Textbooks business, which, in fact had produced a meager $13,476 during the period, and it emphasized a nearly $64 million increase in the Company's cash position, while failing to disclose that it did not have any means or plans to productively utilize the cash to generate returns for shareholders. The same release disclosed that total revenue had fallen 34.8% to $885,804; revenue from smart-campus technological consulting had collapsed 97.4% to approximately $10,000; and CLEU had swung from net income of $376,211 to a net loss of $4,724,773. It also disclosed that its allowance for doubtful accounts had increased more than one hundredfold, from $24,554 to $2,563,577, principally because working capital provided to the two colleges CLEU had agreed to divest was expected to face collection problems. These contemporaneous results directly

contradicted Lam's claim in the same release that they evidenced the "resilience" of CLEU's business model and supported a return to long-term growth.[4]

118. The October 11 Press Release quoted Defendant Lam as saying:

> Those figures are a testament to the resilience of our business model and operations, and we expect to navigate short-term headwinds and resume our long-term growth trajectory. Looking forward, we remain confident in our business model and committed to translating our efforts into sustained growth and creating value for our shareholders.

119. Defendant Lam's statements, and the October 11 Press Release as a whole, were false and misleading because Defendants were not working to "resume [the Company's] long-term growth trajectory," generate "sustained growth," or "create[e] value for . . . shareholders," but instead had determined to monetize the Company's public listing through illicit means.

120. On December 20, 2024, the Company announced that the 15-for-1 share consolidation approved in November would take effect four days later on December 24, 2024.

**D. The Company Conducts a Fraudulent Offering to Put Millions of Shares into the Hands of the *Cedric* Indictees and Their Co-Conspirators**

121. On December 23, 2024, the day before the 15-for-1 consolidation was to take effect, the Company announced an issuance of shares and warrants (the "December 2024 Issuance") to 30 purchasers whose identities were undisclosed at the time but were later revealed to include the *Cedric* Indictees and their co-conspirators.

122. Through the December 2024 Issuance, the Company issued 160,000,000 shares at a price of $0.13 per share. Participants also received warrants (the "Warrants") entitling them to

[4] Press Release, China Liberal Educ. Holdings Ltd., *China Liberal Education Holdings Limited Reports Financial Results for the First Six Months of Fiscal Year 2024* (Oct. 11, 2024), https://www.prnewswire.com/news-releases/china-liberal-education-holdings-limited-reports-financial-results-for-the-first-six-months-of-fiscal-year-2024-302273801.html.

purchase two additional shares for each share purchased in the issuance (*i.e.*, up to 320,000,000 shares).

123. Setting aside the Warrants, the December 2024 Issuance increased the Company's total shares outstanding to approximately 438,800,000 shares, approximately one-third of which were held by the *Cedric* Indictees and their co-conspirators, and another approximately 60,000,000 were held by Defendant Lam directly or indirectly through Ever Alpha.

124. Following the 15-for-1 consolidation, which took effect the day after the December 2024 Issuance, the number of shares outstanding was reduced to approximately 29,300,000 shares, with approximately 10,700,000 of those shares held by the *Cedric* Indictees and their co-conspirators, and another approximately 4,000,000 held by Defendant Lam directly and indirectly through Ever Alpha.

125. As a result of the share consolidation, the Company's stock price increased from a close of $0.16 on December 23, to close at $2.70 per share on December 24, 2024.

126. The December 2024 Issuance was not done for legitimate business purposes. Instead, the issuance was designed to put the Company's shares in the hands of the *Cedric* Indictees and their co-conspirators to be used in a fraudulent pump-and-dump scheme.

127. The December 2024 Issuance was conducted pursuant to a prospectus supplement on Form 424B5 filed by the Company with the SEC on December 23, 2024 (the "December 2024 Prospectus").

128. The December 2024 Prospectus was a prospectus supplement to the Company's shelf registration statement on Form F-3 (File No. 333-273266), which had been declared effective on July 21, 2023. In it, the Company disclosed that it had not entered into any underwriting agreement, arrangement, or understanding for the sale of the shares, and that it had negotiated the

offering price directly with the Investors. The prospectus identified the 30 Investors only as "Purchaser A" through "Purchaser DD" and did not disclose their true identities. As with the June 2024 Issuance, the December 2024 Issuance was placed by the Company directly with a group of purchasers it selected, rather than sold to the public through an underwriter.

129. The December 2024 Prospectus misrepresented that the December 2024 Issuance was intended to raise $20.8 million in proceeds for "working capital and capital expenditure purposes." In fact, however, the CLEU Defendants had no intention of using the proceeds of the offering for such purposes because they had effectively abandoned the Company's operations in favor of monetizing its public listing through illicit means. Further, even if Defendants were attempting to continue the business as a going concern, following the June and September 2024 Issuances, the Company had more than sufficient capital to fund its much-diminished operations for years to come. Indeed, the Company had more than $84 million in cash on hand before the December 2024 Issuance, whereas its operating expenses for the prior year were less than $2.6 million. In other words, the Company already had sufficient cash on hand to fund its operations for more than 32 years, making the December 2024 Issuance entirely unnecessary from a business perspective.

130. The December 2024 Prospectus also failed to disclose that the Cedric Indictees and their co-conspirators were conducting a fraudulent investment scheme through social media and that the December 2024 Issuance was designed to issue shares to the *Cedric* Indictees and their co-conspirators for use in that scheme.

### E. The Company Gifts the *Cedric* Indictees and Their Co-Conspirators Millions of Additional Shares, While Concealing Critical Information from the Market

131. The exercise price of the Warrants issued in conjunction with the December 2024 Issuance initially was set at $0.45 per share. However, on the seventh calendar day after the

issuance (*i.e.*, December 30, 2024), the exercise price would be reduced to $0.04 per share (a price the December 2024 Prospectus itself described as 24% of the minimum price under NASDAQ Listing Rule 5635(d) in effect immediately before the offering), and the number of shares available to be issued upon exercise of the Warrants would increase to 3,600,000,000 (the "Reset Adjustment"), a more than ten-fold increase.

132. The December 2024 Prospectus stated that the Warrants would be subject to "customary anti-dilution and other exercise price adjustment mechanisms," and the Warrant Agreement expressly provided for the exercise price and the number of shares available to be issued to be adjusted to reflect any share split or consolidation by the Company.

133. After giving effect to the Reset Adjustment and the 15-for-1 consolidation, the Warrants were exercisable to acquire 240,000,000 CLEU shares at an exercise price of $0.60 per share, more than eight times the total number of post-consolidation shares outstanding.

134. On December 31, 2024, the Company filed a Form 6-K with the SEC (the "December 2024 6-K") announcing that it had entered into a Warrant Exchange Agreement with the holders of the Warrants (whose identities still were not disclosed). The December 2024 6-K was signed by Defendant Lam. The 6-K stated that the Company's board of directors had approved the Warrant Exchange Agreement and the transactions contemplated by it.

135. Pursuant to the Warrant Exchange Agreement, the holders surrendered the Warrants in exchange for 240,000,000 CLEU shares (the "Exchange Shares"). The holders of the Warrants were not required to pay the exercise price or provide any other consideration to the Company in exchange for the Exchange Shares, other than surrendering the Warrants.

136. In other words, the Company agreed to issue the shares that holders would be entitled to receive upon exercise of the Warrants, but the holders were not required to actually

exercise the Warrants or pay the exercise price contemplated thereby. In effect, the Company gave the holders of the Warrants (*i.e.*, the *Cedric* Indictees and their co-conspirators) 240,000,000 CLEU shares in exchange for no additional consideration, further demonstrating that the sole purpose of the December 2024 Issuance was to put CLEU shares in the hands of the *Cedric* Indictees and their co-conspirators, and not to raise capital.

137. As with the December 2024 Prospectus, the December 2024 6-K failed to disclose that the *Cedric* Indictees and their co-conspirators were conducting a fraudulent investment scheme through social media and that the Warrant Exchange Agreement was designed to issue shares to the *Cedric* Indictees and their co-conspirators for use in that scheme.

138. Defendants also misleadingly concealed the timing of when the Exchange Shares were issued under the Warrant Exchange Agreement to facilitate the use of those shares by the *Cedric* Indictees and their co-conspirators in their fraudulent scheme.

139. Under the terms of the Warrant Exchange Agreement, Transhare, as the Company's transfer agent, was responsible for issuing the Exchange Shares to the holders of the Warrants following receipt of instructions from the Company.

140. The Warrant Exchange Agreement, attached as an exhibit to the December 2024 6-K, identified the holders in a schedule as the same 30 purchasers, designated "Purchaser A" through "Purchaser DD," that had acquired the shares and warrants in the December 2024 Issuance eight days earlier. The agreement provided that the 240,000,000 Exchange Shares would be issued in book-entry form and "without any restrictive legends," meaning they were immediately available to be sold into the public market. It further recited that each holder was "not providing anything of value as consideration for the Exchange Shares other than the Existing Warrants,"

even though those same holders could otherwise have obtained the 240,000,000 shares only by paying the $0.60 per share exercise price, or $144,000,000 in the aggregate.

141. The Exchange Shares were issued to the *Cedric* Indictees and their co-conspirators on December 31, 2024.

142. To conceal the fact that the Exchange Shares had been issued and were available to be traded in the market, the December 2024 6-K represented only that the Exchange Shares were "expected to be delivered to the Holders on or prior to January 7, 2025," without disclosing that the 240,000,000 shares had already been issued on December 31, 2024, or that they were to be placed with the *Cedric* Indictees and their co-conspirators for immediate sale.

143. The Warrant Exchange Agreement's own terms confirmed that issuance and disclosure were to occur almost immediately. Section 1.2 of the agreement required the Company, within one business day after December 31, 2024, to instruct Transhare to issue the Exchange Shares, and Section 4.1 required the Company, within one business day, to file a Form 6-K "disclosing all material terms of the Transactions." That timetable was inconsistent with the December 2024 6-K's representation that the Exchange Shares would merely be delivered "on or prior to January 7, 2025."

144. The Warrant Exchange Agreement imposed an express confidentiality regime that further confirms the concealment. Section 4.3 required CLEU and each Holder to keep confidential the Exchange, the negotiations, the terms of the agreement, and other non-public information. Section 4.1 provided that these confidentiality obligations would terminate, and that CLEU would represent that a Holder did not possess material nonpublic information solely by virtue of participating in the Exchange, only "from and after" the filing of a Form 6-K "disclosing all material terms of the Transactions." As alleged above, the December 2024 6-K did not disclose

that the 240,000,000 Exchange Shares had already been issued or the resulting share count. The Exchange and its terms thus remained concealed from the market when the *Cedric* Indictees began selling the Exchange Shares on January 22, 2025, weeks before CLEU disclosed the issuance on January 27, 2025.[5]

145. Moreover, the CLEU Defendants did not advise the SEC of the issuance or comply with NASDAQ regulations (*i.e.*, NASDAQ Rule 5250(e)(1)) requiring that a Change in Shares Outstanding form be filed within 10 calendar days after the issuance of shares representing 5% or more of the company's shares outstanding.

146. Likewise, despite having issued the shares in its capacity as transfer agent, Transhare did not timely announce or advise the SEC or NASDAQ of the issuance.

147. The CLEU Defendants and Transhare did not publicly announce the issuance of the Exchange Shares until January 27, 2025, and they did not file the Change in Shares Outstanding form with NASDAQ until January 29, 2025.

148. Because of the CLEU Defendants' and Transhare's failure to disclose the issuance of the 240,000,000 Exchange Shares, the market continued to believe through January 2025 that the Company had approximately 29,300,000 shares outstanding, when in fact the actual number of shares outstanding was nearly ten times as much at 269,300,000. As a result, the Company's stock price was artificially inflated throughout January 2025.

149. When CLEU finally disclosed the transaction in its January 27, 2025 Form 6-K, it reported that 269,325,176 shares were outstanding and that approximately 251,964,865 of them (93.6%) were "free trading shares." The Company's own disclosure therefore confirmed that

---

[5] China Liberal Educ. Holdings Ltd., Warrant Exchange Agreement §§4.1, 4.3 (Form 6-K, Ex. 99.1) (Dec. 31, 2024), https://www.sec.gov/Archives/edgar/data/1775085/000147793224008424/cleu_ex991.htm.

nearly the entire enlarged share base was immediately tradeable while the *Cedric* Indictees and their co-conspirators were selling into the artificially inflated market.[6] Although CLEU disclosed 269,325,176 outstanding shares in its January 27 Form 6-K, the civil forfeiture complaint alleges that NASDAQ market data did not reflect the enlarged share count until the market opened on January 30, 2025.[7]

150. Transhare performed a central and indispensable role in the CLEU Scheme. As CLEU's transfer agent, Transhare maintained the Company's official register of shares and was the entity that actually issued the 240,000,000 Exchange Shares on December 31, 2024. Transhare therefore knew, at the time of the issuance, that the number of CLEU shares outstanding had increased nearly tenfold, from approximately 29,300,000 to 269,300,000, at the same time that the market, the SEC, and NASDAQ continued to be informed that only approximately 29,300,000 shares were outstanding.

151. As a transfer agent registered under Section 17A of the Exchange Act, Transhare was subject to the recordkeeping and reporting requirements applicable to registered transfer agents and held itself out as a professional specializing in micro-cap issuers and as a member of the Securities Transfer Association. Rather than act consistently with that role, Transhare used its position and its access to DTC's electronic settlement system to place the secretly issued Exchange Shares into the hands of the *Cedric* Indictees and their co-conspirators, in a form that could be sold into the market, while the issuance remained concealed from the public.

---

6 China Liberal Educ. Holdings Ltd., Current Report (Form 6-K) (Jan. 27, 2025), https://www.sec.gov/Archives/edgar/data/1775085/000147793225000446/cleu_6k.htm.

7 *See,* Verified Complaint for Forfeiture ¶50*, United States v. Funds in The Amount Of $19,901,190.42 Seized From Company A Account Number XXXX9087 Held in the Name of Lim Xiang Jie Cedric,* No. 1:25-cv-02964, ECF No. 1 (N.D. Ill. Mar. 20, 2025). https://www.justice.gov/usao-ndil/media/1394111/dl?inline. ("Forfeiture Complaint").

152. CLEU's own December 23, 2024 Prospectus described Transhare's control over the trading infrastructure in even more explicit terms: the "legal title" to CLEU's NASDAQ-listed shares and their "registration details . . . remain with Transhare," and "[a]ll market transactions" in the shares "will all be conducted through the Transhare Corporation systems." Thus, according to CLEU's own contemporaneous filing, the undisclosed Exchange Shares could not enter the public market in the manner alleged without passing through systems controlled by Transhare.[8]

153. As CLEU's transfer agent and registrar, Transhare was the sole authoritative recordkeeper of CLEU's outstanding securities and the exclusive gateway through which CLEU shares entered the U.S. trading and clearing system. By virtue of that role, Transhare necessarily created and possessed the definitive records of the December 2024 issuance, including the issuer instruction directing issuance; the identity and registration information for each recipient; the number of shares issued to, and the date of registration of, each recipient; the restricted or unrestricted status assigned to each block and any legal opinion relied upon in assigning unrestricted status; the receiving brokerage and DTC participant information; the DWAC or DRS transaction records and timestamps; the cancellation records for the exchanged warrants; and the pre- and post-issuance capitalization totals. Transhare therefore knew, at all relevant times, that CLEU had approximately 269,300,000 shares outstanding while the investing public, the SEC, and NASDAQ were operating on a share count roughly one-tenth that size.

154. The transaction Transhare processed was not a routine issuance but one of the most consequential events in CLEU's history, and it carried facial red flags of manipulation. CLEU's December 23, 2024 Prospectus described an extraordinarily dilutive financing in which CLEU

[8] China Liberal Educ. Holdings Ltd., Prospectus Supplement (Form 424B5) (Dec. 23, 2024), https://www.sec.gov/Archives/edgar/data/1775085/000147793224008281/cleu_424b5.htm.

issued 160,000,000 ordinary shares together with 320,000,000 warrants, provided that seven days after issuance the warrant exercise price would reset from $0.45 to $0.04, increasing the maximum number of shares issuable upon exercise to approximately 3.6 billion, and identified the purchasers only anonymously as "Purchaser A" through "Purchaser DD." Following a reverse share consolidation and the warrant reset, CLEU entered into the December 31, 2024 Warrant Exchange Agreement under which the holders surrendered 320,000,000 warrants and received the 240,000,000 Exchange Shares, for which no new exercise payment was made. Neither the Company nor Transhare disclosed that the exchange had closed until January 27, 2025, when the Company reported 269,325,176 shares outstanding, of which approximately 251,964,865 were free trading. Transhare issued and recorded the Exchange Shares on or about December 31, 2024, yet for nearly a month the market continued to trade on the belief that approximately 29,300,000 shares were outstanding.

155. The circumstances known to Transhare were cumulatively alarming: an almost tenfold increase in outstanding shares; 33 nominally separate purchasers; a warrant reset and exchange occurring within days and without new payment; delivery of the large majority of the Company's capitalization as unrestricted, free-trading stock; recipients seeking immediate access to retail brokerage accounts; and all of this while CLEU was struggling to preserve its NASDAQ listing and while the public share-count figure remained materially false.

156. Transhare's public description of its own practices underscores that its processing of the CLEU issuance was not ministerial. Transhare represents that it requires formal documentation, corporate resolutions, and signature guarantees even for ordinary changes in share ownership. Notwithstanding that professed rigor for routine transfers, Transhare entered 33 purchasers on CLEU's register, marked approximately 240,000,000 Exchange Shares as

unrestricted, delivered them electronically for immediate trading, and represented their validity to brokers, in connection with a transaction that multiplied CLEU's outstanding shares nearly tenfold. The material questions are therefore not whether an issuer instruction existed, but what documentation Transhare demanded and what review Transhare performed before entering the recipients on the register, assigning unrestricted status, delivering the shares electronically, and vouching for them to brokers.

157. The concealment of the issuance of the Exchange Shares and the artificial inflation of the Company's stock price enabled the Company to announce on January 13, 2025, that it had regained compliance with NASDAQ's minimum price requirement, ensuring CLEU shares remained listed and publicly tradeable.

158. Indeed, on January 13, 2025, the Company issued a press release (the "January 13 Press Release"), which was drafted by Ascent and listed Defendant Xiao as the Company's "Investor Relations Contact." The January 13 Press Release stated that the Company had "effectuated a share consolidation on December 24, 2024" "to cure the Minimum Bid Price deficiency," and that the Company had regained compliance with NASDAQ's listing standards because it maintained "a closing bid price at or greater than US$1.00 per share for 10 consecutive business days from December 24, 2024 to January 8, 2025." The January 13 Press Release misleadingly failed to disclose the issuance of 240,000,000 Exchange shares on December 31, 2024, or that, if the issuance of those shares were known to the market, the Company's share price would be far below the NASDAQ minimum price requirement.

159. The *Cedric* Indictees and their co-conspirators, along with Defendant Zhao, then used the Company's continued public listing and their secret holdings of 240,000,000 shares to

carry out a pump-and-dump scheme through which they reaped hundreds of millions of dollars in profits at the expense of the Class.

**F. CLEU's Class Period SEC Filings Were Materially False and Misleading**

160. Throughout the Class Period, CLEU made statements in reports furnished to the SEC on Form 6-K, and in the press releases attached as exhibits thereto, that were materially false and misleading because they described the December 2024 Issuance, the Warrant Exchange, and the related share consolidations as legitimate, routine corporate and capital-markets transactions, while concealing that those transactions were non-bona fide and were designed to place hundreds of millions of CLEU Ordinary Shares into the hands of the Cedric Indictees and their co-conspirators for use in the CLEU Scheme.

161. On or about December 31, 2024, CLEU furnished to the SEC a Current Report on Form 6-K announcing that, on December 31, 2024, it had entered into a warrant exchange agreement pursuant to which "the Holders agreed to surrender 320,000,000 Warrants for cancellation and the Company agreed, in exchange, to issue an aggregate of 240,000,000 Ordinary Shares to the Holders." The accompanying Warrant Exchange Agreement represented that "[t]he Exchange is being made in the form of cashless exercise of the Existing Warrants," made "pursuant to an effective prospectus supplement filed with the [SEC] on December 23, 2024."

162. These statements were materially false and misleading, and omitted material facts necessary to make them not misleading, because they portrayed the issuance of 240,000,000 Ordinary Shares as an ordinary, arms'-length warrant exchange undertaken for legitimate corporate purposes, while failing to disclose that: (a) the December 2024 Issuance and the Warrant Exchange were not bona fide capital-raising or capital-structure transactions, but were instead devices to flood the market with freely tradeable shares; (b) the recipients of the Exchange Shares were participants in, or were acting in concert with, the Cedric Indictees in the CLEU Scheme;

and (c) those shares were to be sold into an artificially inflated market within weeks, to the foreseeable detriment of public investors.

163. On or about January 13, 2025, CLEU furnished to the SEC a Current Report on Form 6-K attaching a press release announcing that the Company "has regained compliance with the NASDAQ Listing Rule 5550(a)(2) ('Minimum Bid Price Requirement') and the matter is closed," and that, "in order to cure the Minimum Bid Price deficiency, the Company has effectuated a share consolidation on December 24, 2024." The same release described CLEU as "a China-based company that provides technological consulting services for smart campus solutions and other educational services."

164. These statements were materially false and misleading, and omitted material facts necessary to make them not misleading, because they presented CLEU as a legitimately operating company that had cured a routine listing deficiency through an ordinary reverse stock split, while failing to disclose that the December 24, 2024 share consolidation, the December 2024 Issuance, and the Warrant Exchange were interlocking components of the CLEU Scheme designed to manufacture an artificially compliant and tradeable security, and that 240,000,000 Ordinary Shares had just been issued to participants in the CLEU Scheme who were poised to dump them into the market. The representation that "the matter is closed" fostered a false impression of corporate normalcy and stability at the precise moment the CLEU Scheme was being executed.

165. Each of the foregoing reports was furnished to the SEC and disseminated into an efficient market, and the market relied upon the integrity of those disclosures in setting the price of CLEU securities. The statements identified above, and CLEU's Class Period filings, as a whole, were rendered materially false and misleading by Defendants' failure to disclose the existence, nature, and purpose of the CLEU Scheme, as further set forth below.

## III. THE *CEDRIC* INDICTEES AND THEIR CO-CONSPIRATORS USE SOCIAL MEDIA TO LURE VICTIMS INTO BUYING CLEU AT ARTIFICIALLY INFLATED PRICES

### A. The *Cedric* Indictees and Their Co-Conspirators Use Social Media to Perpetrate a Pump-and-Dump Scheme

166. The *Cedric* Indictees and their co-conspirators first targeted potential victims with ads on Facebook and Instagram promoting fake investment clubs, which, in reality, were merely vehicles for the scammers to execute a stock manipulation scheme.

167. Some of the ads featured celebrities. For example, Plaintiff Bouck was targeted with ads featuring Kevin O'Leary, a/k/a "Mr. Wonderful" from Shark Tank, while other members of the CLEU Victim Group were targeted with ads featuring Dave Portnoy of Barstool Sports and conservative commentator Tucker Carlson.

168. Other ads featured well-known investors. For example, Plaintiff Zhao was targeted with ads featuring Tom Lee, a featured CNBC commentator, and Plaintiff Spring was targeted with ads featuring Liz Ann Sonders, Managing Director and Chief Investment Strategist at Charles Schwab. Other members of the CLEU Victim Group were targeted with ads featuring Savita Subramanian, Head of U.S. Equity and Quantitative Strategy at Bank of America Merrill Lynch, and Cathie Wood of ARK Invest.

169. Still other ads appeared to be from reputable financial advisory firms whose likenesses, branding, and other information had been appropriated and exploited by the scammers. For example, Plaintiff Bouck was targeted with ads that appeared to be for Sageview Capital, an investment firm based in Newport Beach, California, while other members of the CLEU Victim Group were targeted with ads seemingly for Circle Advisors, Blue Wolf Capital, and Viking Global Investments.

170. The ads told targeted Facebook and Instagram users that investment club members would have access to stock recommendations from the featured financial advisors and promised that the recommendations would result in tremendous returns.

171. For example, advertisements for "Mr. Wonderful Wealth Sharing" touted that the previous week's three stock recommendations were up 48%, 66%, and 108%, respectively.



172. Another ad, purportedly for Ms. Subramanian's "trading training" program, promised potential returns of 30%-40% "everyday."




173. Facebook and Instagram users who clicked on the ads either were automatically added into or were invited to click an embedded link to join a private WhatsApp group.

174. Within the WhatsApp group, *Cedric* Indictees and their co-conspirators posed as representatives of the featured advisors and communicated with users regarding the club's operations, including the timing of stock recommendations.

175. For example, the purported financial advisor representatives in one group communicated that they would make two or three short-term recommendations each week, with returns of 10%-15% over a three- to seven-day holding period, and that they periodically would make medium- to long-term investment recommendations with profits exceeding 160%.

176. The *Cedric* Indictees and their co-conspirators also created dozens of fake accounts, posing as club members within the WhatsApp group and touting their prior successes following the advisors' recommendations, which created the appearance of legitimacy and reliability that helped lure victims into the scheme.




177. Users were offered a free trial period (typically 60 to 90 days) to try out the investment club, after which they would be charged commissions based on the returns they realized.

178. Then, over a period of months, the *Cedric* Indictees and their co-conspirators communicated with users in the WhatsApp group, providing investment recommendations and friendly communications to build trust.

179. Although the *Cedric* Indictees and their co-conspirators held themselves out as U.S.-based investment advisors, including advisors purportedly located in Chicago, Illinois, the individuals operating the WhatsApp accounts were in fact located in China. According to records obtained by federal law enforcement, the WhatsApp accounts used by the purported U.S.-based

investment firms and advisors, in reality, were operated by individuals based in China, whose solicitations of victims were coordinated with the deposits and sales of CLEU shares by the *Cedric* Indictees. *Cedric* Indictment ¶4; *Cedric* Forfeiture Compl. ¶¶23, 33.

### B. The *Cedric* Indictees and Their Co-Conspirators Solicit Purchases of CLEU by Plaintiffs and the Class Based on False and Misleading Information

180. On January 22, 2025, the *Cedric* Indictees and their co-conspirators, posing as financial advisor representatives, began recommending that WhatsApp group members purchase shares of CLEU at specified price points. They predicted that the price of CLEU stock would appreciate significantly in the near future, typically promising returns of 380% within 20-30 days.

181. The *Cedric* Indictees and their co-conspirators continued to recommend additional purchases of CLEU at higher price points over the coming days, pressuring victims to liquidate other investments, move cash from other accounts, and even take out loans to fund their purchases.

182. The *Cedric* Indictees and their co-conspirators provided WhatsApp group members with a purported analyst report setting forth the investment case for CLEU stock.

183. The analyst report forecasted rapid growth in China's education industry, projecting that it "would double again in the next 5-6 years," becoming a $1.4 trillion industry by 2030.

184. The analyst report contained various false and misleading statements about the industry and the market opportunity available to CLEU. For example, the report represented that the Chinese government "emphasizes cooperation and exchanges with other countries in the field of education" and that CLEU "has extensive cooperation and exchanges in the field of international education and is able to provide students with international education services." In fact, however, the Chinese government recently had taken steps to curb cooperation with foreign universities,

limiting opportunities for international education and leading CLEU to shutter its JMAPs and Overseas Study business lines.

185. The analyst report also promoted a fictitious business combination between CLEU and Stride Inc., a U.S.-based online education company that the report claimed was seeking to enter the Chinese market by acquiring CLEU which "will surely lead to explosive growth." The analyst report predicted that CLEU's share price would rise to $22-$28 per share (approximately four times the current trading price) after the business combination was announced.

186. The *Cedric* Indictees and their co-conspirators repeated similar claims in the WhatsApp groups, stating, for example, that their price target for CLEU was $20 per share or higher.

187. The *Cedric* Indictees and their co-conspirators pressured victims to buy quickly, claiming that waiting even a few days would cause them to miss out on the stock's rise.

188. The *Cedric* Indictees and their co-conspirators also promised to reimburse investors for up to 80% of any losses on the CLEU investment.

189. In reliance on these false and misleading statements, Class members purchased shares of CLEU stock.

190. Because hundreds, if not thousands, of victims across hundreds of WhatsApp groups were making purchases, CLEU's stock price rose rapidly. With the promised returns seemingly materializing, Class members were falsely reassured and continued to make additional purchases based on the scammers' representations, further inflating the stock price.

191. CLEU's stock price increased from a closing price of $5.32 per share on January 21, 2025 to a peak of $7.90 per share on January 29, 2025, as shown in the chart below.




192. Trading volume was exceptionally high, with 126 million shares traded on January 22, 71.6 million shares on January 23, and at least 23 million shares traded on each of the following four trading days. In contrast, CLEU's prior trading volume typically was less than 1 million shares daily.

## IV. DEFENDANTS UNLOAD THEIR CLEU SHARES, INCLUDING THE SECRETLY ISSUED EXCHANGE SHARES, ON PLAINTIFFS AND THE CLASS

### A. The Cedric Indictees and Their Co-Conspirators Use Victims' Purchases to Unload Their CLEU Shareholdings, Including the Secretly Issued Exchange Shares, at Inflated Prices

193. Unbeknownst to the victims, *Cedric* Indictees and their co-conspirators were standing on the other side of the CLEU transactions from January 22 through January 29, 2025.

194. The *Cedric* Indictees and their co-conspirators unloaded their CLEU shareholdings (including the 240,000,000 Exchange Shares they had received pursuant to the Warrant Exchange Agreement, which still had not been disclosed to the market) by entering sale transactions at price points matching those fed to victims in the WhatsApp groups.

195. Through these sales, the *Cedric* Indictees and their co-conspirators reaped hundreds of millions of dollars in illicit profits by selling CLEU shares at inflated prices.

196. The sales by the *Cedric* Indictees are summarized in the following table:

| Defendant | Date(s) | Number of Shares | Proceeds |
|---|---|---|---|
| K.W. Wong | Jan. 22, 2025 | 4,936,410 | $26 million |
| Cheng | Jan. 22, 2025 | 9,278,975 | $49 million |
| Chai | Jan. 22, 2025 | 9,188,500 | $49 million |
| Cedric | Jan. 22, 2025 | 3,687,598 | $19 million |
| Ma | Jan. 22-23, 2025 | 8,949,270 | $48 million |
| K.S. Wong | Jan. 23, 2025 | 9,329,500 | $57 million |
| Vun | Jan. 29, 2025 | 7,285,000 | $56 million |

197. Following the sales by Defendants Cedric, Chai, Cheng, and K.S. Wong on January 22 and 23, 2025, they were prohibited by their brokerage firm from selling any additional CLEU shares. However, between January 24 and 29, 2025, Defendants Cedric, Chai, Cheng, and K.S. Wong collectively entered and immediately canceled more than 2,500 orders to purchase approximately 56 million CLEU shares to create the appearance of demand and increase the value of the stock to facilitate sales by the other *Cedric* Indictees and their co-conspirators.

198. The government's civil forfeiture filings detail additional facts regarding Cheng's individual conduct that further evidence the coordinated nature of the scheme and Cheng's knowledge of it.[9] Cheng opened the U.S.-based brokerage account that he used to sell his CLEU shares on December 24, 2024, the same day the Company announced the 15-for-1 reverse split and did so for the purpose of trading CLEU stock. Cheng acquired his CLEU shares at a cost of approximately $0.60 per share. On January 16, 2025, before selling any shares, Cheng confirmed with the brokerage that his CLEU shares were not subject to any sale restriction. When Cheng sold his shares on January 22, 2025, he realized proceeds of approximately $49,535,081.17, and

[9] *See* Gov't's Resp. to Claimant's Mot. to Vacate Default J. at 3–6, 22, *United States v. Funds in the Amount of $37,905,571.53*, No. 1:25-cv-02965, ECF No. 32 (N.D. Ill. July 2, 2025).

his sell orders were placed at the same prices that the *Cedric* Indictees and their co-conspirators were simultaneously directing victims in the WhatsApp groups to pay. This price alignment reflects a further layer of coordination between the traders liquidating CLEU shares and the social-media impersonators generating retail demand.

199. On information and belief, Defendant Lam also made sales of CLEU shares, both directly and indirectly through Ever Alpha, during the period when the stock price was inflated by the failure to disclose the issuance of the Exchange Shares and the market manipulation scheme.

### B. Transhare and Defendant Zhao Facilitate Sales of CLEU Shares by the *Cedric* Indictees and Their Co-Conspirators

200. To sell the 240,000,000 Exchange Shares through the pump-and-dump scheme, the *Cedric* Indictees and their co-conspirators needed to deposit those shares into brokerage accounts with the capability of trading NASDAQ-listed securities and ensure that those shares were not subject to trading restrictions.

201. On January 14 and 15, 2025, Defendants Cheng, K.S. Wong, Cedric, and Chai collectively deposited more than 33.9 million CLEU shares into accounts at a U.S.-based brokerage firm, which, on information and belief, was Charles Schwab & Co. Inc. ("Schwab").

202. Between January 17 and 29, 2025, Defendants K.W. Wong, Ma, and Vun collectively deposited more than 21.1 million CLEU shares into accounts at a U.S.-based brokerage firm, which, on information and belief, was eToro Group Ltd. ("eToro").

203. In connection with those deposits, Defendants K.W. Wong, Ma, and Vun each made false statements to eToro that concealed the coordinated nature of the scheme. According to the Forfeiture Complaint, in response to due-diligence inquiries from the brokerage concerning the purpose of the share transfers, each of the three represented that he was not connected to any other owner of CLEU shares, and each represented that he intended to hold the shares rather than

sell them. Forfeiture Compl. ¶¶ 42–43. In reality, both Defendants acted in concert with the other Cedric Indictees and their co-conspirators and sold their entire CLEU position almost immediately after the shares were deposited. *Id.* In addition, brokerage IP records show that on December 31, 2024 (the same day the Company issued the 240,000,000 Exchange Shares pursuant to the Warrant Exchange Agreement) the brokerage accounts of Defendants Vun and Ma were accessed from the same IP address. *Id.*

204. According to the Forfeiture Complaint, before he began selling his CLEU shares, Defendant K.W. Wong's brokerage account held a cash balance of approximately $40,142.10. Forfeiture Compl. ¶45. On the morning of January 22, 2025, K.W. Wong sold all 4,936,410 of his CLEU shares and, within approximately one-half hour of beginning to sell, made a total of $26,186,430.61. *Id.* Then, on or about January 27, 2025, while the Cedric Indictees' co-conspirators were still soliciting victims to purchase CLEU shares, K.W. Wong used $18.3 million of his proceeds to purchase shares of an unrelated investment fund, converting the bulk of his illicit proceeds into a different security days before the collapse of CLEU's share price. *Id.*

205. The DOJ's civil forfeiture complaint alleges that federal investigators traced the resulting proceeds account by account. Four brokerage accounts received 33,906,975 CLEU shares between January 10 and 15, 2025 and sold 31,484,573 of those shares on January 22 and 23 for $176,104,984. Three additional accounts received 21,170,680 shares between January 17 and 29 and sold all of those shares during the same period for $131,766,360.80. In total, the government traced more than $307.8 million in proceeds to seven accounts that received CLEU shares before the 240,000,000-share issuance became public.[10]

[10] Compl. ¶¶19–21, *United States v. Funds in the Amount of $19,901,190.42*, No. 1:25-cv-02965 (N.D. Ill. Mar. 20, 2025), https://www.justice.gov/usao-ndil/media/1394111/dl?inline=.

206. Defendant Zhao facilitated the opening of the accounts by the *Cedric* Indictees and their co-conspirators, including by communicating with Schwab and eToro representatives, completing account-opening documents and other required paperwork, and arranging for the transfer of the CLEU shares.

207. Zhao's role in facilitating sales of CLEU shares is corroborated by the Zhao indictment. That indictment identifies CLEU as "Public Company A," which it describes as a Cayman Islands company with principal executive offices in China, trading on NASDAQ, that purported to be an educational services company and operated using a variable interest entity structure.[11] The indictment alleges that, beginning in or around December 2024, Zhao held himself out as a financial advisor and cultivated relationships with U.S.-based brokers, and that he directed the sale of his clients' CLEU shares through those brokers, including at or around the time CLEU's share price was crashing. The indictment further alleges that, in or around January 2025, Zhao contacted a U.S.-based broker to open accounts and transfer the shares of two of his clients who had participated in a CLEU securities offering. These allegations corroborate that CLEU's offering shares were funneled to Zhao's clients for sale during the price-inflation campaign, as alleged herein.

208. Transhare also facilitated the opening of the accounts by vouching for the legitimacy of the 240,000,000 Exchange Shares despite knowing that the issuance of the shares had not been publicly reported or reflected in public information regarding the number of CLEU shares outstanding, and that the *Cedric* Indictees and their co-conspirators were perpetuating a market manipulation scheme. Among other things, Transhare advised Schwab and eToro

---

[11] Indictment, *United States v. Yan Zhao,* No 1:25-cr-00259 (E.D. Virginia Sept. 10 2025), https://www.justice.gov/criminal/media/1413971/dl

representatives that the Exchange Shares had been issued directly by the Company, were not subject to any restrictions, and were available to be traded, despite knowing that NASDAQ and other public sources were unaware the shares had been issued.

209. Transhare's status as a FAST and DRS agent with DTC was essential to the scheme. Because Transhare participated in DTC's electronic settlement system, it was able to, and did, cause the 240,000,000 Exchange Shares to be issued and delivered in electronic form and, on information and belief, free of any restrictive legend, so that the shares could be deposited into the brokerage accounts at Schwab and eToro and sold into the market during the January 2025 price-inflation campaign. Had Transhare instead issued the Exchange Shares with a restrictive legend, declined to confirm their free-trading status, or reported the issuance when it occurred, the *Cedric* Indictees and their co-conspirators could not have deposited and sold the Exchange Shares as they did.

210. Transhare thus did not merely record the issuance in silence; it made affirmative misrepresentations concerning the Exchange Shares. When brokerage firms including Charles Schwab and eToro questioned the legitimacy and tradability of the newly deposited CLEU shares and contacted Transhare, Transhare affirmatively represented that CLEU had issued the shares, that the shares were valid, that they were unrestricted, and that they were available for trading, while its own register simultaneously reflected approximately 269,300,000 shares outstanding and public sources still reflected approximately 29,300,000, a discrepancy that Transhare alone was positioned to see. On information and belief, those representations induced the receiving brokers to accept the Exchange Shares for deposit and clearance, without which the *Cedric* Indictees and their co-conspirators could not have sold the Exchange Shares into the public market during the price-inflation campaign.

## V. DISCLOSURE OF THE EXCHANGE SHARES CRATERS CLEU'S STOCK PRICE, DEVASTATING PLAINTIFFS AND THE CLASS

### A. CLEU's Stock Price Collapses When the CLEU Defendants and Transhare Disclose the Exchange Shares

211. At its peak price on January 29, 2025, CLEU's stock closed at $7.75 per share, representing a more than 200% increase from its trading price just weeks earlier. With over 269 million shares issued or outstanding at that time, the Company's market capitalization exceeded $2 billion.

212. Following the Company and Transhare's filing of the Change in Shares Outstanding form with NASDAQ on January 29, 2025, the reported number CLEU shares outstanding was updated to reflect the 240,000,000 previously undisclosed Exchange Shares.

213. This revelation caused the CLEU share price to fall precipitously on January 30, 2025, as the market became aware that the actual number of shares outstanding was 269,000,000, and not 29,000,000 as previously reported.

214. The stock opened at $1.03 per share on January 30, versus a closing price of $7.75 per share the previous day. By the end of the day, the stock price had collapsed to less than $0.15 per share, a one-day loss of 98%, resulting in hundreds of millions of dollars in losses to Plaintiffs and the Class.

215. Plaintiffs and the Class soon discovered that they had been victimized by a pump-and-dump scam, that the purported financial advisors in the WhatsApp group were, in reality, criminal scammers, and that the information they had been provided regarding the Company was false, misleading, and unreliable. These revelations spurred further declines in the stock price as victims sold their CLEU shares.

216. CLEU's share price continued to decline over the coming weeks, falling to approximately $0.05 by the end of February 2025.

217. Effective March 3, 2025, the Company conducted an 80-for-1 share consolidation, which nominally increased CLEU's share price, but did nothing to repair the damage suffered by Plaintiffs and the Class.

218. The Company's shares were then suspended by NASDAQ on June 3, 2025, and the delisting became effective on August 18, 2025.

**B. The Scheme's Devastating Impact on Victims**

219. The CLEU Scheme caused significant financial harm to its victims. The more than 500 members of the CLEU Victim Group collectively suffered losses of more than $64 million, and Plaintiffs estimate that the overall loss to the Class was more than $300,000,000.

220. Members of the CLEU Victim Group and the proposed Class come from all walks of life: parents, grandparents, retirees, young families, veterans, active-duty military personnel, first responders, public servants, business executives, scientists, engineers, university professors, and students.

221. Several victims report having lost their entire life savings, and many face difficulties paying their mortgages or their children's college tuition. Others have been forced to take out loans or work long hours of overtime to make ends meet.

222. In addition to the CLEU Scheme's financial impact, victims have suffered emotional, psychological, social, and physical distress, including feelings of shame, depression, and anxiety, with physical impacts including elevated blood pressure, heart palpitations, and insomnia, with some victims requiring medication and/or therapy.

223. In addition to Plaintiffs, members of the CLEU Victim Group include a 71-year-old grandmother, who has been battling neuroendocrine cancer for eight years, who was lured into the CLEU Scheme because she was looking for investment income to replace the $3,200 per month she lost when her long-term disability policy expired. She ended up losing a majority of her

savings and is uncertain how she will pay for her monthly chemotherapy treatments. She reports an "overwhelming" emotional toll and that she has been required to begin taking medication for insomnia.

224. Another victim is a single mother of a one-and-a-half-year-old daughter, who recently escaped an abusive marriage. She lost 15 years of savings and is now living paycheck-to-paycheck and questions how she will afford childcare (which she needs to be able to work full-time), healthcare (including treatment for pregnancy-related complications), housing, and finalization of her divorce.

225. Additionally, a married couple lost approximately $985,000, including all the money they had saved to pay college tuition for their four children. The couple has been forced to overhaul their finances and reassess college plans and other family expenses.

226. Similarly, a 68-year-old senior and her 69-year-old husband have been forced to delay their plans to retire this year. Despite deteriorating health, they must continue to work to pay for medical treatment because they lost the approximately $182,000 they had saved to pay for future medical expenses.

## VI. CRIMINAL PROSECUTIONS, FORFEITURE PROCEEDINGS, AND REGULATORY ACTIONS CORROBORATE THE SCHEME

### A. Defendants Extend Their Scheme to Other Penny Stocks

227. In addition to CLEU, Defendant Zhao and the *Cedric* Indictees and their co-conspirators orchestrated virtually identical pump-and-dump scams involving other Chinese companies, including JYD, OST, and PTHL.

228. Like CLEU, each of JYD, OST, and PTHL are Chinese companies that employ a VIE structure, are incorporated in the Cayman Islands, and have (or had) their shares listed on NASDAQ.

229. Like CLEU, each of JYD, OST, and PTHL were the subject of social media-based pump-and-dump scams, with scammers impersonating financial advisors in WhatsApp groups, encouraging victims to purchase shares in anticipation of a significant increase in the stock price based on an as-yet-unannounced merger or other material developments.

230. Like CLEU, each of JYD, OST, and PTHL conducted non-bona fide securities offerings involving the issuance of shares to scammers working in collaboration with Zhao and the *Cedric* Indictees, who then sold those shares while the price was inflated by the social media scheme.

231. Defendants perpetrated these schemes in the months following the CLEU scheme, with JYD's share price increasing rapidly through March before crashing on April 2, 2025, OST's share price increasing rapidly from April through June before crashing on June 26, 2025, and PTHL's share price increasing rapidly through June and July before collapsing on July 29, 2025.

**B. The Truth Emerges**

232. On March 20, 2025, the DOJ unsealed an indictment in the Northern District of Illinois charging the *Cedric* Indictees with seven counts of wire fraud, in violation of 18 U.S.C. §1343, and seven counts of securities fraud, in violation of 18 U.S.C. §1348(1), for orchestrating the CLEU pump-and-dump scheme that injured Plaintiffs and the proposed class.[12] The indictment also notes that all *Cedric* Indictees are residents of either Malaysia or Taiwan.[13]

233. The indictment alleges that the *Cedric* Indictees "all received shares of CLEU stock directly from CLEU prior to the issuance and transfer of that stock being disclosed to the public" and how they engaged in a fraudulent scheme to artificially inflate the price and trading volume of

12 *Cedric* Indictment.

13 *Id.*

CLEU stock through social media and messaging service applications, including promotions that impersonated advisors and financial professionals.[14] Due to all investors in the June 2024 Offering being "friends, acquaintances and business associates" of Defendant Lam, and the December 2024 Offering being limited to 30 specifically identified investors, the Company purposefully issued the shares to the *Cedric* Indictees with knowledge they would orchestrate a pump-and-dump scheme, or recklessly disregarded a substantial risk they would do so. Overall, the June 2024 and December 2024 offerings were purposefully structured to give the appearance of legitimate financing but were, in fact, used to funnel shares into nominee accounts later used for dumping.

234. The indictment explicitly details how during the Class Period, the *Cedric* Indictees deposited the millions of CLEU shares received directly from the Company into newly opened brokerage accounts, and proceeded to sell said shares while simultaneously impersonating legitimate financial advisors on social media advising Plaintiffs and others to purchase CLEU over "electronic messaging services," promising massive returns.[15] Specifically, the indictment details that the *Cedric* Indictees collectively sold at least 51,567,864 shares of CLEU (over 20% of all issued and outstanding shares) from January 22 through 25, 2025 alone, at or near the peak value of the shares and mere days before the January 30 collapse.[16] This resulted in the *Cedric* Indictees fraudulently obtaining, at a minimum, over $300 million in proceeds from the sale of CLEU stock while their victims were left penniless.[17]

235. The indictment further alleges that the *Cedric* Indictees received their CLEU shares between approximately January 10 and January 21, 2025, before CLEU's January 27, 2025

---

14 *Id.*

15 *Id.*

16 *Id.*

17 *Id.*

disclosure that it had issued approximately 240,000,000 shares on December 31, 2024. It also alleges that after one of the brokerages barred four of the *Cedric* Indictees from selling additional CLEU stock on or about January 23, 2025, those defendants entered and immediately canceled more than approximately 2,500 orders to purchase approximately 56,000,000 shares in an effort to create the false appearance of demand and further inflate the price. The indictment alleges that when CLEU's true share count became public, CLEU's share price fell approximately 99% on or about January 30, 2025, causing over 600 U.S.-based investors and others located across the world to lose almost the entirety of their investments. *Cedric* Indictment ¶¶1(o), 20, 22.

236. On January 31, 2025, the day after the crash, penny stock trader and blogger Timothy Sykes published the article "CLEU Stock News: Inside the Latest Penny Stock Pump Disaster" on his website detailing how the scam worked to educate investors on how to not fall for the next one.[18] Specifically, in the section "How the CLEU Scam Worked" he explains:[19]

> *CLEU is a low-float Chinese penny stock in the education sector, supposedly focused on overseas study consulting services, smart campus solutions, and technological consulting services for smart campus solutions.*
>
> *[…]*
>
> *[S]uddenly, volume exploded. […] convincing naïve traders that it was some "hot new AI play" or an "undervalued gem."*
>
> *No news. No real company fundamentals. Just a massive surge in buying.*
>
> *That was your first red flag.*
> *Then came the dump—the inevitable rug pull.*
>
> *In January 30 premarket, the stock plummeted from the high $7s to the $1s, followed by a further implosion throughout the day.*

---

18 Tim Sykes, *CLEU Stock News: Inside the Latest Penny Stock Pump Disaster*, TIMOTHYSYKES:NEWS (Feb. 5, 2025), https://www.timothysykes.com/news/cleu-news-2025_01_31/.

19 *Id.*

*97% gone.*

*Millions of dollars wiped out.*

*Retail traders left holding the bag.*

237. Sykes goes on to discuss how the stock's skyrocketing price with no justification, massive insider ownership, and lack of any institutional support or analyst coverage as key evidence the stock was being manipulated by "insiders," namely Defendants and their co-conspirator *Cedric* Indictees.[20]

238. The mechanics of the CLEU Scheme were further documented by state securities regulators. On March 5, 2025, the Securities Division of the Washington State Department of Financial Institutions (the "Washington DFI") published an investor alert reporting a complaint about a WhatsApp group that was operating a pump-and-dump scheme in CLEU shares while impersonating a legitimate investment adviser, Adams Financial Concepts, LLC, and its Vice President, Albert Souza.[21] According to the alert, the complaining investor was recruited through a Facebook advertisement and directed into a WhatsApp group called "US Stock Investment Group 121," in which individuals posing as Souza and his purported assistant marketed a "VIP Value Investment Trading Strategy" and told the investor when to buy and sell. The impersonators directed the investor to purchase CLEU at $7.78 per share and represented that group members would realize returns of 160% to 380% if they purchased and held the stock for six trading days.

239. The account documented by the Washington DFI mirrors the CLEU Scheme alleged herein in every material respect. Within days of the investor's purchase, CLEU's share

---

[20] *Id.*

[21] *WhatsApp Group, Impersonating Adams Financial Concepts, LLC, Appears to Be Engaged in Fraud*, Wash. State Dep't of Fin. Insts., Sec. Div. (Mar. 5, 2025), https://dfi.wa.gov/alerts/whatsapp-group-impersonating-adams-financial-concepts-llc-appears-be-engaged-fraud.

price collapsed to less than $0.50 per share. When the investor raised concerns, the impersonators blamed unidentified "malicious investors" who supposedly had leaked trading information, told the investor to sell, and promised to compensate the investor for any losses, echoing the same false loss-reimbursement assurances the *Cedric* Indictees and their co-conspirators used to placate victims. The impersonators then attempted to draw the investor into a follow-on scheme that promised a further 150% return in five trading days. The investor never recovered the losses or received any compensation. The same alert advised the public that federal authorities had indicted the alleged perpetrators of the CLEU pump-and-dump scheme and that the FBI was seeking additional victims. Published by an independent state securities regulator, the Washington DFI alert corroborates Plaintiffs' allegations that CLEU shares were promoted to retail investors through Facebook-driven WhatsApp groups in which criminal actors impersonated legitimate, licensed financial professionals, touted specific inflated price targets and guaranteed returns, and used false assurances of loss reimbursement to forestall victim sell-offs while insiders and their co-conspirators dumped their shares.

240. The illegitimacy of the December 2024 Issuance was independently confirmed by NASDAQ itself. More specifically, NASDAQ calculated that the Private Placement carried an equivalent price of just $0.006 per share, 96% below NASDAQ's $0.15 Minimum Price. That calculation objectively confirmed the extreme economic dilution created by the structure of the December 2024 Issuance and Warrant Exchange Agreement.[22]

241. On May 7, 2025, the Listing Qualifications Department of NASDAQ (the "Staff") notified the Company that, pursuant to NASDAQ's discretionary authority under Listing Rule

---

[22] China Liberal Educ. Holdings Ltd., Report of Foreign Privat Issuer (Form 6-K), Exhibit 99.1 (Press Release) (May 12, 2025), https://www.sec.gov/Archives/edgar/data/1775085/000147793225003553/cleu_ex991.htm.

5101, the Staff had determined to delist CLEU based on public interest concerns arising from the Company's substantial issuance of ordinary shares in December 2024.[23] The Staff explained that the Company's issuance of ordinary shares and warrants pursuant to the private placement investment agreements dated December 23, 2024 raised public interest concerns because the issuance resulted in substantial dilution to shareholders, and further noted that NASDAQ closely scrutinizes transactions involving deeply discounted equity securities, including warrants exercisable for little or no consideration, that are highly dilutive to existing public shareholders, precisely the structure of the December 2024 Issuance and the Warrant Exchange Agreement described above, through which the *Cedric* Indictees and their co-conspirators received 240,000,000 Exchange Shares for no consideration other than surrender of the Warrants. On May 21, 2025, the Staff issued an additional determination notice citing the Company's failure to file its Annual Report on Form 20-F for the fiscal year ended December 31, 2024, in violation of NASDAQ Listing Rule 5250(c)(1), as a further basis for delisting. The Company appealed to a NASDAQ Hearings Panel but did not request a stay of suspension or cure the Form 20-F delinquency, and trading in CLEU securities was suspended on June 3, 2025.

242. On June 12, 2025, the Panel denied the Company's request for continued listing, concluding that CLEU was "not suitable for continued listing on Nasdaq," and the Staff's determination to delist became final on July 28, 2025. NASDAQ thereafter filed a Form 25 notification of removal from listing and registration under Section 12(b) of the Exchange Act, and the delisting became effective on August 18, 2025. CLEU's securities have since traded on the OTC Pink market under the symbol "CLEUF."

---

[23] China Liberal Educ. Holdings Ltd., Report of Foreign Private Issuer (Form 6-K) (May 12, 2025), https://www.sec.gov/Archives/edgar/data/1775085/000147793225003553/cleu_6k.htm.

243. NASDAQ's exercise of its public interest authority to delist CLEU specifically because of the December 2024 Issuance corroborates Plaintiffs' allegation that the issuance was not a bona fide capital-raising transaction, but rather an illegitimate and highly dilutive device used to place hundreds of millions of CLEU shares into the hands of the *Cedric* Indictees and their co-conspirators for use in the pump-and-dump scheme, and it confirms that the very public listing the CLEU Defendants sought to monetize was ultimately stripped from the Company as a direct consequence of that fraudulent issuance.

244. The scale of the CLEU Scheme and the resulting harm to investors have since been confirmed by the United States government's recovery efforts. In May 2025, the U.S. Attorney's Office for the Northern District of Illinois obtained the civil forfeiture of more than $200 million in assets traceable to the CLEU Scheme.[24]

245. On February 3, 2026, the DOJ announced the launch of the CLEU remission fund to compensate the victims of the scheme using the forfeited proceeds. In announcing the remission fund, Assistant Attorney General A. Tysen Duva of the Justice Department's Criminal Division described the scheme as "a coordinated act of both social and market manipulation" in which the defendants made millions "by setting a trap for unsuspecting investors, many of whom lost their life savings."

246. United States Attorney Andrew S. Boutros for the Northern District of Illinois stated that "the defendants defrauded U.S. investors through deceitful and coordinated trading activities" and that the "large forfeiture order of more than $200 million" should serve as a warning

---

[24] Press Release, U.S. Attorney's Office in Chicago Obtains Forfeiture of $214 Million in Proceeds from Alleged "Pump and Dump" Investment Fraud Scheme, U.S. DEP'T OF JUST. (May 26, 2025), https://www.justice.gov/usao-ndil/pr/us-attorneys-office-chicago-obtains-forfeiture-214-million-proceeds-alleged-pump-and.

to those who manipulate the U.S. stock market. The DOJ further disclosed that the FBI had identified thousands of victims of the CLEU Scheme, that the defendants are not in custody and warrants have been issued for their arrests, that CLEU has since been delisted from NASDAQ, and that the Boston Regional Office of the SEC and the SEC's Office of Inspector General assisted the investigation. The government's forfeiture order exceeding $200 million, its identification of thousands of victims, and its establishment of a dedicated victim remission fund independently corroborate Plaintiffs' allegations that CLEU securities were the instrument of a large-scale pump-and-dump scheme and that Plaintiffs and the Class suffered substantial, quantifiable losses as a direct result.[25]

247. The government's recovery efforts have been contested by at least one of the traders. On July 2, 2025, the United States filed a response opposing Defendant Cheng's motion to vacate the default forfeiture judgment that had been entered against approximately $37.9 million in proceeds seized from the U.S. brokerage account Cheng used to sell his CLEU shares.[26] In that filing, the government represented that Cheng received CLEU shares directly from the Company, sold them for approximately $49.5 million during the January 2025 price-inflation campaign, and remains a fugitive who has never appeared to answer the related criminal charges. The government argued that Cheng is barred from litigating the forfeiture under the fugitive-disentitlement statute, 28 U.S.C. §2466. The government also described the CLEU Scheme as a coordinated pump-and-dump that defrauded approximately 3,000 American retail investors, many of whom lost

---

25 Press Release, U.S. Department of Justice Announces Compensation Process for Victims of Chinese Liberal Education Holdings Ltd. (CLEU) Investment Fraud Scheme, U.S. DEP'T OF JUST. (Feb. 3, 2026), https://www.justice.gov/opa/pr/us-department-justice-announces-compensation-process-victims-chinese-liberal-education.

26 *See* Gov't's Resp. to Claimant's Mot. to Vacate Default J., *United States v. Funds in the Amount of $37,905,571.53 Seized from Company A Account No. XXXX8688 Held in the Name of Ming-Shen Cheng*, No. 1:25-cv-02965, ECF No. 32 (N.D. Ill. July 2, 2025).

retirement savings, and characterized Cheng's profits from a penny stock that he held for less than a month as circumstantial proof of his knowing participation in the fraud. These representations by the United States further corroborate Plaintiffs' allegations regarding the scale of the CLEU Scheme and the *Cedric* Indictees' knowing participation in it.

### C. The Broader Regulatory Response Corroborates the Scheme

248. The CLEU Scheme was one instance of a documented wave of fraud involving NASDAQ-listed, China-based issuers that has drawn sustained regulatory attention. On September 4, 2025, NASDAQ proposed enhanced listing standards directed at the structural vulnerabilities exploited by schemes like the CLEU Scheme, including a minimum public float and a minimum public offering requirement for companies principally operating in China. The SEC approved a $15 million minimum public float requirement effective January 17, 2026, and separately approved a $25 million minimum offering requirement for China-based issuers on May 14, 2026.[27] In approving the offering requirement, the SEC noted that from August 2022 through April 2025, approximately 70% of NASDAQ's enforcement referrals to the SEC or FINRA relating to market manipulation involved Chinese companies, even though those companies accounted for less than 10% of NASDAQ listings during that period.

249. On September 5, 2025, the SEC announced the formation of a Cross-Border Task Force within its Division of Enforcement focused on pump-and-dump and ramp-and-dump

---

[27] Self-Regulatory Organizations; The Nasdaq Stock Market LLC; Notice of Filing of Amendment No. 1 and Order Granting Accelerated Approval of a Proposed Rule Change, as Modified by Amendment No. 1, to Modify Certain Initial Listing Requirements, Exchange Act Release No. 34-104450 (Dec. 18, 2025), https://www.sec.gov/files/rules/sro/nasdaq/2025/34-104450.pdf; Self-Regulatory Organizations; The Nasdaq Stock Market LLC; Notice of Filing of Amendment No. 3 and Order Granting Accelerated Approval of a Proposed Rule Change, as Modified by Amendment No. 3, to Adopt Additional Initial Listing Criteria for Companies Primarily Operating in China, Exchange Act Release No. 34-105494 (May 14, 2026), https://www.sec.gov/files/rules/sro/nasdaq/2026/34-105494.pdf.

schemes involving foreign-based issuers, with China identified as a jurisdiction of heightened risk.[28] The Task Force's mandate expressly includes heightened scrutiny of gatekeepers, particularly auditors and underwriters, that help such companies access the U.S. capital markets. That focus on auditor gatekeepers is directly relevant here, where Defendant Audit Alliance issued clean audit opinions on CLEU's financial statements as alleged above.

250. Since September 2025, the SEC has suspended trading in the securities of numerous companies, many with ties to mainland China or Hong Kong, based on suspicious trading patterns of the kind alleged here.[29] These regulatory actions independently confirm that the mechanics of the CLEU Scheme, namely the placement of deeply discounted or free shares with undisclosed recipients, the concealment of share issuances from the market, and the coordinated social-media promotion and dumping of those shares, reflect a recognized and recurring pattern of manipulation targeting U.S.-listed Chinese micro-cap issuers.

251. Together, the facts alleged by Plaintiffs and other class members, along with the DOJ Indictment, NASDAQ's delisting of CLEU under its public interest authority, and news releases like those of Mr. Sykes prove that throughout the Class Period, CLEU's stock price was artificially inflated through coordinated social media campaigns which disseminated materially false and misleading information about the Company. They further establish that these campaigns were made possible by the Company directly issuing the *Cedric* Indictees millions of CLEU shares with the purposeful intent they orchestrate a pump-and-dump promotion scheme, or with reckless disregard they would do so. Finally, they establish that, to effectuate the scheme, the *Cedric*

---

[28] Press Release, SEC Announces Formation of Cross-Border Task Force to Combat Fraud, SEC (Sept. 5, 2025), https://www.sec.gov/newsroom/press-releases/2025-113-sec-announces-formation-cross-border-task-force-combat-fraud.

[29] Trading Suspensions, SEC, https://www.sec.gov/enforcement-litigation/trading-suspensions (last visited July 20, 2026).

Indictees used stolen identities of legitimate financial advisors to lure victims through Facebook/Instagram ads funneling them into private investor chat groups on platforms like WhatsApp/Messenger/Threads to circulate unfounded news and generate excitement and raise buying pressure of CLEU stock.

252. The statements made by Defendants and their co-conspirator *Cedric* Indictees alleged herein had no legitimate basis in the Company's actual operations or financial condition, yet they were presented as authoritative tips to lure retail investors into purchasing CLEU shares at inflated prices. By peddling fabricated prospects of imminent corporate success, the scheme orchestrated by Defendants' and their *Cedric* Indictee co-conspirators misled investors about CLEU's value and created artificial demand for the stock. Furthermore, CLEU's June 2024 and December 2024 Offerings and low float were purposefully designed by Defendants and *Cedric* Indictees to enable this fraudulent scheme to be effectuated.

**AUDIT ALLIANCE ENABLED THE SCHEME**

253. The unqualified 2022 and 2023 audit opinions of Audit Alliance were incorporated into the Registration Statement, prospectuses, and other "offerings" of securities the Company filed during the Class Period. In each of those opinions, Audit Alliance certified that, "in our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the company" and that "[w]e conducted our audits in accordance with the standards of the PCAOB and in accordance with the auditing standards generally accepted in the United States of America" which "require that we plan and perform the audit to obtain reasonable assurance

about whether the consolidated financial statements are free of material misstatement, whether due to error or fraud."[30] They go on to affirm the procedures they performed stating:[31]

> Our audits included performing procedures to assess the risks of material misstatement of the consolidated financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. We believe that our audits provide a reasonable basis for our opinion.

Audit Alliance's unqualified opinions were false or misleading because Audit Alliance lacked a reasonable basis to state that its audits had been conducted in accordance with PCAOB standards.

254. In issuing unqualified audit opinions on CLEU's financial statements, despite these GAAP and PCAOB violations, Audit Alliance failed to comply with the professional standards dictated by the PCAOB. These required Audit Alliance to exercise due professional care in the performance of the audit and to obtain competent, sufficient evidentiary matter to form a basis for their opinion, and to obtain reasonable assurances that the financial statements were free from material misstatement, whether caused by error or fraud.[32]

255. In conducting its audits, Audit Alliance had access to the files and key employees of the Company at all relevant times. As CLEU's auditor, Audit Alliance had continuous access to and knowledge of the Company's confidential internal, corporate, financial, operating, and

---

[30] China Liberal Educ. Holdings Ltd., Annual Report (Form 20-F) (Apr. 15, 2024), https://www.sec.gov/ix?doc=/Archives/edgar/data/0001775085/000147793224002119/cleu_20f.htm, *see also* China Liberal Educ. Holdings Ltd., Annual Report (Form 20-F) (May 15, 2023), https://www.sec.gov/ix?doc=/Archives/edgar/data/0001775085/000147793223003610/cleu_20f.htm.

[31] *Id.*

[32] *See* PCAOB AS 1015, Due Professional Care in the Performance of Work; AS 1105, Audit Evidence; AS 2301, The Auditor's Responses to the Risks of Material Misstatement; and AS 2810, Evaluating Audit Results.

business information, and had the opportunity to observe and review CLEU's business and accounting practices, and to test the Company's internal accounting information and publicly reported financial statements as well as CLEU's internal controls and structures. Accordingly, Audit Alliance was aware of the significant deficiencies at the Company. Thus, had Audit Alliance complied with PCAOB standards, it would have determined that there was no reasonable basis for its unqualified audit reports because, among other things, Audit Alliance was aware of undisclosed facts tending to seriously undermine the accuracy of their audit reports; and the Company's reported financial metrics.

256. Audit Alliance enabled the scheme by issuing clean audit opinions on financial statements that carried the misstatements and omissions alleged above. Throughout the conduct described above, Audit Alliance, a PCAOB-registered accounting firm, served as CLEU's outside auditor and issued unqualified audit opinions on the Company's consolidated financial statements despite numerous red flags of fraud and financial distress apparent on the face of CLEU's audited fiscal year 2023 financial statements, including: (i) a net loss of $4,958,744 and net cash used in operating activities of $3,784,615 for fiscal year 2023, which caused Audit Alliance to include a going-concern uncertainty paragraph in its own audit report; (ii) a $40,000,000 "receivable from disposal of subsidiaries" recorded as a current asset, approximately 61% of the Company's $65,594,478 in total current assets, and carried at full value with no allowance; (iii) a $2,734,004 goodwill impairment and a $2,285,309 loss on the disposal of subsidiaries recognized in the same year; (iv) a decline in revenue from $5,218,283 for fiscal year 2022 to $2,886,222 for fiscal year 2023 following the September 1, 2023 deconsolidation of the Company's principal revenue-generating operations; and (v) a $3,521,176 "advance to suppliers" recorded from a prior-year balance of nil. As set forth below, the Audit Alliance's engagement was continuous throughout

the Class Period, its audits failed to detect or address the accounting defects identified herein, and its PCAOB inspection record put every securities-law gatekeeper on notice that opinions issued by the firm were materially more likely than the industry norm to rest on procedures that did not satisfy PCAOB standards.

257. The $40,000,000 "receivable from disposal of subsidiaries" was itself the product of a round-trip transaction that Audit Alliance accepted without apparent scrutiny. CLEU had acquired Wanwang Investment Limited ("Wanwang"), which operated the Company's two colleges, FMP and Strait College, from Xiaoshi Huang and Thrive Shine Limited under a February 1, 2022 stock purchase agreement for $60 million, and delivered US$40 million to Xiaoshi Huang at the September 2, 2022 closing. About fifteen months later, on December 28, 2023, CLEU agreed to transfer Wanwang back to Xiaoshi Huang, the same seller, for US$40 million, and Xiaoshi Huang released CLEU from the two remaining $10 million contingent installment payments. That $40 million sale-back consideration is the "receivable from disposal of subsidiaries" that CLEU carried at full value, with no credit-loss allowance, as approximately 61% of its total current assets. The disposal had not closed as of December 31, 2023; the Company disclosed that it expected the transaction to close on or before June 30, 2024. Audit Alliance nonetheless issued an unqualified opinion on financial statements that carried this uncollected, uncollateralized $40 million receivable at full value at the same time its own report disclosed substantial doubt about the Company's ability to continue as a going concern.

258. Audit Alliance's unqualified audit opinions remained in CLEU's offering documents throughout the Class Period.

259. Audit Alliance issued unqualified audit opinions on CLEU's consolidated financial statements for fiscal years 2022 and 2023. That opinion was contained in CLEU's annual report

on Form 20-F for fiscal year 2023, filed with the SEC on April 15, 2024, which was the Company's most recent annual report on file at the time of both the June 6, 2024 and December 23, 2024 offerings. The June 2024 final prospectus, on Form 424B4 dated June 6, 2024 (Registration No. 333-279370), separately incorporated CLEU's fiscal year 2023 Form 20-F by reference and, in its "Experts" section, expressly relied on Audit Alliance's report as the authority for the audited financial statements it presented. The December 2024 prospectus supplement on Form 424B5, filed December 23, 2024, likewise incorporated the fiscal year 2023 Form 20-F, filed April 15, 2024, by reference and, in its "Experts" section, expressly relied on Audit Alliance's report as the authority for the audited financial statements. The fiscal year 2023 Form 20-F itself included Audit Alliance's written consent to the use and incorporation by reference of its audit report, filed as Exhibit 15.1 to that annual report. CLEU filed a shelf registration statement on Form F-3 with the SEC on July 14, 2023, covering the offer and sale from time to time of up to $100,000,000 of ordinary shares and other securities. The Form F-3 provided that CLEU incorporated by reference its then-most-recent annual report on Form 20-F, which was the annual report for fiscal year 2022, together with all reports the Company thereafter filed under the Securities Exchange Act, including any annual reports on Form 20-F filed after the date of the prospectus and before the offering terminated. Audit Alliance consented to the incorporation of its audit opinion into the Form F-3, and its consent was filed as Exhibit 23.1 to that registration statement. When CLEU filed its fiscal year 2023 Form 20-F on April 15, 2024, that annual report, including Audit Alliance's unqualified opinion on the fiscal year 2022 and 2023 consolidated financial statements, was incorporated by reference into the Form F-3 by operation of that provision, and it was the operative annual report incorporated into the prospectus supplements for the June 6, 2024 and December 23, 2024 offerings, under which the Company sold securities into the Class Period market. In each opinion,

the Audit Alliance certified that "in our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company" and that its audits were conducted "in accordance with the standards of the PCAOB." The continued presence of clean audit opinions in the offering documents allowed investors to rely on financial statements that carried the defects alleged herein.

260. In its report on CLEU's fiscal year 2023 financial statements, Audit Alliance did include a "Material Uncertainty Related to Going Concern" paragraph. In that paragraph, and in Note 2 to the financial statements, Audit Alliance represented that the Company had incurred a net loss of "US$7,158,688" for the year ended December 31, 2023 and had "accumulated deficits by US$8,986,893." Those figures do not tie to the audited financial statements that the same report certified as presenting the Company's financial position "fairly, in all material respects." The audited consolidated statement of operations reported a net loss of $4,958,744 for fiscal year 2023, and the audited consolidated balance sheet reported accumulated deficits of $6,786,949, each figure differing from the amount recited in Audit Alliance's report by exactly $2,199,944. The same going-concern paragraph also recited that the Company "had negative operating activities of US$3,784,559," a figure that likewise does not tie to the audited consolidated statement of cash flows, which reported net cash used in operating activities of $3,784,615 for fiscal year 2023. An auditor's report that recites a net loss and an accumulated deficit materially different from the audited financial statements it accompanies reflects a failure to exercise due professional care in violation of PCAOB AS 1015 and supports a strong inference that Audit Alliance did not perform the audit procedures it represented it had performed.

261. Although Audit Alliance audited only CLEU's financial statements, PCAOB standards required it to read the entire annual report and to consider whether other information in

the filing was materially inconsistent with the audited financial statements. See PCAOB AS 2710.04. Here, the audited financial statements and Audit Alliance's own report disclosed substantial doubt about the Company's ability to continue as a going concern, yet other information in the same Form 20-F represented the opposite. In the liquidity discussion accompanying the financial statements, the Company stated that "the Company had cash of approximately $20.3 million" and that "the Company's current cash as of December 31, 2023 will be sufficient to meet its working capital needs for at least the next 12 months," and in its operating and financial review the Company stated that "[a]s of December 31, 2023, we had positive working capital." Audit Alliance was required to read that other information and to take steps to resolve its material inconsistency with the going-concern doubt disclosed in the audited financial statements before issuing its report. It failed to do so, allowing the Form 20-F to present investors with directly contradictory characterizations of CLEU's solvency.

262. Audit Alliance is not a run-of-the-mill accounting firm whose work product CLEU's investors could fairly assume would meet PCAOB standards. Audit Alliance was the subject of a PCAOB inspection report dated September 27, 2024. The report covered three of the firm's audits for fiscal year 2022 and identified deficiencies in two of the three audits reviewed. On one of the inspected audits, the firm had identified a fraud risk in revenue recognition but failed to perform procedures sufficient to test it. On two of the three inspected audits, the firm failed to communicate to the audit committee, and failed to accurately report on Form AP, the participation of another accounting firm in the audit, in violation of PCAOB AS 1301 and PCAOB Rule 3211.

263. Those were not the inspection's only relevant findings. In another inspected audit, for which Audit Alliance had identified a significant risk, Audit Alliance did not perform any procedures to test the fair value of certain significant accounts, including contradictory information

in its own workpapers. It also did not test significant assumptions, external data, or issuer-prepared data used in a goodwill-impairment analysis. The PCAOB separately found failures in one or more reviewed audits to communicate a going-concern evaluation and all significant risks to audit committees, to inquire concerning possible violations of law and fraud risks, and to communicate all material weaknesses. Those deficiencies concerned the same categories of risk that Audit Alliance confronted in CLEU's 2023 financial statements, including the $40 million uncollected receivable, the $2.7 million goodwill impairment, substantial doubt about CLEU's ability to continue as a going concern, and heightened fraud and legal-compliance risks.[33]

264. Had Audit Alliance conducted its CLEU audits in accordance with those standards, it would have determined that there was no reasonable basis for its unqualified audit opinions.

265. In issuing its unqualified audit opinions on CLEU's financial statements, Audit Alliance was required to exercise due professional care and to obtain competent, sufficient evidential matter to afford a reasonable basis for its opinions. Audit Alliance failed to satisfy these requirements. Among other things, the Audit Alliance failed to: (i) test the existence, valuation, and collectability of the $40,000,000 "receivable from disposal of subsidiaries" that comprised approximately 61% of CLEU's total current assets and that CLEU carried at full value with no credit-loss allowance; (ii) investigate the substance and business purpose of the round-trip Wanwang transaction from which that receivable arose, including the related-party nature of CLEU's agreement to transfer Wanwang back to the same seller from whom CLEU had acquired it; (iii) test the $3,521,176 "advance to suppliers" recorded from a prior-year balance of nil; (iv) obtain sufficient competent evidence supporting the $2,734,004 goodwill impairment and the

---

[33] 2023 Inspection of Audit Alliance LLP (Singapore) at 7–10, PCAOB (Sept. 27, 2024), https://assets.pcaobus.org/pcaob-dev/docs/default-source/inspections/reports/documents/104-2024-149-audit-alliance-singapore.pdf?sfvrsn=e6aff90d_2.

$2,285,309 loss on disposal of subsidiaries recognized in the same fiscal year; (v) resolve whether the going-concern uncertainty disclosed in the audited financial statements was consistent with the other information in the Company's annual report, including the Company's representations that it had positive working capital and sufficient cash to meet its needs for at least the next twelve months; and (vi) assess whether CLEU maintained accounting personnel and internal controls adequate to prepare financial statements in conformity with U.S. GAAP and the reporting requirements applicable to a U.S.-listed public company.

266. Audit Alliance's representations were material to investors. CLEU was a foreign private issuer with limited operating history in the United States, and investors and the market necessarily relied on its audited financial statements and on the independent audit opinions certifying them. Without Audit Alliance's unqualified audit opinions, and its written consents to the incorporation by reference of its audit report into CLEU's registration statements and the prospectuses for the June 6, 2024 and December 23, 2024 offerings, CLEU could not have conducted those Class Period offerings in the form presented to investors. Audit Alliance's clean opinions and consents supplied the appearance of financial legitimacy on which those offerings, and the market for CLEU's securities, depended.

267. Audit Alliance's audit failures with respect to CLEU were not isolated. As alleged above, the PCAOB's September 27, 2024 inspection report identified deficiencies in two of the three Audit Alliance audits it reviewed, including a failure to perform procedures sufficient to test an identified fraud risk in revenue recognition. On information and belief, Audit Alliance also served as the independent auditor for other China-based, U.S.-listed micro-cap issuers that shared CLEU's profile and whose securities later experienced extreme trading volatility, trading halts, or delisting consistent with the pump-and-dump and ramp-and-dump schemes described herein.

Having audited issuers of this profile, Audit Alliance had particular reason to scrutinize CLEU as a low-float foreign issuer whose financial statements, revenue support, related-party transactions, and going-concern status displayed the red flags identified above. Instead, Audit Alliance issued unqualified opinions that helped create the appearance of legitimacy necessary for the Class Period offerings and the market manipulation scheme.

268. The deficiencies the PCAOB identified in Audit Alliance's audits were significant. The PCAOB classifies as Part I.A deficiencies those of such significance that, in the PCAOB's view, the firm had not obtained sufficient appropriate audit evidence to support its audit opinion at the time it issued its report. On the three fiscal year 2022 audits the PCAOB selected for review, it identified deficiencies in two of the audits, and the deficiencies it described, including a failure to perform procedures sufficient to test an identified fraud risk in revenue recognition and a failure to perform any procedures to test the fair value of significant accounts, are of the character the PCAOB treats as Part I.A deficiencies. A deficiency of that character means the PCAOB concluded that Audit Alliance issued an opinion it lacked a sufficient basis to give.

269. PCAOB standards required Audit Alliance to identify CLEU's related-party relationships and transactions, to obtain an understanding of their business purpose, and to perform procedures to determine whether they were properly authorized, accounted for, and disclosed in conformity with U.S. GAAP. See PCAOB AS 2410 (Related Parties). The $40,000,000 "receivable from disposal of subsidiaries" arose from a related-party round-trip. CLEU acquired Wanwang from Xiaoshi Huang and Thrive Shine Limited under a February 1, 2022 stock purchase agreement and, about fifteen months later, on December 28, 2023, agreed to transfer the same entity back to the same seller, Xiaoshi Huang, for the same $40,000,000. CLEU then carried the resulting receivable at full value, with no credit-loss allowance, as approximately 61% of its total

current assets. AS 2410 required Audit Alliance to evaluate the business purpose and economic substance of that transaction with a related party and to test the existence and collectability of the receivable it generated. Had Audit Alliance performed those procedures, it would have confronted the round-trip character of the transaction and the absence of any allowance against an uncollected receivable owed by the same counterparty from whom CLEU had purchased the asset. Its failure to do so was a departure from AS 2410 that allowed the Company's single largest current asset to be presented to investors at full value.

270. The fraud-risk revenue testing and impairment-assumption testing that Audit Alliance's public inspection record showed it was failing to perform were the same categories of procedures the CLEU engagement demanded, given the related-party Wanwang receivable, the $2,734,004 goodwill impairment, and the fraud and going-concern risks apparent on the face of CLEU's financial statements. That record placed Audit Alliance on heightened notice of the need for enhanced diligence in auditing a U.S.-listed, China-based micro-cap issuer of CLEU's profile. A reasonable auditor with that notice would have conducted CLEU's audits with heightened care with respect to the related-party transactions, the going-concern presentation, and the internal-control and accounting-personnel limitations disclosed in the Company's filings. Moreover, once Audit Alliance concluded that substantial doubt existed about CLEU's ability to continue as a going concern, PCAOB AS 2415 required that conclusion to be reflected consistently in its report and in the financial statements, and, as alleged above, AS 2710 required Audit Alliance to resolve the material inconsistency between that going-concern conclusion and the Company's representations elsewhere in the same Form 20-F that it had positive working capital and sufficient cash to meet its needs for at least the next twelve months. Audit Alliance did neither before issuing its unqualified opinion.

## UNDISCLOSED ADVERSE FACTS

271. The market for CLEU's securities was open, well-developed, and efficient at all relevant times. As a result of these materially false and/or misleading statements, and/or failures to disclose, CLEU's securities traded at artificially inflated prices during the Class Period. Plaintiffs and other members of the Class purchased or otherwise acquired CLEU's securities relying upon the integrity of the market price of the Company's securities and market information relating to CLEU and have been damaged thereby.

272. During the Class Period, Defendants and their *Cedric* Indictee co-conspirators materially misled the investing public, thereby inflating the price of CLEU's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false or misleading. The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about CLEU's business, operations, and prospects as alleged herein.

273. At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiffs and other members of the Class. As described herein, during the Class Period, Defendants and their *Cedric* Indictee co-conspirators made or caused to be made a series of materially false and/or misleading statements about CLEU's financial well-being and prospects. These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' and their *Cedric* Indictees co-conspirators' materially false and/or

misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

## LOSS CAUSATION

274. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss and other damages suffered by Plaintiffs and the Class.

275. During the Class Period, Plaintiffs and the Class purchased CLEU shares at artificially inflated prices and were damaged thereby. The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors losses.

276. During the Class Period, the prices at which Plaintiffs and the Class purchased CLEU securities were artificially inflated as a direct and proximate result of the fraudulent scheme alleged herein, including the dissemination through social-media platforms and messaging applications of solicitations by persons impersonating financial professionals that were designed to attract retail purchasers of CLEU securities at inflated prices, and the gatekeeping failures of Audit Alliance and Transhare that permitted the scheme to be executed through a U.S.-listed issuer. When the scheme could no longer be sustained and the manipulative trading patterns it generated attracted regulatory scrutiny, the artificial inflation in CLEU securities was removed from the market. The price decline and trading halts described above were the foreseeable consequences of, and were caused by, the materialization of the manipulative acts and practices comprising the scheme alleged herein, and Plaintiffs and the Class were damaged thereby.

## SCIENTER ALLEGATIONS

277. Defendants acted with scienter because Defendants: (a) engaged in a deliberate scheme to manipulate the price of CLEU shares through false and misleading statements and abusive trading practices; (b) intentionally facilitated the scheme by conducting non-bona fide offerings, concealing the issuance of the Exchange Shares, and making false and misleading statements to brokerage firms; and (c) were motivated by their receipt, directly or indirectly, of hundreds of millions of dollars in illicit trading proceeds.

278. Transhare acted with scienter. Transhare itself issued the 240,000,000 Exchange Shares and therefore knew, on December 31, 2024, the true number of CLEU shares outstanding. Transhare knew that the issuance had not been reported to the market, the SEC, or NASDAQ, and that public sources continued to reflect approximately 29,300,000 shares outstanding. With that knowledge, Transhare represented to Schwab and eToro that the Exchange Shares were validly issued, unrestricted, and available to trade, and thereby enabled the *Cedric* Indictees and their co-conspirators to deposit and sell the shares.

279. Transhare's knowledge and intent are further supported by its history of acting as transfer agent to other PRC-based NASDAQ issuers whose shares were used in materially identical pump-and-dump schemes, and by the fact that Transhare is a small, closely held firm controlled by its President, Jinlong Liu, in which a share issuance of this magnitude would have been known to its principals.

280. Before the CLEU issuance, Transhare had already served as transfer agent for another NASDAQ-listed issuer that was publicly suspended for the same category of manipulation alleged here, and also shared the same investor-relations firm. Transhare served as transfer agent for Chanson International Holding (NASDAQ: CHSN), whose investor-relations representatives

were Ascent and Tina Xiao. On or about October 7, 2024, less than three months before the CLEU issuance, the SEC suspended trading in Chanson securities based on potential manipulation through social-media recommendations designed to inflate the security's price and volume. The SEC's order did not name Transhare, and Plaintiffs do not allege that it constitutes a finding that Transhare or Chanson committed fraud. The Chanson suspension is alleged to show that, before it processed the CLEU issuance, Transhare had direct experience with the precise risk that small, foreign NASDAQ issuers within the same service-provider network were being promoted through coordinated social-media schemes, such that Transhare was on notice of, or was reckless in disregarding, the red flags CLEU's December 2024 transaction presented.

281. The pairing of Ascent and Transhare across suspended issuers was not isolated. In addition to Chanson and CLEU, Transhare served as transfer agent for Pitanium Limited (NASDAQ: PTNM), whose investor-relations representatives were also Ascent and Tina Xiao, and which the SEC suspended on or about October 3, 2025, for potential social-media manipulation and later identified among 13 small-capitalization, Asia-based issuers suspended in connection with such schemes. Transhare also served as transfer agent for Smart Digital Group (NASDAQ: SDM), which the SEC suspended on or about September 26, 2025, on substantially similar grounds and which NASDAQ thereafter determined to delist. The October 2025 underwriting agreement for Texxon Holding Ltd., with D. Boral Capital, separately designated both Ascent and Transhare as acceptable providers, indicating that the repeated Ascent-Transhare overlap arises from a recurring underwriter and referral network rather than independent selection by unrelated issuers. The foregoing SEC orders do not name Transhare, and Plaintiffs do not allege there are findings against Transhare or the issuers; they are alleged to establish a recurring

pattern and Transhare's place within a coordinated service-provider network surrounding these issuers.

282. The Director and Officer Defendants acted with scienter. Throughout the Class Period, they knew or recklessly disregarded that the offering documents, press releases, and other public statements they issued or caused to be issued were materially false and misleading, and they knowingly and substantially participated in the scheme alleged herein. By virtue of their positions within the Company, their control over and receipt of the Company's SEC filings and press releases, and their access to the Company's books, records, and personnel, the Director and Officer Defendants were privy to the true facts concerning CLEU's share count, its Class Period offerings, and the identities and purpose of the recipients of the Company's shares.

283. Defendant Lam, as CLEU's Chief Executive Officer and Principal Executive Officer, directly orchestrated and executed the scheme. Lam: (i) signed the December 2024 6-K announcing the Warrant Exchange Agreement; (ii) signed the Warrant Exchange Agreement on behalf of the Company; (iii) signed and certified the Company's SEC filings during the Class Period as Principal Executive Officer; (iv) approved and directed the share consolidations and the June 2024, September 2024, and December 2024 issuances that placed CLEU shares in the hands of her hand-selected purchasers and the *Cedric* Indictees; (v) held CLEU shares directly and through Ever Alpha, a British Virgin Islands entity she wholly owns and controls; (vi) was quoted in the October 11 Press Release disseminated in furtherance of the scheme; and (vii) orchestrated the non-bona fide offerings in conjunction with Defendant Zhao.

284. Lam knew that the market, the SEC, and NASDAQ continued to be told that only approximately 29,300,000 CLEU shares were outstanding at the same time she knew, from her direction of the December 2024 Issuance and the Warrant Exchange Agreement, that the Company

had issued 240,000,000 Exchange Shares on December 31, 2024, and that the true number of shares outstanding was approximately 269,300,000. Lam's direction of the issuance while the December 2024 6-K represented that the Exchange Shares would be issued at a future date demonstrates actual knowledge that the true share count was being concealed from the market.

285. Lam's direct participation in every critical step of the scheme, from approving the share consolidations, to directing the non-bona fide offerings, to signing the Warrant Exchange Agreement, to holding shares through Ever Alpha, establishes that she acted with actual knowledge of the fraud and with intent to deceive investors, or, at a minimum, with reckless disregard for the truth.

286. Defendant Zhuang, as CLEU's Chief Financial Officer and designated Principal Financial Officer, was responsible for the Company's financial reporting and SEC filings during the relevant time period. Because of his position and his responsibility for the Company's financial reporting, Zhuang knew or recklessly disregarded that the Company's public filings misrepresented the number of CLEU shares outstanding and the nature and purpose of the Company's Class Period offerings.

287. The *Cedric* Indictees and Defendant Zhao acted with scienter, as confirmed by the criminal charges against them. On March 20, 2025, a federal grand jury in the Northern District of Illinois returned an indictment charging the *Cedric* Indictees with wire fraud and securities fraud arising out of the CLEU Scheme. Defendant Zhao is the subject of a separate criminal indictment in the Eastern District of Virginia arising out of multiple interrelated stock manipulation schemes, including the CLEU Scheme. A grand jury returns an indictment only upon finding probable cause that the charged crimes were committed, and the grand jury's determination that probable cause

existed to charge the *Cedric* Indictees and Zhao with intentional securities fraud strongly supports an inference of scienter as to each of them.

288. The magnitude of the dilution and the terms of the offerings establish that Defendants knew they were engaging in fraud. Through the Warrant Exchange Agreement, the *Cedric* Indictees and their co-conspirators received 240,000,000 CLEU shares for no consideration beyond surrendering Warrants they were never required to exercise and for which they never paid the $0.60 exercise price. That issuance was more than eight times the total number of post-consolidation shares then outstanding and served no legitimate capital-raising purpose. No legitimate business justification existed for conveying 240,000,000 shares for nothing to a closed group of previously identified recipients while the issuance was concealed from the market.

289. The structure of the Warrant Exchange Agreement further supports scienter. Rather than exercise the Warrants and pay the exercise price, the holders surrendered the Warrants in exchange for the same 240,000,000 shares they would have received on exercise, at no cost. A holder acting for legitimate economic reasons would not forgo exercise in favor of an exchange that produced the identical shares for free unless the transaction had been arranged in advance to place free-trading shares in the hands of the *Cedric* Indictees and their co-conspirators for sale into an artificially inflated market.

290. The shares issued to the *Cedric* Indictees and their co-conspirators were delivered in electronic form, on information and belief free of any restrictive legend, and without any lock-up or vesting restriction on their sale. Defendants' issuance of 240,000,000 freely tradable shares to a closed group of recipients, with no restriction on immediate resale and while the issuance was concealed from the market, supports the inference that Defendants intended the shares to be sold into an artificially inflated market.

291. The concealment of the December 31, 2024 issuance, the January 2025 social media promotional campaign, and the coordinated selling of the Exchange Shares beginning on or about January 22, 2025, were synchronized. The Exchange Shares were deposited into brokerage accounts at Schwab and eToro in mid-January 2025, the promotional campaign inflated the price during January 2025, and the *Cedric* Indictees sold into that inflation in the days before the Company first disclosed the issuance on January 27, 2025. This sequencing demonstrates coordination between the securities issuances and the market manipulation and supports a strong inference of scienter.

292. During the period in which CLEU's share price rose to a Class Period high of $7.75 per share on January 29, 2025, the Company announced no business development, earnings result, contract, or other legitimate corporate event that could justify the increase. To the contrary, CLEU's core businesses had been effectively eliminated, its net losses had grown from more than $1.2 million in 2021 to approximately $5.0 million in 2023, and it faced recurring delisting. The absence of any legitimate basis for the price increase, together with Defendants' knowledge of the concealed share issuance and the coordinated promotion, establishes that Defendants knew the price was being artificially manipulated.

293. The recipients of the Company's Class Period share issuances were not arm's-length public investors. As the indictment alleges, the investors in the June 2024 offering were "friends, acquaintances and business associates" of Defendant Lam, and the December 2024 Issuance was limited to 30 specifically identified investors that included the *Cedric* Indictees and their co-conspirators. The placement of the Company's shares with a closed, hand-selected group, rather than through a bona fide offering to public investors, supports the inference that the offerings

were structured to funnel shares to the participants in the scheme and supports a strong inference of scienter.

294. The scheme alleged herein involved CLEU's core corporate activity, namely the issuance and sale of the Company's own securities and the reporting of its shares outstanding. The Director and Officer Defendants, as the officers and directors who approved the share consolidations and the June 2024, September 2024, and December 2024 issuances, necessarily had detailed knowledge of the Company's share issuances and capital structure. Under the core operations doctrine, that knowledge supports a strong inference that the Director and Officer Defendants knew or recklessly disregarded the fraudulent nature of these transactions.

295. Defendant Zhao's participation in the CLEU Scheme was part of a pattern of materially identical schemes involving other China-based, NASDAQ-listed issuers, including OST, JYD, and PTHL, each of which experienced an artificial run-up followed by a collapse after Zhao facilitated the placement and sale of the issuer's shares. That Zhao carried out the same conduct across multiple issuers, using the same techniques, supports a strong inference that he acted with scienter in the CLEU Scheme.

296. Defendants Transhare and Ascent were likewise recurring participants in materially identical schemes. As alleged above, Transhare served as transfer agent, and Ascent as investor relations consultant, to other PRC-based NASDAQ issuers whose shares were used in social media pump-and-dump schemes. Their repeated performance of the same roles across multiple such schemes supports the inference that each acted with knowledge of, or reckless disregard for, the fraudulent purpose of the CLEU offerings and disclosures, in addition to the scienter allegations set forth as to Transhare above.

297. Ascent's participation in the CLEU Scheme did not occur in a vacuum. Before Ascent disseminated the misleading CLEU communications alleged herein, at least two other issuers that had publicly identified Ascent and Xiao as their investor-relations representatives had their securities suspended from trading by the SEC based on indications of coordinated social-media manipulation of the same general character alleged here. On or about August 27, 2024, BAIYU Holdings, Inc. (NASDAQ: BYU) publicly identified Ascent and Xiao as its investor-relations contacts. On or about September 5, 2024, the SEC ordered the suspension of trading in BAIYU securities, citing questions concerning the accuracy and adequacy of publicly available information and indications that unknown persons were using social-media recommendations to inflate BAIYU's share price and trading volume. On or about September 27, 2024, Chanson International Holding publicly identified Ascent and Xiao as its investor-relations contacts. On or about October 7, 2024, the SEC ordered the suspension of trading in Chanson securities based on substantially similar indications that its securities were being manipulated through social-media purchase recommendations designed to inflate price and volume.

298. By no later than October 2024, months before Ascent disseminated CLEU's January 2025 public communications, Ascent was aware, or was reckless in failing to appreciate, that the securities and public communications of multiple recent Ascent clients were being exploited in coordinated social-media promotion schemes bearing the same hallmarks as the CLEU Scheme. Notwithstanding that notice, Ascent drafted and disseminated CLEU communications that omitted the issuance of the 240,000,000 Exchange Shares and misleadingly portrayed CLEU's compliance with NASDAQ's continued-listing requirements, as alleged herein.

299. Ascent's exposure to this modus operandi continued after CLEU. Two additional issuers represented by Ascent in 2025 were later suspended by the SEC on substantially the same

grounds. On or about October 3, 2025, the SEC suspended trading in Pitanium Limited, which had identified Ascent and Xiao as its investor-relations contacts in its June 2, 2025 initial-public-offering closing release. On or about October 22, 2025, the SEC suspended trading in Robot Consulting Co., Ltd. (NASDAQ: LAWR), which had identified Ascent as its investor-relations representative. The SEC thereafter identified Pitanium among 13 small-capitalization, Asia-based issuers whose securities were suspended in connection with social-media stock-manipulation scams. The foregoing SEC orders do not name Ascent, and Plaintiffs do not allege that these orders constitute findings that Ascent or any issuer itself committed fraud. The orders are alleged to establish the recurring pattern of manipulation surrounding Ascent's clients and the notice that such events were provided to Ascent.

300. Ascent did not come to CLEU as an independent vendor selected at arm's-length. Ascent has functioned as part of a recurring network of underwriters, transfer agents, and other service providers surrounding small foreign issuers entering the U.S. public markets. Underwriting agreements for multiple such issuers have required or expressly contemplated that the newly public issuer retain Ascent, including agreements requiring the issuer to retain Ascent for a minimum of one to two years following the offering. In the underwriting agreement for Texxon Holding Ltd., the underwriter separately designated as acceptable to both Ascent and Transhare Corporation, the same transfer agent named as a Defendant in this action. These recurring arrangements support the inference that Ascent operated within a coordinated service-provider network rather than as a vendor independently selected on the merits by unrelated issuers.

301. Defendants had both motive and opportunity to commit the fraud alleged herein.

302. Defendant Lam and the other Director and Officer Defendants had motive to inflate CLEU's share price through fraud because: (i) CLEU was financially distressed, with declining

revenues, mounting losses, and the elimination of its core businesses; (ii) the Company faced recurring delisting from NASDAQ for failure to maintain the $1.00 minimum bid price and repeatedly resorted to reverse-share consolidations to preserve its listing; (iii) inflating the share price permitted Lam, Ever Alpha, the *Cedric* Indictees, and their co-conspirators to sell shares at artificially inflated prices; and (iv) the scheme generated more than $300 million in illicit proceeds for the *Cedric* Indictees and their co-conspirators, of which the United States has seized and sought forfeiture of approximately $214 million.

303. Defendants had opportunity to commit the fraud because: (i) as officers and directors of CLEU, the Director and Officer Defendants controlled the Company's securities offerings, SEC filings, and press releases; (ii) they had the authority to approve the share consolidations and issuances and to execute the Warrant Exchange Agreement on behalf of the Company; (iii) they had access to material non-public information concerning the Company's true share count and financial condition; (iv) Transhare, as transfer agent, controlled the issuance and delivery of the Exchange Shares and their free-trading status; and (v) Zhao maintained the relationships with brokers that were used to open accounts and sell the Exchange Shares.

304. The combination of motive and opportunity, together with the other facts alleged herein, establishes a strong inference of scienter.

305. Ascent had motive to further the CLEU Scheme because its compensation has been tied to the share prices of the issuers it promotes. In its annual report on Form 20-F for fiscal year 2018, CLPS Incorporation (NASDAQ: CLPS) disclosed that, on or about May 24, 2018, it issued to Ascent, then acting as its investor-relations consultant, 107,000 warrants, each exercisable at $4.20 per share for five years and subject to a 180-day lockup. Such equity-linked compensation gives an investor-relations firm a direct financial interest in inflating the price of its clients'

securities. On information and belief, Ascent received equity, equity-linked compensation, success fees, or comparable consideration in connection with its engagement by CLEU, the value of which depended on CLEU's share price.

306. Defendant Audit Alliance acted with scienter, or at a minimum with reckless disregard, in issuing clean audit opinions on the financial statements incorporated into the Class Period offerings, for the reasons set forth in the auditor allegations above. Audit Alliance's audits concerned CLEU's core financial reporting, it had access to the Company's books, records, and personnel, and it was compensated for its work; together with the red flags identified above, these facts support a strong inference that Audit Alliance associated its clean opinions with CLEU's financial statements with at least reckless disregard for their accuracy.

307. The magnitude of the fraud alleged herein further supports a strong inference of scienter as to Audit Alliance. The defects went to the legitimacy of the very financial statements Audit Alliance certified and included a $40,000,000 receivable that comprised a material portion of CLEU's current assets and arose from a round-trip transaction with a related party, a disclosed going-concern uncertainty, and net-loss and accumulated-deficit figures that Audit Alliance's own report recited inconsistently with the audited financial statements it accompanied. Defects of this character and magnitude, apparent on the face of the financial statements Audit Alliance audited, could not have been overlooked by an auditor exercising the professional care it represented it had exercised, absent at least reckless disregard for the truth.

308. Audit Alliance was compensated, directly or indirectly, in connection with the audits it performed for CLEU and the consents it provided for the Class Period offerings. That compensation gave Audit Alliance a motive to issue and to reaffirm unqualified opinions that

facilitated CLEU's offerings without performing the due diligence and audit procedures that PCAOB standards and its own representations required.

309. Audit Alliance was aware of the heightened risk that U.S.-listed, China-based micro-cap issuers of CLEU's profile were being used as vehicles for market manipulation. Audit Alliance's PCAOB inspection record reflected deficiencies in testing identified fraud risks, and, on information and belief and as alleged above, Audit Alliance audited other similar foreign issuers whose securities later experienced trading volatility and halts consistent with pump-and-dump and ramp-and-dump schemes. Having audited issuers of this profile, Audit Alliance was on notice of the heightened fraud risk that CLEU presented, and its issuance of unqualified opinions despite that risk supports a strong inference that it acted with knowledge of, or reckless disregard for, the fraudulent nature of CLEU's financial statements and Class Period offerings.

310. Audit Alliance issued its unqualified opinions against a public PCAOB inspection record that independently supports a strong inference of recklessness. As alleged above, the September 27, 2024 inspection report identified deficiencies in two of the three Audit Alliance audits the PCAOB reviewed, including a failure to perform procedures sufficient to test an identified fraud risk in revenue recognition and a failure to test the fair value of significant accounts and the assumptions underlying a goodwill-impairment analysis. The audit procedures CLEU's financial statements demanded, including the testing of the goodwill impairment and the going-concern and fraud risks apparent on the face of those statements, were the same categories of procedures the PCAOB found Audit Alliance was failing to perform. An auditor that signs a clean opinion on financial statements presenting the very risks its own regulatory record shows it does not adequately test acts with at least reckless disregard for whether its opinion has a sufficient

basis. Those deficiencies reflected a firm-level pattern in Audit Alliance's audit performance with respect to issuers of CLEU's profile.

**APPLICABILITY OF PRESUMPTION OF RELIANCE**
**(FRAUD-ON-THE-MARKET DOCTRINE)**

311. The market for CLEU's securities was open, well-developed, and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, CLEU's securities traded at artificially inflated prices during the Class Period. On January 29, 2025, the Company's share price closed at a Class Period high of $7.75 per share. Plaintiffs and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of CLEU's securities and market information relating to CLEU and have been damaged thereby.

312. During the Class Period, the artificial inflation of CLEU's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiffs and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about CLEU's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of CLEU and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

313. At all relevant times, the market for CLEU's securities was an efficient market for the following reasons, among others:

(a) CLEU's shares met the requirements for listing, and were listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b) As a regulated issuer, CLEU filed periodic public reports with the SEC and/or the NASDAQ; and/or

(c) CLEU regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services.

314. As a result of the foregoing, the market for CLEU's securities promptly digested current information regarding CLEU from all publicly available sources and reflected such information in CLEU's share price. Under these circumstances, all purchasers of CLEU's securities during the Class Period suffered similar injury through their purchase of CLEU's securities at artificially inflated prices and a presumption of reliance applies.

315. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects (information that Defendants were obligated to disclose), positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## NO SAFE HARBOR

316. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of CLEU who knew that the statement was false when made.

## CLASS ACTION ALLEGATIONS

317. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired CLEU securities between June 6, 2024 and January 31, 2025, inclusive, and who were damaged thereby (the "Class").

318. Excluded from the Class are: (a) Defendants; (b) members of the immediate family of each Defendant; (c) any subsidiary or affiliate of CLEU; (d) any entity in which any Defendant has or had a controlling interest; (e) the officers and directors of CLEU during the Class Period; (f) the legal representatives, heirs, successors, and assigns of any excluded person or entity; and

(g) any person or entity who purchased CLEU securities as part of the fraudulent scheme alleged herein.

319. The members of the Class are so numerous that joinder of all members is impracticable. Upon information and belief, the Class consists of thousands of geographically dispersed victims. Throughout the Class Period, CLEU's shares actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least hundreds or thousands of members in the proposed Class. Millions of CLEU shares were traded publicly during the Class Period on the NASDAQ. Record owners and other members of the Class may be identified from records maintained by CLEU or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

320. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of CLEU; and

(c) to what extent the members of the Class have sustained damages and the proper measure of damages.

321. Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

322. Plaintiffs are committed to prosecuting this action and have retained competent counsel experienced in litigation of this nature.

323. Plaintiffs' claims are typical of the claims of other Class members, and Plaintiffs have the same interests as other Class members. Accordingly, Plaintiffs are adequate representatives of the Class and will fairly and adequately protect the interests of the Class.

324. The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Defendant or adjudications with respect to individual members of the Class that would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

325. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## CAUSES OF ACTION

## COUNT I

### Violation of Section 10(b) of the Securities Exchange Act and SEC Rule 10b-5 Against All Defendants

326. Plaintiffs repeat and reallege the allegations set forth in the paragraphs above as if fully set forth herein.

327. Defendants violated Section 10(b) of the Securities Exchange Act and SEC Rule 10b-5 promulgated thereunder by (a) employing a device, scheme, or artifice to defraud; (b)

making false and misleading statements; and (c) engaging in acts, practices, and a course of business that operated as a fraud or deceit on Plaintiffs and the Class.

328. The *Cedric* Indictees and their co-conspirators perpetrated a fraudulent scheme by (a) using fraudulent advertisements to lure Plaintiffs and the Class into fake investment clubs; (b) making knowingly false and misleading statements about the Company and its prospects to entice Plaintiffs and the Class into purchasing CLEU shares; (c) conspiring with the CLEU Defendants to obtain secret Exchange Shares through the December 2024 Issuance and the Warrant Exchange Agreement; (d) entering and immediately canceling illegitimate purchase orders for CLEU shares to create the appearance of demand and further inflate the CLEU share price; and (e) selling CLEU shares at artificially inflated prices.

329. The CLEU Defendants participated in the alleged fraudulent scheme by (a) engaging in non-bona fide transactions, namely the December 2024 Issuance and the Warrant Exchange Agreement, to transfer shares to the *Cedric* Indictees and their co-conspirators; (b) making false and misleading statements regarding the terms and purpose of those transactions; (c) concealing the issuance of the Exchange Shares through their false and misleading statements in the December 2024 6-K that the shares would be issued at a future date and their failure to timely advise the SEC and NASDAQ that the Exchange Shares had been issued, including failing to comply with applicable NASDAQ regulations; and (d) selling CLEU shares at artificially inflated prices and failing to report those sales.

330. Defendants Transhare and Zhao participated in the alleged fraudulent scheme by (a) failing to timely disclose or advise the SEC or NASDAQ of the issuance of the Exchange Shares; (b) facilitating the opening of brokerage accounts to enable the *Cedric* Indictees and their co-conspirators to trade the Exchange Shares; and (c) making false and misleading statements to

Schwab and eToro that the Exchange Shares were validly issued and available to be traded, despite knowing the shares had not been disclosed to the market, the SEC, or NASDAQ. Transhare and Zhao also participated in the alleged fraudulent scheme by issuing and delivering the 240,000,000 Exchange Shares in electronic, free-trading form so that they could be deposited into brokerage accounts and sold into the market even though the issuance had been concealed from the market, the SEC, and NASDAQ, and by engaging in acts, practices, and a course of business that operated as a fraud and deceit upon Plaintiffs and the Class in violation of Rule 10b-5(a) and (c).

331. Defendants Ascent and Xiao participated in the alleged fraudulent scheme by drafting and issuing false and misleading press releases on behalf of the Company, concealing the issuance of the Exchange Shares, and falsely claiming that the Company had regained compliance with NASDAQ listing standards, thereby ensuring that the shares remained available for trading during the period the *Cedric* Indictees carried out their pump-and-dump scheme.

332. Defendants' participation in the alleged fraudulent scheme was intentional and knowing, and they made all allegedly false and misleading statements with actual knowledge of the true facts and the statements' falsity.

333. Defendants' fraudulent scheme, including their false and misleading statements and their manipulative trading practices, caused the price of CLEU shares to be artificially inflated during the Class Period.

334. Plaintiffs and the Class purchased CLEU shares while the price was artificially inflated and were damaged thereby.

335. Plaintiffs and the Class purchased CLEU shares in reliance on the integrity of the market, believing the share price reflected all material information regarding the Company and its shares, and without knowledge of Defendants' fraudulent scheme.

336. By virtue of the foregoing, Defendants violated Section 10(b) and SEC Rule 10b-5.

337. As a direct and proximate cause of Defendants' wrongful conduct, Plaintiffs and the Class suffered damages in connection with their respective purchases and sales of CLEU shares during the Class Period.

**COUNT II**

**Violation of Section 10(b) of the Exchange Act**
**and Rule 10b-5(a) and (c) Promulgated Thereunder (Scheme Liability)**
**Against the CLEU Defendants, Transhare, Zhao, Ascent, Xiao,**
**the *Cedric* Indictees, and Audit Alliance**

338. Plaintiffs repeat and reallege the allegations set forth in the paragraphs above as if fully set forth herein. This Count does not depend on, and is not limited to, any false or misleading statement, and is asserted based on the manipulative and deceptive acts, practices, and course of business alleged herein.

339. During the Class Period, the CLEU Defendants, Transhare, Zhao, Ascent, Xiao, the *Cedric* Indictees, and Audit Alliance (the "Scheme Defendants"), directly or indirectly, in connection with the purchase or sale of CLEU securities, by the use of the means or instrumentalities of interstate commerce, the mails and wires, or the facilities of a national securities exchange, knowingly or with reckless disregard: (a) employed devices, schemes, and artifices to defraud; and (b) engaged in acts, practices, and a course of business that operated or would operate as a fraud or deceit upon Plaintiffs and the Class.

340. The scheme was not carried out through false statements alone. It was executed through a coordinated course of manipulative and deceptive conduct designed to place large blocks of CLEU shares in the hands of the *Cedric* Indictees and their co-conspirators through non-bona fide transactions; conceal the issuance and free-trading status of those shares from the market, the

SEC, and NASDAQ; generate the false appearance of legitimate supply and demand for CLEU shares; and enable the coordinated dumping of those shares into an artificially inflated market at the expense of Plaintiffs and the Class.

341. The CLEU Defendants participated in and executed the scheme by conducting non-bona fide transactions, the December 2024 Issuance and the Warrant Exchange Agreement, that had no legitimate business purpose and were designed to transfer 240,000,000 Exchange Shares to the *Cedric* Indictees and their co-conspirators; by concealing the issuance and free-trading status of the Exchange Shares; and by failing to timely advise the SEC and NASDAQ that the Exchange Shares had been issued, including by failing to comply with applicable NASDAQ requirements, so that the shares would remain available for sale into the market during the execution of the scheme.

342. Zhao participated in and executed the scheme by conceiving of and orchestrating, in conjunction with Defendant Lam, the non-bona fide offerings that placed CLEU shares in the hands of the *Cedric* Indictees and their co-conspirators, and by facilitating manipulative trading in CLEU shares on their behalf, including by opening brokerage accounts, preparing account-opening documents, and providing trading instructions on their behalf.

343. The *Cedric* Indictees participated in and executed the scheme by receiving CLEU shares through non-bona fide offerings for little or no consideration; by entering and then canceling illegitimate purchase orders for CLEU shares to create the false appearance of demand and to further inflate the CLEU share price; and by selling their CLEU shares into the artificially inflated market beginning on or around January 22, 2025, generating more than $300 million in illicit proceeds.

344. Transhare participated in and executed the scheme by issuing and delivering the 240,000,000 Exchange Shares in electronic, free-trading form so that they could be deposited into brokerage accounts and sold into the public market; by facilitating the opening of brokerage accounts that enabled the *Cedric* Indictees and their co-conspirators to trade the Exchange Shares; and by vouching to Schwab and eToro that the Exchange Shares were validly issued and available to be traded, while knowing that the issuance had been concealed from the market, the SEC, and NASDAQ.

345. Ascent and Xiao participated in and executed the scheme by drafting and disseminating press releases on behalf of the Company that concealed the issuance of the Exchange Shares and falsely represented that the Company had regained compliance with NASDAQ listing standards, thereby ensuring that the Exchange Shares remained available for trading during the period in which the *Cedric* Indictees carried out the coordinated dumping of those shares.

346. Audit Alliance participated in and executed the scheme by issuing clean audit opinions on the financial statements incorporated into the Class Period securities offerings, and by consenting to the incorporation of those opinions, which created the appearance of legitimacy necessary to place and sell CLEU shares and to sustain trading in CLEU securities while the scheme was carried out, when Audit Alliance knew or recklessly disregarded that CLEU was not a legitimate operating enterprise and that the offerings were vehicles for the scheme alleged herein.

347. Each of the Scheme Defendants engaged in the conduct alleged in this Count knowingly or with reckless disregard for the truth, and for the purpose and with the effect of artificially inflating the price and trading volume of CLEU shares and concealing the true nature, mechanics, and purpose of the scheme from Plaintiffs and the Class.

348. As a direct and proximate result of the manipulative and deceptive conduct alleged in this Count, the price and trading volume of CLEU shares were artificially inflated during the Class Period, and the artificial inflation was removed when the scheme could no longer be sustained, causing the losses suffered by Plaintiffs and the Class.

349. Plaintiffs and the Class were ignorant of the scheme and the manipulative and deceptive acts and practices alleged herein. Plaintiffs and the Class purchased CLEU shares in reliance on the integrity of the market price of those shares. Had Plaintiffs and the Class known of the scheme, they would not have purchased CLEU shares, or would not have done so at the artificially inflated prices they paid.

350. By virtue of the foregoing, the Scheme Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder.

351. As a direct and proximate result of the Scheme Defendants' wrongful conduct, Plaintiffs and the Class suffered damages in connection with their respective purchases and sales of CLEU shares during the Class Period.

## COUNT III

### Violation of Section 20(a) of the Exchange Act Against the Director and Officer Defendants

352. Plaintiffs repeat and reallege the allegations set forth in the paragraphs above as if fully set forth herein.

353. The Director and Officer Defendants acted as controlling persons of CLEU as alleged herein. By virtue of their high-level positions, participation in and awareness of the Company's operations, and knowledge of and participation in preparing the contents of the Company's SEC filings and communications with the public, the Director and Officer Defendants had the power to influence and control, and did influence and control, directly or indirectly, the

decision-making of the Company, including the contents and dissemination of the statements alleged to be false and misleading. The Director and Officer Defendants had access to the Company's SEC filings and other public statements prior to or shortly after the statements were issued and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

354. As set forth above, CLEU violated Section 10(b) and Rule 10b-5 by virtue of its participation in the alleged fraudulent scheme and its false and misleading statements. By virtue of their positions as controlling persons, the Director and Officer Defendants are liable as control persons of CLEU pursuant to Section 20(a).

355. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the Class have suffered damages in connection with their respective purchases and sales of CLEU shares during the Class Period.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs demand judgment as follows:

A. Determining that this action is a proper class action and certifying Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure and Plaintiffs' counsel as Lead Counsel for the Class;

B. Finding that Defendants violated the federal securities laws as alleged herein;

C. Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

D. Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees, expert fees, and other out-of-pocket expenses incurred by Plaintiffs or their counsel; and

E. Awarding such other and further relief as the Court deems just and appropriate.

**JURY TRIAL DEMANDED**

Plaintiffs hereby demand a trial by jury.

DATED: July 22, 2026

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**

/s/ John T. Jasnoch
John T. Jasnoch (*pro hac vice*)
Mollie Chadwick (*pro hac vice*)
600 W. Broadway, Suite 3300
San Diego, CA 92101
Tel: (619) 233-4565
jjasnoch@scott-scott.com
mchadwick@scott-scott.com

**MORRIS KANDINOV LLP**

/s/Aaron T. Morris
Aaron T. Morris
Andrew W. Robertson
William H. Spruance III
305 Broadway, 7th Floor
New York, NY 10007
(212) 431-7473
aaron@moka.law
andrew@moka.law
william@moka.law

**MORRIS KANDINOV LLP**
Leo Kandinov
550 West B Street, 4th Floor
San Diego, CA 92101
(619) 780-3993
leo@moka.law

*Lead Counsel for Plaintiffs*

**POMERANTZ LLP**
Jeremy A. Lieberman
Samantha Daniels
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
jalieberman@pomlaw.com
sdaniels@pomlaw.com

**HIGHFUL LAW PLLC**
Tyler Highful
5900 Balcones Drive, Suite 100
Austin, TX 78731
(512) 666-7426
tyler@highful.com

*Additional Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on July 22, 2026, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the email addresses denoted on the Electronic Mail Notice List.

/s/ John T. Jasnoch
John T. Jasnoch (admitted *pro hac vice*)